IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CR No. 10-2734 JCH |
| vs. | ) | |
| | ) | |
| JOHN CHARLES McCLUSKEY, | ) | |
| | ) | |
| Defendant. | ) | |

## **RESPONSE TO MOTION TO SUPPRESS STATEMENTS (Dkt. 293)**

In the above-captioned motion, Defendant requests that this Court suppress all statements he made during interviews with FBI agents on August 20 and 24, 2010.  He contends that the agents violated his *Miranda* rights to counsel and silence, his Fifth Amendment due process right, and his Sixth Amendment right to counsel.  The remedy that Defendant seeks is broad:  he demands not only that the Court exclude his statements from the United States' case-in-chief, but also that the Court forbid use of his statements for *any* reason, including as impeachment.  For the following reasons, the Court (1) should deny part of the *Miranda* right to counsel claim as moot because the United States does not intend to offer certain of Defendant's statements in its case-in-chief; (2) deny the remainder of the *Miranda* right to counsel claim because Defendant reinitiated his dialogue with the interviewing agent; (3) deny the *Miranda* right to silence claim on the merits; (4) conclude that all of Defendant's statements were voluntary rather than the product of unlawful coercion; and (5) deny the Sixth Amendment claim on the merits.

## **I.  Pertinent Factual Background**

At an evidentiary hearing, the United States would prove that Defendant McCluskey and co-defendant Tracy Province escaped from a prison near Kingman, Arizona, on the evening of July 30,

2010.[1]  Their escape was aided and abetted by co-defendant Casslyn Welch.  Three days later,

Defendant, Province, and Welch carjacked and robbed Gary and Linda Haas, a married couple

heading to Colorado for a vacation.  During the course of the carjacking and robbery, Defendant

shot and killed the Haases.  The three fugitives then took the Haases' camper trailer to a remote

location, incinerated it with the victims inside, and drove away in the Haases' pickup truck.  After

dropping Province off in Wyoming, Defendant and Welch eluded authorities until they were

arrested on the evening of August 19, 2010, at a campground in northeastern Arizona.

### A.  Statements to Agent Rominger

After their arrest, Defendant and Welch were transported to the Apache County Detention

Facility in St. Johns, Arizona.  Defendant was escorted to an office in the jail complex, where he

met FBI Special Agent James Rominger.  The encounter between Defendant and Agent Rominger

was captured by a digital audio/video-recorder.[2]  Defendant began the interaction by stating:  "I

don't want to talk to nobody without a lawyer."  Exh. 2 at 2.  Agent Rominger invited Defendant to

take a seat in the office, introduced himself, and explained generally his purpose for meeting with

Defendant that night.  The agent mentioned that Defendant potentially could help Welch by

explaining what her role was in the crimes that they had committed in New Mexico.  At

approximately 4:50 into the recording, Agent Rominger advised Defendant of his *Miranda*

warnings by reading from a form.  *Id.* at 7-8.  The video shows that Defendant appeared to read

along as the agent read the form.  Defendant acknowledged that he understood his rights.  *Id.* at 8.

---

[1]A third inmate, Daniel Renwick, also escaped.  Soon after the escape, however, he split from the other three.  Neither his flight nor the circumstances of his capture are relevant to this motion.

[2]Government Exhibit 1 is a compact disk containing the two discussions that Defendant and Agent Rominger had on August 20th.  Government Exhibit 2 is a transcript of the first discussion. Copies of these exhibits will be delivered to chambers for the Court's review prior to the hearing.

A few moments later, after some more dialogue, Defendant stated "I don't want to talk to you without my lawyer[,]" but then explained that "[i]f [Welch] needs my help she knows how to get it" and "I'll do anything for her." *Id.* at 9. The following exchange then took place:

Defendant:     So if you want to go talk to her and say, hey, your cousin says he'll do anything for you. If you tell him to do it, I'll do that.

Agent:     And then you'll come back in and talk to me?

Defendant:     *Yeah, but she has got to tell me to talk to you.*
. . .

Agent:     What -- would you trust me enough if she says I want you to talk to him?

Defendant:     I would trust you enough to where if you said, hey, officer, get that girl. She's two doors down from him. Put her on his door and say, hey, Charlie, *go talk to that motherfucker. That's all it's going to take for me.*

Agent:     All right.
. . .

Defendant:     *So if you want anything out of me, you tell her to talk to you.*

Agent:     Okay. We can do that.
. . .

Defendant:     *I will come in here and tell you everything about New Mexico word for word how it went down.*

Agent:     All right.
. . .

Defendant:     *If she tells me -- if she comes to my window and says do it.*

*Id.* at 9-11 (emphasis added). This encounter lasted approximately eight minutes.

In an effort to comply with the pre-condition that Defendant imposed, Agent Rominger arranged for Welch to be brought to the office. That encounter, which lasted approximately ten and

a half minutes, was recorded as well.[3]  Agent Rominger summarized what Defendant had said about

requiring Welch's permission before he would agree to an interview.  *See* Exh. 4 at 2-3.  Early on,

the following exchange occurred:

> Agent:          And -- and John [McCluskey] said he will tell everything, do everything
> for your benefit.  He said you had nothing to do with it.  But I said I need specifics.  I
> need detail.  I need to know what -- he says I will tell you everything, but he said I
> I would like Casslyn to give me the okay to do that and I'm going to do it.  Because he
> said that's what he wants to do.  So that's one thing that I'd like to do with you if you're
> willing.  And we'll just have you tell John just please do that.  You know, come in and
> he'll explain everything?
>
> Welch:          Okay.  Yeah, I want to talk to him.
>
> Agent:          Huh?
>
> Welch:          I'll talk to him.

*Id.* at 3.  Later, Agent Rominger asked Welch "[a]nd so what do you think?  I mean, are you willing

to -- I mean, do you want to --" to which Welch responded "I'll talk to him."  *Id.* at 5.  Still later,

Agent Rominger advised Welch:

> He [McCluskey] said I want it to be known, you know, of Casslyn's non-involvement
> in the New Mexico.  I said, okay, but let's talk.  And he said, well, I want Casslyn to
> give me the okay.  If she just comes and says, John, talk to the man.  That's his exact
> words, John, talk to the man, he said that's all I need and I'll tell you everything and I'll
> prove to you that she had nothing to do with the New Mexico thing.

*Id.* at 9.  Welch explained again that she wanted to talk to Defendant and emphasized that "[h]e'll do

anything for me."  *Id.* at 10.

Jail personnel then arranged for Welch to be escorted to the cell that held Defendant.  The

two engaged in a discussion that lasted approximately one minute during which Welch said words

---

[3]Government Exhibit 3 is a compact disk containing the initial discussion that Welch and
Agent Rominger had on August 20th.  Government Exhibit 4 is a transcript of that discussion.
Copies of these exhibits will be delivered to chambers for the Court's review prior to the hearing.

4

to the effect of "go ahead and tell what we did."  Defendant asked repeatedly whether Welch was sure and she replied with words to the effect of "yeah, go ahead."

With his pre-condition satisfied and having agreed with Welch that he should talk, Defendant then returned under escort to the office where Agent Rominger was located. Approximately 24 minutes had elapsed between Defendant's encounters with the agent, during which time Defendant was housed by himself in a cell.  The discussion that ensued also was recorded.[4]  After explaining that he had been able to get Welch a blanket and off "suicide watch," Agent Rominger sought to confirm that Defendant's self-imposed pre-condition had been satisfied and that he was voluntarily returning to the office for the purpose of providing a statement:

> Agent:  So I'm helping all that I can and -- *and I did what you asked*.  So what do you think?  Are you willing to talk to me?
>
> Defendant:  Yeah, *she told me to talk to you*.
>
> Agent:  Okay.
>
> Defendant:  *I'm not willing to talk to you, but she told me to talk to you so I'm willing to talk to you.*

Exh. 5 at 2-3 (emphasis added).

Agent Rominger then reminded Defendant of the earlier rights advisement and asked Defendant whether he would sign the form acknowledging the advice of rights and further acknowledging that he was willing to talk.  *Id.* at 3.  The FD-395 form, entitled "ADVICE OF RIGHTS," is attached hereto as Government Exhibit 6.  Just above Defendant's signature appears a section entitled "WAIVER OF RIGHTS" that reads:  "I have read this statement of my rights and I

---

[4]The second discussion between Defendant and Agent Rominger is also on Government Exhibit 1.  The transcript for the second discussion will be marked as Government Exhibit 5 and delivered to chambers for the Court's review prior to the evidentiary hearing.

understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Over the next 49 minutes, Defendant explained *inter alia* how he alone killed the Haases, how neither Province nor Welch knew in advance of his intention to kill them, and how both of them expressed their *post hoc* disagreement with his decision.  Defendant emphasized that the decision to kill them was his alone.  *See* Exh. 5 at 13, 20-21, 29-30, 49.

Throughout the interview, Defendant and Agent Rominger were alone in the office and both spoke in conversational tones.  Although wearing restraints due to the escape and security risk he presented, Defendant appeared at all times to be physically comfortable and certainly never complained of any discomfort.  At times, he smiled and even laughed.  At no time was Defendant ever threatened, physically or verbally abused, lied to, denied sustenance or bathroom breaks, or harassed in any way.  Defendant and the agent had no trouble understanding each other and Defendant's answers at all times were responsive to the agent's questions.  The interview ended amicably and Defendant was escorted back to his cell.

### B.  Statements to Agents McCaskill and Bucksath

Defendant stayed less than 24 hours at the Apache County Detention Facility.  After he made an initial appearance on the afternoon of August 20th before a Superior Court judge (who advised him of his rights to silence and counsel), Defendant was transported to the Mohave County Jail in Kingman.  On August 23rd, Defendant appeared before a Mohave County Superior Court judge for the purpose of being arraigned on the state charges that had been filed in the wake of the escape.  He also was appointed counsel for the state charges.  Sometime that night, however, Defendant obtained a razor, ostensibly for the purpose of shaving.  Defendant instead extracted the razor blade, inflicted superficial cuts to his neck and left forearm, and secreted the razor blade in his

anus.[5]  Defendant was transported to the Kingman Regional Medical Center for treatment of his wounds and extraction of the razor blade.

While Defendant was awaiting treatment, FBI Special Agent Marcus McCaskill and New Mexico State Police Agent Patrick Bucksath approached him and introduced themselves.  Their interaction with Defendant was recorded by a digital audio-recorder.[6]  After the introductions, the following exchange occurred:

> Agent McCaskill:     So listen I, we want to talk to you for just a second.  *You don't have to say anything to us right now* but just listen to me for a second if you don't mind.  We are down here because we wanted to talk to you and sort of follow up a little bit on what Jay [Rominger] talked to you about. . .
>
> [O]bviously Jay tape recorded your interview and he gave us a copy of that and we appreciate how. . . how much of a stand-up guy you were with him, so I appreciate that.  *Don't. . .don't say anything*.  Just let me finish telling you what I have to tell you okay.  Because I don't want you to. . .I don't want you to feel like you're being treated unfairly.
>
> Defendant:     That's not what I was gonna say, okay.
>
> McCaskill:     Okay.
>
> Defendant:     The stand-up thing is, I ain't looking for none of that shit, it's  bullshit anyway.  What I did was wrong.
>
> McCaskill:     Okay.  Well listen what we want to do is we want to talk about that. We want to talk --

---

[5]Although Defendant insists this was a suicide attempt, *see* Dkt. 293 at 6, 16, 19, 22, 23, the United States believes this was more likely a thinly-disguised *escape* attempt.  Defendant did not cut himself very deeply and took great pains to preserve the razor blade for further use, presumably as a weapon.  After all, he would have no reason to hide the razor in his digestive tract if all he wanted to use it for was to *shave,* because the jail issued razors for that purpose.  Regardless, the Court need not resolve the suicide-or-escape dispute because it has no bearing on the legal issues in the motion.

[6]Government Exhibit 7 is a compact disk containing recordings of both of the discussions that Defendant had with Agents McCaskill and Bucksath on August 24, 2010.  Government Exhibit 8 is a transcript of those recordings.  Copies of both exhibits will be delivered to chambers.

Defendant:     I'm in no situation to be talking to nobody right now.  I don't know if you understand.

McCaskill:     I understand what you did.  I do.  And if you feel like talking, then now's a good time --

Defendant:     My lawyer would shit if I did.

McCaskill:     *Well listen, we're going to tell you what your rights are again.  If you want to talk to us, you talk to us.*

Defendant:     I would...I would...I would...*I would probably be willing to talk to somebody, but it's going to have to be somebody that's willing...that's willing to help my mom.*  The woman didn't have nothing to do with this shit.

Exh. 8 at 2-3 (emphasis added).  A few moments later, Agent McCaskill emphasized:

Okay, well listen, *you don't have to tell us anything, okay.  You don't ever have to tell us anything. [] The stuff you're telling me now you don't have to tell me, okay.* but what I'm trying to get across to you is that sometimes these situations work out best when you put the first foot forward.

*Id.* at 7 (emphasis added).  Still later, the following exchange occurred:

McCaskill:     I want to be able to get a better idea of what your whole story is and if we do that, that's maybe the first, that's maybe the best foot forward for you, for Cassie, for your mom, for everybody is getting the full details of it.  *But it's up to you.*

Defendant:     I, I probably ain't gonna have no problem doing that man, but like I said, today's not the day for it.  I don't know what to tell you guys.  I'm sure you can look at me and see my mind is not really here right now.

McCaskill:     John, I understand.  I understand.  *How about if we come back and visit you when they get you out of this hospital and get you back to the jail[?]*

Defendant:     *How about if you. . .go figure out what you can do and figure out what you need me to do.  Figure out what you need me to do.*

McCaskill:     I got you.

Defendant:     *And maybe. . .maybe the next time we see each other we'll both be able to accommodate each other.*  I'm not guaranteeing you that.

McCaskill:     I'm not gonna guarantee you anything either.

> Defendant:    I know you're not.

*Id.* at 8-9 (emphasis added).  Agent McCaskill then explained that he would try to find out

information about Defendant's mother's legal situation:

> McCaskill:    Well here's the deal.  I'm going to tell you what our plans are for today, okay.  We're going to leave and let you get stitched up, okay.  And you're going to get back to the jail.  And we're going to come back and visit you today.  I'm going to make some phone calls.  I'm going to see if I can figure out who arrested your mother.  I'm going to see if I can figure out what the charges are against her and I can see. . .I'm going to see if I can figure out if she's got an attorney.  I'm going to see if I can figure out what the next step in the process is for her.  I will do those things for you.

> Defendant:    Alright.

> McCaskill:    That is going to be as much as I can do for you.  But if I come back to the jail and have done those things and give you that information, I'm hoping that that I'll... that will show you the good faith to be able to trust us a little bit and talk to us directly.

> Defendant:    *And what are you. . .and what are you wanting to discuss? . . .just . . .just New Mexico?*

> McCaskill:    New Mexico.

*Id.* at 11-12 (emphasis added).  When Defendant asked whether the lawyer appointed to represent

him on the state charges could be present, Agent McCaskill responded:  "If you want. . .if you want

him there yeah, absolutely."  *Id.* at 12.  The encounter essentially ended with this exchange:

> Defendant:    I can't think right now dude.

> McCaskill:    Well then --

> Defendant:    They just gave me a shot of shit --

> McCaskill:    Fine, that's fine.  That's fine.  We're going to let you get taken care of here and we'll visit you later today in jail, okay.

> Defendant:    *I hope you can tell me something about my mom getting out.*

> McCaskill:    *I'm going to see what I can find out, okay.*

> Defendant:    Thank you.

McCaskill:     *Is that fair?*

Defendant:     *That's about as fair as anybody can be.*

*Id.* at 13 (emphasis added).

This encounter took place around 9:00 a.m., lasted less than eleven minutes, and featured no questions at all about the crimes that Defendant was suspected to have committed.  At all times, Defendant was sitting up in a hospital bed.  He did not have difficulty speaking or moving his head, despite the superficial injuries to his neck.  He did not appear to be in substantial pain, and he did not complain of pain.

Around 4:00 p.m. the same afternoon, after Defendant had been transported back to the jail, he met with Agents McCaskill and Bucksath in an office.  Defendant was in a wheelchair and restrained at his hands and feet.  He was provided with water to drink.  He did not appear to be in substantial discomfort.  He did not seem intoxicated or mentally impaired in any way.  He had no trouble communicating with the agents.  He provided responsive answers and displayed good recall and reasonably sophisticated thinking.  He appeared to have the full use of his mental faculties.  At no time was Defendant ever threatened, physically or verbally abused, lied to, denied sustenance or bathroom breaks, or harassed in any way.

This encounter, which lasted approximately 59 minutes, began with Agent McCaskill advising Defendant of his *Miranda* rights by using an FD-395 form.  *See* Exh. 8 at 15-16. Defendant acknowledged his rights, agreed to waive them and answer questions, and signed the form, a copy of which is attached hereto as Government Exhibit 9.  At about the 4:00 mark in this recording, Agent McCaskill explained what he was able to find out concerning the case against Defendant's mother.  *See* Exh. 8 at 19-22.  At about the 9:00 mark, Defendant began describing how

he, Province, and Welch identified and selected the Haases to carjack. *See id.* at 24, *et seq.* He emphasized that, after he had ordered the Haases into the trailer, Defendant made Province and Welch get out because "[n]either one of them supported what I was doing.  But they didn't know what I was doing either.  They don't. . .they were all under the impression we were going to be able to tie these people up." *Id.* at 36.  Defendant volunteered, in reference to Gary Haas, that "I shot him in the temple." *Id.* at 38.  When asked whether Mr. Haas had said anything before being shot, Defendant replied:  "Not a word.  And, uh, to my knowledge, it's no consolation, but to my knowledge, he dropped immediately." *Id.*  Defendant next confessed to shooting Linda Haas in the chest and head, though she too had not said a word. *Id.* at 38-39.  Defendant went on, using visual aids as necessary, to describe how, where, and why the three fugitives abandoned and incinerated the trailer with the bodies inside. *Id.* at 44-54.  Defendant emphasized that neither Province nor Welch was "happy" with the decision he had made to kill the Haases. *Id.* at 55; *see also id.* at 56 ("[t]hey were both disappointed in what I did."), 73 ("[w]ell they both were against what I did.").

During this interview, Defendant expressed that he did not want to talk about Province, a request the agents honored. *Id.* at 55.   In addition, Defendant refused to discuss whether he and Welch had robbed a beauty salon in Arkansas, reminding the agents that the interview was to be concerned with what had happened in New Mexico. *Id.* at 68.  And Defendant recounted for the agents how Welch had encouraged him to talk to Agent Rominger on the night of their arrest. *See id.* at 70-71.  Near the end of the interview, Defendant emphasized his hope that his admissions during the interview could benefit Welch:  "I hope it works out for her.  That's what I hope." *Id.* at 72.  The interview ended with Defendant talking emotionally about his mother and desiring the recorder be turned off:  "I...I'd really prefer that nobody hears this shit." *Id.* at 80.

11

**II.  Fifth Amendment Right to Counsel**

Defendant first alleges that all of his statements should be suppressed because his Fifth

Amendment right to counsel under *Miranda* was violated.  In evaluating this claim, the Court

should examine the circumstances of each of the four statements (two to Rominger, two to

McCaskill) separately and independently.

**A.  The Law**

The Fifth Amendment accords a suspect in custody the right *inter alia* to have an attorney

present before being interrogated.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  So long as the

suspect invokes this right in a clear, unequivocal, and unambiguous manner, interrogation must

cease.  *See Davis v. United States*, 512 U.S. 452 (1994).  Interrogation "refers not only to express

questioning, but also to any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  A

defendant in custody who faces imminent interrogation may invoke his *Miranda* rights before the

interrogation actually begins.  *See, e.g., United States v. Bautista*, 145 F.3d 1140, 1147 n.3 (10th

Cir. 1998); *United States v. Kelsey*, 951 F.2d 1196 (10th Cir. 1991).  Statements obtained in

violation of a suspect's Fifth Amendment right to counsel ordinarily are inadmissible during the

government's case-in-chief.  *See Edwards v. Arizona*, 451 U.S. 477 (1981).

When a suspect has invoked his *Miranda* right to counsel, police may not reinitiate

interrogation until the suspect has been provided an attorney and the attorney is present for the

interrogation.  *See Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).  At any time, however, the

*suspect* may reinitiate questioning.  *See Edwards*, 451 U.S. at 485 (further questioning barred

"unless the accused himself initiates further communication, exchanges, or conversations with the

police"); *Kelsey*, 951 F.2d at 1198 ("any statements a suspect makes after requesting an attorney and before being provided one are not admissible unless it is clear that the suspect, and not the police, initiated the dialogue with authorities") (citing *Edwards*, 451 U.S. at 485-87); *see also United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006) ("Simply stated, a defendant -- even if he has asserted the right to counsel -- may choose to reinitiate contact with the police *so long as the government does not coerce him into doing so*.") (emphasis added).

  If a suspect reinitiates communication with the police after invoking his right to counsel, the government still bears the burden of proving that any further interrogation was preceded by a valid *Miranda* rights advisement and waiver.  *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (emphasizing that the initiation of conversation and the waiver of Fifth Amendment rights are separate inquiries).  "If a defendant talks to officers after invoking his right to counsel, the government bears the burden of proving by a preponderance of the evidence the waiver was voluntary." *United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir. 1997) (citing *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997)).  "A waiver is voluntary if the totality of the circumstances demonstrates (1) the waiver was a product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving it." *Roman-Zarate*, 115 F.3d at 782 (citations omitted).  In examining voluntariness, the Court should "examine several factors including the characteristics of the suspect, such as his age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force." *United States v. Brown*, 287 F.3d 965, 973 (10th Cir. 2002) (quotation and citation omitted).

  When a suspect engages in activity that suggests a desire to reinitiate communication, agents

have the right to inquire whether s/he is in fact reinitiating communication.  *See United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001) (citing *Bradshaw*, 462 U.S. at 1045-46).  In *Michaud*, two inmates contacted a corrections officer in a jail.  One of them (Michaud) was a suspect in a murder and earlier had invoked her *Miranda* right to counsel when interrogated about the crime.  Michaud remained silent while the other inmate told the officer that Michaud wanted to talk to someone about the murder.  When an FBI agent and a detective showed up an hour later to question Michaud, they began by confirming that she did indeed desire to talk with them.  The Ninth Circuit held that Michaud reinitiated communication even though the detectives technically asked the first question in the renewed interrogation.  *Id.* at 735-36.

A suspect may reinitiate communication with the police after the intervention of non-police third parties.  In *United States v. Alexander*, 447 F.3d 1290 (10th Cir. 2006), two inmates were arrested for assaulting another inmate in a federal prison.  When FBI agents attempted to interview him, Alexander invoked his right to remain silent and was sent back to a cell.[7]  His co-defendant requested permission to be placed in a cell next to Alexander for the express purpose of convincing him to change his mind and make a statement.  Prison officials, in conjunction with the FBI agents, permitted this to happen.  After discussing matters with his co-defendant, Alexander agreed to be interviewed, waived his *Miranda* rights, and confessed.  The Tenth Circuit emphasized that the co-defendant was motivated by his own self-interest to convince Alexander to make a statement.  *Id.* at 1297.  That the government was the "incidental beneficiary" of the co-defendant's actions did not vitiate Alexander's reinitiation, even though the authorities had facilitated their conversation.  *Id.*

---

[7]Although *Alexander* technically was a right to silence case, the Tenth Circuit did not limit its decision to the right to silence.  Instead, the court reasoned that "[s]imply stated, a defendant -- even if he has asserted the *right to counsel* -- may choose to reinitiate contact with the police so long as the government does not coerce him into doing so."  447 F.3d at 1294 (emphasis added).

An Eleventh Circuit decision cited with favor in *Alexander* is itself worthy of mention.  In *United States v. Gaddy*, 894 F.2d 1307, 1311 (11th Cir. 1990), a suspect invoked his right to counsel to cut off interrogation.  Detectives then approached his aunt, who also worked at the police department, and told her that it would be in Gaddy's best interests for him to talk to them.  The aunt communicated this to Gaddy and he thereafter agreed to talk.  The aunt advised the detectives of Gaddy's change of heart and they approached him.  Gaddy waived his *Miranda* rights and made a statement.  The Eleventh Circuit held under these facts that Gaddy had reinitiated communication with the detectives, inasmuch as they had not directed his aunt to talk to him but had instead only suggested that doing so might be in his best interests.  *Id.*

**B.  Analysis**

**1.  Statements to Agent Rominger**

The United States does not dispute that Defendant's announcement that "I don't want to talk to nobody without a lawyer" was an unambiguous and unequivocal invocation of his *Miranda* right to counsel.[8]  Consequently, the United States advises the Court that it will not introduce in its case-in-chief any statements made by Defendant during his *initial* encounter with Agent Rominger.

The United States contends, however, that all of the statements that Defendant made during his *second* encounter with Agent Rominger are admissible in its case-in-chief because they occurred after he reinitiated communication with the agent and after he properly waived his *Miranda* rights.  As the United States will prove at the hearing, it was Defendant who imposed as a pre-condition to his discussing the facts of the case that he first receive permission from Welch.  It was Defendant

---

[8]Another issue the Court need not decide is whether Defendant was "in custody" for *Miranda* purposes.  Even under last month's decision in *Howes v. Fields*, __ U.S. __, __ S.Ct. __ (2012), in which the Supreme Court stressed that an inmate is not always "in custody" for *Miranda* purposes, the United States concedes that Defendant was "in custody" for each of the four statements at issue.

who established the ground rules for what he first needed to hear -- and who he needed to hear it from -- before he would answer the agent's questions. It was Defendant who told Agent Rominger what the agent should tell Welch and jail personnel in order to satisfy Defendant's pre-condition. It was Defendant who quite clearly was motivated to exculpate Welch in the murders in New Mexico. That motivation was inside him by virtue of love and kinship, not planted there by the agent.

Agent Rominger then complied with Defendant's instructions. He briefed Welch on what Defendant had said and what Defendant had demanded to hear before he would talk. Welch agreed to talk to Defendant -- for her own self-interested reasons -- to attempt to convince him to explain to the agent what had happened in New Mexico. As demanded by Defendant, Welch then was brought to Defendant's cell-door, whereupon she communicated to him what he had insisted he needed to hear before he would talk. It is crystal clear, therefore, that Defendant and Welch *agreed* that Defendant would talk to the agent and explain what had gone on in New Mexico. All that remained to breathe life into Defendant's agreement was for him to return to the interview room. Once there, as in *Michaud*, Agent Rominger sought to confirm that Defendant now wished to answer questions about the crimes. It is worth repeating that Defendant adverted to Welch having caused him to change his mind: "Yeah, *she* told me to talk to you. . . I'm not willing to talk to you, but *she* told me to talk to you so I'm willing to talk to you." Exh. 5 at 2-3 (emphasis added). By Defendant's own admission, therefore, it was the intercession of *Welch*, not any government official, that caused him to reinitiate communication. Furthermore, it was Defendant himself who suggested that Welch's permission was the pre-condition necessary for him to reinitiate the discussion.

The Tenth Circuit's case in *Alexander* is applicable to our facts. As in *Alexander*, where agents facilitated a custodial conversation between two suspects even though one of them had

unequivocally invoked his right to silence, Agent Rominger and jail personnel arranged for Welch to talk with Defendant.  Just as with the co-defendant in *Alexander*, Welch was motivated purely by self-interest (limiting her criminal exposure) and the government was the incidental beneficiary of her conversation with Defendant.  And Defendant, just like Alexander, was motivated to reinitiate questioning to help someone other than himself and did so following a renewed *Miranda* advisement and waiver.  Such a scenario complies with *Miranda* and *Edwards*.  *See Alexander*, 447 F.3d at 1297.  *See also United States v. Gaddy*, 894 F.2d 1307, 1311 (11th Cir. 1990).

Because Defendant "himself initiate[d] further communication, exchanges, or conversations" with Agent Rominger, *see Edwards*, 451 U.S. at 485, it was appropriate for the agent to interrogate Defendant after re-advising him of his *Miranda* rights and obtaining a valid waiver.  There is no question that the written waiver that Defendant executed was both knowing and voluntary.  After all, at the time of these interviews, Defendant was a seasoned veteran of the criminal justice system with multiple felony convictions and even more arrests in his background.  He was 45 years old, literate, reasonably articulate, a reliable historian, and gifted with at least average intelligence.  According to Arizona state records, he had earned a General Equivalency Diploma.  The interview lasted less than an hour, involved only a single interviewer who spoke solely in conversational tones, and featured nothing in the way of threats, violence, or any other form of coercion or deception.[9]  Defendant's written *Miranda* waiver was knowing and voluntary.

## 2.  Statements to Agents McCaskill and Bucksath

The *Miranda* right to counsel analysis for Defendant's statements on August 24, 2010, is substantially easier.  The analysis hinges solely on whether Defendant reinitiated the discussion

---

[9]Defendant accuses Agent Rominger of "badgering" him.  This allegation is baseless.  The Court can view the interview for itself and deduce that nothing close to "badgering" took place.

with Agent Rominger four days earlier.  If the Court finds that Defendant reinitiated the discussion with Agent Rominger, then there is no *Edwards* bar to admitting in the government's case-in-chief his statements to Agents McCaskill and Bucksath four days later.  After all, at no time after his reinitiation did Defendant re-invoke his right to counsel.

If the Court finds, however, that Defendant did *not* reinitiate the discussion with Agent Rominger, then Defendant's confession to Agents McCaskill and Bucksath would be excluded from the government's case-in-chief under *Edwards.*  This would be true no matter how voluntary the confession was that Defendant made nor how valid the *Miranda* waiver was that he executed.  His confession still would be excluded simply because Defendant had not experienced a break in *Miranda* custody of at least fourteen days before Agents McCaskill and Bucksath endeavored to reinitiate questioning of him.  *See Maryland v. Shatzer*, __ U.S. __, 130 S.Ct. 1213, 1223 (2010) (holding that police may reinitiate interrogation with suspect who previously has invoked *Miranda* right to counsel, provided that there has been a break in *Miranda* custody of at least 14 days).

Accordingly, the Court should conclude that Defendant's request to exclude the statements he made during his initial encounter with Agent Rominger is moot in light of the United States' decision not to offer the statements in its case-in-chief.  The Court should deny the remainder of his *Miranda* right to counsel claim for the reasons set forth above.

## II.  Fifth Amendment Right to Silence

Defendant makes a fleeting and cursory argument that his statements to Agents McCaskill and Bucksath should be suppressed because he invoked his *Miranda* right to *silence*.  *See* Dkt. 293 at 17-18.  The Court should make short work of this claim, for it is beyond dispute that Defendant never unambiguously and unequivocally invoked his right to silence.

### A.  The Law

"In order to determine if a suspect invoked the right to remain silent, [the court] examines the entire context of the relevant statement for a clear and unambiguous assertion of the right to remain silent."  *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004) (holding that suspect who answered "No" to question of whether he wanted to talk about his suspected involvement in robberies had invoked his right to silence).  In *Rambo*, the Tenth Circuit cited to *United States v. Johnson*, in which the Eighth Circuit reasoned that "[t]o adequately invoke the [right to silence] and effectively cut off questioning, a suspect must indicate a clear, consistent expression of a desire to remain silent."  56 F.3d 947, 955 (8th Cir. 1995) (quotation and citation omitted).  It is necessary to "consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent."  *Id.* (citation omitted).

In *Berghuis v. Thompkins*, 560 U.S. __, 130 S.Ct. 2250 (2010), the Supreme Court emphasized that the invocation of the right to silence -- just like the invocation of the right to counsel -- must be unambiguous and unequivocal.  In *Berghuis*, the suspect had been advised of his right to silence and *had remained silent* for 2 1/2 hours, but was deemed not to have invoked his right to silence; rather, he was deemed to have implicitly waived the right when he began to answer questions after that length of time.[10]  *Id.* at 2261-63.  Whether a suspect's statement is  unambiguous and unequivocal is to be determined objectively from the perspective of a reasonable police officer under the circumstances.  *See Davis v. United States*, 512 U.S. 452, 458-59 (1994); *United States v. Nelson*, 450 F.3d 1201, 1211-12 (10th Cir. 2006) (asking whether a suspect's statement was

---

[10]*Berghuis* reaffirmed the well-established rule that the government bears the burden of proving by a preponderance of the evidence that a suspect knowingly and voluntarily waived his *Miranda* right to silence.  130 S.Ct. at 2261 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

"sufficiently clear that a reasonable police officer in the circumstances would understand it to be an invocation of a *Miranda* right").  Although "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself[,]" an accused's *pre*-request responses can be considered in evaluating whether the words used by the suspect amounted to an unambiguous and unequivocal invocation.  *Smith v. Illinois*, 469 U.S. 91, 100 (1984) (emphasis omitted).  "If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."  *Berghuis*, 130 S.Ct. at 2259-60 (internal quotation marks, citation omitted).

### B.  Analysis

Defendant points to two statements he made during his hospital meeting with Agents McCaskill and Bucksath as evidence that he invoked his right to silence.  In doing so, however, he gives those statements much more legal significance than they deserve.  Defendant points first to his statement that "I'm in no situation to be talking to nobody right now.  I don't know if you understand."  Exh. 8 at 3.  Viewed in context by a reasonable police officer under the circumstances, this statement would not be considered an unambiguous and unequivocal invocation of the right to silence.  Rather, it is much more reasonably viewed as a comment on the Defendant's physical condition and the self-inflicted circumstances that had occasioned his unscheduled trip to the hospital.  And that is certainly how Agent McCaskill viewed the statement, inasmuch as he replied:  "I understand what you did.  I do.  And if you feel like talking, then now's a good time[.]"  *Id.*

Apart from the immediate circumstances in which Defendant made this statement, the overall context in which he made it also included the fact that he had been advised of his rights in

the last four days not just by Agent Rominger, but *also* by two different Arizona state judges.[11]

Furthermore, Agents McCaskill and Bucksath knew that Defendant had made an extensive post-*Miranda* confession a few nights earlier.  Thus, a reasonable police officer in the agents' position -- knowing that the suspect whom he was attempting to interview was a veteran of the criminal justice system, had already confessed, had recently been advised of his rights on multiple occasions, and had conferred with an attorney -- would not have viewed "I'm in no situation to be talking to nobody right now[]" as an unambiguous and unequivocal invocation of the right to silence.

Defendant also contends that another statement he made substantially later in this encounter was an invocation of his right to silence.  *See* Dkt. 293 at 18.  In response to Agent McCaskill explaining the purpose of the intended interview and the opportunity that it presented for Defendant to benefit his mother and Welch, Defendant stated:  "I, I probably ain't gonna have no problem doing that man, but like I said, today's not the day for it.  I don't know what to tell you guys.  I'm sure you can look at me and see my mind is not really here right now."  Exh. 8 at 8.  Agent McCaskill construed that statement to be another reference to the circumstances attendant to Defendant's hospital visit and his physical condition, rather than an invocation of the right to refuse to answer questions:  "John, I understand.  I understand.  How about if we come back and visit you when they get you out of this hospital and get you back to the jail[?]"  *Id.*

A reasonable officer in Agent McCaskill's position would not have viewed this second statement as an unambiguous and unequivocal invocation of the right to silence.  The context of *this* statement includes the preceding six and a half minutes of dialogue between Defendant and the agents.  A critical component of the preceding dialogue had centered around Defendant's concerns

---

[11]Defendant concedes in his motion that he also had conferred with appointed counsel prior to his encounters with Agents McCaskill and Bucksath.  *See* Dkt. 293 at 16.

about his mother being in jail.  *See, e.g.,* Exh. 8 at 3 ("I would probably be willing to talk to somebody, but it's going to have to be somebody that's willing. . .to help my mom."), 4 ("I take care of my business here.  You guys take care of my mother.  You want something from me, you'll have the world from me.  Get my mother out of jail."), 6 ("I ain't got no problem talking with either one of you if you got that guy with you who can make that decision to get my mother out of jail.").

Taking all of the facts and circumstances into context, particularly those that preceded the statement, a reasonable officer in the agents' position would not have viewed Defendant's "today's not the day for it" comment to be an unambiguous and unequivocal invocation of the right to silence.

The agents and Defendant ended this encounter with an agreement:  the agents were going to figure out as much as they could about the legal case against Defendant's mother and they would report back to him later that day.  *See* Exh. 8 at 11.  Defendant understood that, when the agents returned, they would be interested in hearing from him about what had happened in New Mexico. *Id.* at 11-12.  A particular exchange is worthy of emphasis:

McCaskill:    [] We're going to let you get taken care of here and we'll visit you later in jail, okay.

Defendant:    I hope you can tell me something about my mom getting out.

McCaskill:    I'm going to see what I can find out, okay.

Defendant:    Thank you.

McCaskill:    Is that fair?

Defendant:    That's about as fair as anybody can be.

*Id.* at 13.  Later that afternoon, after Defendant had been returned to the jail, the agents returned with the information they had learned.  Agent McCaskill began this encounter by advising

Defendant, both orally and in writing, of his *Miranda* rights. Defendant acknowledged his rights in writing, agreed to waive them, and agreed to answer questions. *Id.* at 15-16; *see also* Exh. 9 (written *Miranda* waiver executed by Defendant) (attached hereto).

In sum, Defendant never invoked his *Miranda* right to silence in the unambiguous and unequivocal manner required by law. The Court should reject this claim.

### III. Fifth Amendment Right to Due Process

Defendant asserts that all of his statements to Agents Rominger, McCaskill, and Bucksath should be excluded for all purposes because they were "involuntary" under the Due Process Clause. *See* Dkt. 293 at 19-24. In so doing, however, Defendant exaggerates certain circumstances and overlooks or minimizes others. A rational and objective view of the circumstances surrounding his statements shows that they were constitutionally voluntary.

### A. The Law

To determine the voluntariness of a confession, a court must inquire whether under the totality of the circumstances the defendant's will has been overborne. *See Haynes v. Washington*, 373 U.S. 503 (1963). The totality of the surrounding circumstances includes the characteristics of the accused and the circumstances of the interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The voluntariness inquiry is binary: either the statement was "voluntary or it was the product of duress or coercion, express or implied[.]" *Id.* at 227. This factual inquiry centers on the conduct of law enforcement officers in creating pressure and the suspect's capacity to resist that pressure. *See Mincey v. Arizona*, 437 U.S. 385 (1978). The government must prove voluntariness of a confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477 (1972).

For a confession to be involuntary, there must be *coercive police* conduct. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The Fifth Amendment is not "concerned with moral and

psychological pressures to confess emanating from sources other than official coercion[.]" *Oregon v. Elstad*, 470 U.S. 298, 304-05 (1985).  A desire to help a co-defendant does not render a confession involuntary because "[t]hese types of personal psychological pressures do not amount to official coercion rendering a confession involuntary." *United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir. 1997) (abrogated on other grounds by *Corley v. United States*, 556 U.S. 303 (2009)); *see also United States v. Alexander*, 447 F.3d 1290 (10th Cir. 2006) (confession not coerced even though defendant made statement to protect fellow inmate); *United States v. Westbrook*, 125 F.3d 996, 1006 (7th Cir. 1997) (holding that agent's suggestion that defendant's cooperation may help defendant's wife did not constitute undue coercion); *United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir. 1997) (holding that agents' statement in general that cooperation may have benefits does not render a statement involuntary); *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986) (holding that defendant's confession was not involuntary "by reason of his desire to extricate his wife from a possible good faith arrest").

In *United States v. Rith*, 164 F.3d 1323 (10th Cir. 1999), the Tenth Circuit set forth five factors for district courts to assess when deciding whether a statement was voluntary:

(1) the age, intelligence, and education of the defendant;

(2) the length of any detention;

(3) the length and nature of the questioning;

(4) whether the defendant was advised of his/her constitutional rights; and

(5) whether the defendant was subjected to physical punishment.

164 F.3d at 1333 (citing *Glover*, 104 F.3d at 1580).[12]

---

[12]Although *Glover* has been abrogated on other grounds, *see Corley v. United States*, 556 U.S. 303 (2009), it remains good law for the proposition for which it was cited in *Rith*.

Because Defendant is demanding that the Court exclude all of his statements to Agents Rominger, McCaskill, and Bucksath, the Court should evaluate the circumstances of each of the statements separately.  At the hearing, the proof will show that Defendant was never subjected to government coercion of any kind, much less the level of coercion required to overbear the will of someone like this Defendant.  Because of page limitations, the United States incorporates by reference the facts set forth elsewhere in this brief, and reserves the right to prove additional voluntariness facts at the evidentiary hearing.

Defendant places great weight on *Mincey v. Arizona*.  *See* Dkt. 293 at 23-24.  Even a cursory review of *Mincey*, however, shows that the two fact patterns bear little resemblance to each other.  The facts in *Mincey* were truly egregious:  Mincey had been shot in the hip, which resulted in damage to his sciatic nerve and partial paralysis of his right leg.  He was nearly comatose and in excruciating pain.  He had tubes in his throat to help him breathe and through his nose to keep him from vomiting.  He could not speak and was forced to write to communicate.  He repeatedly asked for counsel and to be left alone, which requests were denied.  He slipped in and out of consciousness, only to be subjected to renewed interrogation during the intervening moments of awareness.  His answers were at times nonresponsive and incoherent. And all of this occurred in the intensive care unit of a hospital.  *Mincey*, 437 U.S. at 396-401; *see Bobby v. Dixon*, 565 U.S. __, __, 132 S.Ct. 26, 30 (2011) at n.2 (describing *Mincey* as involving the "virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness" who was in a hospital's intensive care unit and who clearly expressed his wish not to be interrogated while in a debilitated and helpless condition.") (internal quotation marks omitted).

The facts of the instant case are nowhere close to those in *Mincey*.[13]  Although Defendant was at the hospital awaiting treatment for his self-inflicted injuries, he was oriented, rational, and conscious.  He did not appear to be in extreme pain and did not complain of pain.  He was able to articulate thoughts in a coherent, linear, and responsive fashion.  Furthermore, unlike the detective in *Mincey*, Agents McCaskill and Bucksath actually did *not* interrogate Defendant in the hospital.  They waited to do so until Defendant got back to the *jail*, which ensured that their questioning of him occurred in a place with which he was much more familiar and comfortable.  Following a knowing and voluntary *Miranda* waiver, Defendant made a voluntary confession.

In sum, Defendant's statements were not coerced.  Rather, as the United States will prove by well more than a preponderance of the evidence, they were voluntary.[14]

### IV.  Sixth Amendment Right to Counsel

Defendant's last argument is that his statements to Agents McCaskill and Bucksath were obtained in violation of his Sixth Amendment right to counsel.  *See* Dkt. 293 at 24-26.  He asserts that his federal lawyers already had been appointed to represent him before the agents began their interrogations and, therefore, the Sixth Amendment precludes the admission of the statements.  The Court should reject this claim for two independent and alternative reasons:  (1) the Sixth Amendment right to counsel had not yet attached; and (2) Defendant's knowing and voluntary

---

[13]Similarly, the facts of this case bear no resemblance to *McCullah*, *Fulminante*, and *Payne*, all of which are cited in Defendant's motion.  *See* Dkt. 293 at 21.  Each of those cases featured law enforcement making a palpable and believable threat of death to a suspect that would be ameliorated only if he confessed.  Nothing even remotely close to that occurred in the instant case.

[14]In the event that the Court rules that Defendant's confessions should be excluded from the United States' case-in-chief under *Miranda* but were otherwise voluntary, the United States intends to file a motion *in limine* on the uses to which such confessions can be put.  *See, e.g., Harris v. New York*, 401 U.S. 222 (1971).

*Miranda* waiver operated simultaneously as a Sixth Amendment right to counsel waiver.[15]

Defendant concedes that the majority of federal courts have held that the Sixth Amendment right to counsel does not attach with the filing of a federal criminal complaint. *See* Dkt. 293 at 24 (citing *United States v. Boskic*, 545 F.3d 69, 83 (1st Cir. 2008)). In addition to *Boskic*, every federal court of appeals to have addressed the issue has held that the filing of a federal criminal complaint does not animate the Sixth Amendment right to counsel. *See United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006); *United States v. Moore,* 122 F.3d 1154, 1156 (8th Cir. 1997); *United States v. Langley,* 848 F.2d 152, 153 (11th Cir. 1988) (*per curiam*); *United States v. Pace,* 833 F.2d 1307, 1312 (9th Cir. 1987); *United States v. Duvall,* 537 F.2d 15, 22 (2d Cir. 1976); *see also United States v. Harris,* 1995 WL 7958, at *2 (6th Cir.1994) (per curiam) (unpublished); *United States v. Santiago,* 180 Fed.Appx. 337, 339 (3d Cir. 2006) (unpublished). The Seventh Circuit has now reached the same conclusion. *See United States v. States* 652 F.3d 734, 741 (7th Cir. 2011) (identifying the initial appearance of a defendant pursuant to Fed. R. Crim. P. 5 as the point at which the Sixth Amendment right to counsel attaches with respect to a criminal complaint); *see also Rothgery v. Gillespie County*, 554 U.S. 191, 213 (2008) (Sixth Amendment right to counsel attaches only at a defendant's initial appearance before a judge on that complaint). Thus, an unbroken succession of nine federal circuits have ruled against Defendant on this claim. This Court should reject Defendant's request to go where no court has gone before and should instead follow the

---

[15]The facts pertinent to this claim are not in dispute. A criminal complaint was filed against Defendant on August 23, 2010. *See* Dkt. 1. The original indictment was filed on September 29, 2010. *See* Dkt. 24. The indictment was superseded on December 29, 2010, and again on January 12, 2011. *See* Dkt. 73, 83. Because he remained in Arizona state custody until his state charges were resolved, Defendant did not appear in federal court until June 30, 2011, when he was arraigned on the Second Superseding Indictment. *See* Dkt. 202 (clerk's minutes of arraignment).

persuasive authority from these nine circuits.

Alternatively, the Court should reject this claim because Defendant knowingly and voluntarily waived his Sixth Amendment right to counsel.  Though Defendant's motion is silent on this point, the United States Supreme Court has made clear that a valid *Miranda* waiver operates to simultaneously waive the Sixth Amendment right to counsel in the context of a police interrogation. *See Montejo v. Louisiana*, 556 U.S. 778 (2009).  Because Defendant knowingly and voluntarily waived his *Miranda* rights before his jailhouse interview with Agents McCaskill and Bucksath, he also waived whatever Sixth Amendment right to counsel he may have had.

A final point:  Defendant asserts that "the Supreme Court has recognized that there may be some circumstances when the government interferes with the defendant's Sixth Amendment right to counsel even before the initiation of criminal charges."  Dkt. 293 at 25 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490-91 (1964)).  This argument is disappointing in the extreme, for the Supreme Court itself has emphasized that *Escobedo* should be considered as a *Fifth* Amendment case, and not a Sixth Amendment case.  *See Moran v. Burbine*, 475 U.S. 412, 429-30 (1986); *United States v. Gouveia*, 467 U.S. 180, 188 n.5 (184) ("[W]e have made clear that we required counsel in *Miranda* and *Escobedo* in order to protect the Fifth Amendment privilege against self-incrimination *rather than* to vindicate the Sixth Amendment right to counsel.") (citations omitted) (emphasis added). The Court should reject the Sixth Amendment claim.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that this Court deny Defendant's motion in all respects after conducting an evidentiary hearing.

Respectfully submitted:

KENNETH J. GONZALES
United States Attorney

*Filed Electronically March 5, 2012*
LINDA MOTT
GREGORY J. FOURATT
Assistant U.S. Attorneys
201 Third St., NW, Suite 900
Albuquerque, New Mexico  87102
(505) 346-7274

MICHAEL S. WARBEL
Trial Attorney
United States Department of Justice
Capital Case Unit
1331 F. St. NW, Rm. 346
Washington, DC 20004
(202) 514-5605

I HEREBY CERTIFY that on March 5,
2012, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF
system which will send notification to
Michael Burt and Theresa Duncan, Esqs.

 /s/
GREGORY J. FOURATT
Assistant U.S. Attorney