# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

**v.**                                     **Case No.  10-CR-2734 JCH**

**JOHN CHARLES McCLUSKEY,**

   **Defendant.**

## DEFENDANT'S MOTION TO PRECLUDE DEATH QUALIFICATION OF JURY

COMES NOW the Defendant, John Charles McCluskey, by and through undersigned counsel, and hereby STATES and PRAYS as follows:

## I. INTRODUCTION

Defendant John Charles McCluskey hereby files, pursuant to Fed. R. Crim. P. 12, the First, Fourth, Fifth, Sixth, Eighth, Tenth and Fourteenth Amendments to the United States Constitution and pursuant to other applicable rules and law, his Motion to Preclude Death Qualification of Jury. Although the government is pursuing a death penalty prosecution in this case, the Defendant submits that federal law does not permit the "death qualification" of the jury. Accordingly, the

1

Defendant requests an order from this Honorable Court that no "death qualification" of the jury shall be permitted.

## II. RELEVANT PROCEDURAL HISTORY

Mr. McCluskey is presently charged under a Third Superseding Indictment with twenty counts, including, *inter alia*, Conspiracy to Commit Carjacking Resulting in Death, Carjacking Resulting in Death, and Murder of a Witness, contrary to 18 U.S.C. § 371, 18 U.S.C. § 2119, and 18 U.S.C. § 1512, respectively. [Doc. 274.]  The Third Superseding Indictment includes several special findings that authorize the government to seek a sentence of death, pursuant to 18 U.S.C. § 3591.  The government filed its notice of intent to seek a sentence of death against Mr. McCluskey on January 26, 2012.  [Doc. 275.]  Trial in this case is scheduled for March 11, 2013.  [Doc. 220.]

## III. THE GOVERNMENT MAY NOT CHALLENGE FOR CAUSE JURORS WHO WOULD NOT IMPOSE THE DEATH PENALTY

It has been assumed that the jury in this case will be "death qualified." Mr. McCluskey objects to a "death qualified" jury in this case as a violation of due process under the Fifth Amendment, a fair trial under the Sixth Amendment, and further, that any resulting death sentence would constitute cruel and unusual punishment under the Eighth Amendment. Moreover, the death qualifying of this jury will violate many of the excluded jurors' First Amendment rights of free

exercise of religion and the separation of church and state and Fifth Amendment due process of law.[1]

## IV. LEGAL ARGUMENT AND AUTHORITY

### A. There is No Basis in Federal Law Permitting or Requiring Removal of Jurors Who Oppose the Death Penalty.

The Supreme Court has long recognized that the regulation of cause and peremptory challenges is left to "the common law or to the enactments of Congress." *United States v. Wood*, 299 U.S. 123, 145 (1936). Death-qualification did not exist at common law or in *Blackstone's England*. In *Blackstone's England*, as at common law, there were only four challenges for cause:

> 1. If a Lord was empaneled, he could be challenged propter honoris respectum (on account of respect for nobility). 2. If a person previously convicted of a felony or misdemeanor was empaneled, he could be challenged propter delictum (on account of crime). 3. If an alien or slave was empaneled, he could be challenged propter defectum (on account of defect). 4. If a venireman was related to either party, was the defendant's master or servant, or had previously served as a juror or arbitrator in the same cause, then he could be challenged propter affectum (on account of favor or bias). *4 William Blackstone, Commentaries* *337, *346

---

[1]Defendant can assert the violation of the prospective jurors' religious beliefs because it directly affects him in that those prospective jurors religiously opposed to the death penalty will be systematically excluded from the jury. *See Powers v. Ohio*, 499 U.S. 400, 413-16 (1991) (criminal defendant has standing to challenge systemic exclusion of a third-party group in the jury selection process).

As Blackstone made clear, the "bias" that formed the basis of a challenge "propter affectum" was limited to relational bias. *Id.* at *346-47. Cause challenges based on a juror's conscientious objection to a particular law or punishment did not seep into the American criminal trial scheme until the nineteenth century, as the nation struggled with religious freedom and slavery. With respect to American jurisprudence, not a single case prior to 1828, a half-century after the Constitution, could be located where jurors are excused for cause based upon their opposition to the death penalty. *See Commonwealth v. Lesher*, 17 Serg. & Rawle 155, 159, 1828 Pa. LEXIS 9 (Pa. 1828). Dissenting, Justice Gibson accused his colleagues of legislating from the bench: "[F]eeling, as I do, a horror of judicial legislation, I would suffer any extremity of inconvenience, rather than step beyond the legitimate province of the court to touch even the hair of any privilege of a prisoner on trial for his life." *Id.*, 17 Serg. & Rawle at 164-65 (Gibson, J., dissenting). Moreover, it appears that from the outset there existed an inexorable connection between race and the death-qualification of juries. *See, e.g.*, Robert M. De Witt, John Edwin Cooke, *The Life, Trial and Execution of Capt. John Brown, Being a Full Account of the Attempted Insurrection at Harper's Ferry* 63 (1859) (noting death-qualification of jury in an indictment against "white men" and "free

negroes" for conspiring insurrection against the Commonwealth to free slaves[2]:
"[T]he following were the questions put to the jury...have you any conscientious
scruples against convicting a party of an offense to which the law assigns the
punishment of death, merely because that is the penalty assigned."[3]). From the
varying accounts of John Brown's trial, it remains unclear whether the jurors who
were opposed to the death penalty were removed for cause or after resolving the
cause challenges on the prosecutor's peremptory strike.

Also, although the authority for "death qualification" is often presumed to
flow from the United States Supreme Court opinions in *Witherspoon v. Illinois*,
391 U.S. 510 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 423 (1985), in these
cases, the Supreme Court made clear that it was not establishing a basis for
removing jurors because of their views on the death penalty, but rather identifying
a limitation on the government's ability to exclude jurors should the state chose to
do so.

In *Witherspoon*, what was at stake was the constitutionality of an Illinois
statute which provided that, "In trials for murder it shall be a cause for challenge

---

[2]The indictment appears at
http://www.law.umkc.edu/faculty/projects/FTrials/johnbrown/browntrial.html.

[3]*Id.*, October 26, 1859, afternoon session.

of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." *Witherspoon v. Illinois*, 391 U.S. at 512. The Court found that the operation of that statute exceeded the boundaries of the Sixth Amendment. As later jurisprudence made clear:

> As an initial matter, it is clear beyond peradventure that Witherspoon is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. *Adams v. Texas*, 448 U.S. 38, 47-48 (1980).

The Supreme Court affirmed this limited holding of *Witherspoon* in *Wainwright v. Witt, supra*, a State of Florida death sentence on federal habeas review: We begin by reiterating Adams' acknowledgment that "Witherspoon is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude. . . . *Wainwright v. Witt*, 469 U.S. at 423. Thus these cases do not establish an independent basis for a challenge for cause based on death penalty attitudes in capital cases. They do recognize that a state may, under its traditional powers to regulate challenges for cause, enact such a challenge. But,

rather than create such a challenge, these cases establish the constitutional frame within which such a challenge must fit if enacted. And, it is here where there is a critical difference between the Federal Death Penalty Act and the state cases considered by the United States Supreme Court. Unlike the Illinois (*Witherspoon*), Texas (*Adams*), and Florida (*Wainwright*) legislatures, Congress has not seen fit to remove from the process those jurors who oppose the death penalty. Thus, since such a challenge was not recognized at common law, and since Congress did not create such a challenge by statute, a juror in a Federal Death Penalty case may not be removed for cause because of their views on capital punishment.

### B. There is an Emerging Claim That the Death-qualification of Juries Violates the Sixth Amendment Right to an Impartial Jury

There is an emerging claim that the death-qualification of juries violates the Sixth Amendment right to an impartial jury, and a capital defendant must preserve that argument. A number of historians and legal scholars have suggested that it is now time to reconsider *Wainwright* and *Adams* in light of the original conception of a jury. *See Campbell v. Louisiana*, U.S.S.Ct. No. 08-399 Brief amicus curiae of Academics.[4]

_____

[4]www.scotusblog.com/wp/petitions-to-watch-conference-of111408 (cert. denied

While the Supreme Court's jurisprudence currently permits limited death-qualification of jurors when authorized by statute, *see Adams, supra*, the Court has not hesitated to reexamine other precedents concerning the Sixth Amendment for fidelity to the Framers' intent and understanding. *See, e.g., Ring v. Arizona*, 536 U.S. 584 (2002) (reversing *Walton v. Arizona*, 497 U.S. 639 (1990), based upon historic and textual interpretation of Sixth Amendment "right to a jury trial"); *Crawford v. Washington*, 541 U.S. 36 (2004) (reversing *Ohio v. Roberts*, 448 U.S. 56 (1980), based upon historic and textual interpretation of Sixth Amendment right to confrontation); *see also Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009).

Indeed, the watershed cases of *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), have been predicated upon the belief that the Sixth Amendment guarantees a jury trial right as understood at the time of the founding, rather than what might be considered reliable for assessing guilt and punishment today.

In *Jones v. United States, supra*, 526 U.S. 227, the Court expressed concern with any effort that prevented juries from expressing the will of the community by

---

Nov. 17, 2008.

nullifying an egregious law. Removing from a jury all citizens who would not do the State's bidding constitutes a similar erosion of the jury trial right. It is akin to the "attempts to confine jury determinations in libel cases to findings of fact, leaving it to the judges to apply the law and, thus, to limit the opportunities for juror nullification." *Id.*, 526 U.S. at 246 (discussing 318-55 T. Green, *Verdict According to Conscience* (1985), and 300-02 J. Rakove, *Original Meanings* (1996)).

The Framers believed the jury to be finders of both fact and law.[5] The enormity of this responsibility and influence clashes with the modern vision of the

---

[5]Jeffrey Abramson, *We the Jury: The Jury System and the Ideal of Democracy* 30- 31, 63-64, 67-77 (1994); *The Complete JuryMan: Or, A Compendium of the Laws Relating to Jurors* 194-202, 246-47 (1752); Clay S. Conrad, *Jury Nullification: The Evolution of a Doctrine* 13-63 (1998); William L. Dwyer, *In the Hands of the People: The Trial Jury's Origins, Triumphs, Troubles, and Future in American Democracy* 62-72 (1st ed. 2002); *The English-Man's Right: A Dialogue Between a Barrister at Law and a Jury-Man 10-35 (1680);* Norman J. Finkel*, Commonsense Justice: Jurors' Notions of the Law* 24-31 (1995); Thomas Andrew Green, *Verdict According to Conscience: Perspectives on the English Criminal Trial Jury* 1200-1800, at 153-99 (1985); John Hostettler, *The Criminal Jury Old and New: Jury Power From Early Times to the Present Day* 30-32, 48, 70-72, 92-103, 112- 14, 121, 133-34 (2004); Larry D. Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review* 28-29 (2004); Leonard W. Levy, *The Palladium of Justice: Origins of Trial by Jury* 69-105 (1st ed. 1999).

All these authorities appear in *United States v. Polizzi,* 2008 U.S. Dist. LEXIS 26900 (E.D.N.Y April 1, 2008) (Weinstein, J.)(Opinion withdrawn)

jury function. Yet, the Framers' support for a strong and independent jury could not have been clearer. The Framers viewed the jury as a bicameral branch of the judiciary. *See* Akhil Reed Amar, *The Bill Of Rights: Creation and Reconstruction* 100 (1998) ("[J]uries can be seen as part of the judicial department, the lower (and if anything, presumptively more legitimate, because more popular) branch."). John Adams, writing in 1771, observed that juries served the central purpose of being the "voice of the people." *2 Works Of John Adams* 253 (1771) (explaining that "[j]uries are taken, by lot or by suffrage, from the mass of the people, and no man can be condemned of life, or limb, or property, or reputation, without the concurrence of the voice of the people"). Adams noted that one of the objections informing those who sought independence from England was that some juries were being instructed to render verdicts which "would render juries a mere ostentation and pageantry, and the court absolute judges of law and fact." *Id.* at 253-54. Alexander Hamilton's views on the great protection of the jury trial right were reflected in his defense of Harry Croswell, who the prosecution argued had libeled Thomas Jefferson by claiming that Jefferson had paid "James Thompson Callender for calling George Washington 'a traitor, a robber, and a perjurer' and for calling John Adams 'a hoary-headed incendiary.'" *People v. Croswell*, 3 Johns. Cas. 337, 341, 342, 1804 N.Y. LEXIS 175 (N.Y. 1804). Hamilton had defended

Croswell by observing that juries have the power to determine the law, and that jurors have the duty to follow their convictions. *Id.*

Early jurists further confirmed the view of the jury as finder of both fact and law: The "history of English criminal jurisprudence furnishes abundant evidence . . . that the power of juries to determine the law as well as the facts in criminal trials was essential to the protection of innocence and the preservation of liberty." *State v. Croteau*, 23 Vt. 14, 21-23, 1849 Vt. LEXIS 106 (1849) (overruled on other grounds by *State v. Burpee*, 65 Vt. 1, 25 A. 964 (1892) (jury instruction issue).

Whereas the framers' jury had the power to rule on the constitutionality of the death penalty (though the force of any ruling applied only to the particular case on which they sat), a prospective juror today cannot even sit on a capital jury unless the juror promises that he or she would be able and willing to impose a sentence of death. The practical effect of "death-qualification" is to expose the capitally accused to increased odds of receiving the death penalty. Death-qualification also eliminates the voices of citizens who would opt to "check" the government's decision to inflict the ultimate penalty. Death-qualification eliminates from juries those citizens who would find a death sentence to be cruel

and unusual either generally or in a particular context. As a result, when appellate courts review the frequency with which juries impose a death sentence for a certain class of capital crimes, that measure is necessarily an inaccurate thermometer for determining how much a society has chilled to the idea of executing a certain class of offenders.

That the Sixth Amendment might interfere with the government's effort to impose a death sentence is perhaps inconvenient; but the historical basis for the amendment was to interpose citizens between the Government and the accused for that very purpose. We cannot have strayed that far from the original intent. Indeed, with *Jones*, *Apprendi*, *Blakely*, *Crawford*, and *Melendez-Diaz*, if anything, we are back closer to the original intent.

**C. Removal of a Juror for Cause for Religious Scruples For ("Eye for an Eye") or Against (Religion Does Not Allow Them to Kill) the Death Penalty Violates the First Amendment's Free Exercise and Separation of Church and State Clauses and the No Religious Test Clause of Art. VI, cl. 3; All Jurors with Religious Scruples For or Against the Death Penalty Should Have a Chance to Sit in a Death Penalty Case.**

Even if this Court rejects Mr. McCluskey's argument that there is no basis for "death qualifying" this jury generally, there is at least a category of opinions that are frequently used for grounds of disqualification that still should be

12

permitted. Exclusion of "death qualified" jurors is often based on religious

scruples that favored the government ("eye for an eye") or favored the defendant

(religious belief would not permit them to vote to kill). In doing so, the jurors'

religious freedom was violated by an arm of the U.S. government in violation of

the First Amendment's free exercise and separation of church and state clauses and

Art. IV, cl. 3 ("no religious Test shall ever be required as a Qualification to any

Office or public Trust under the United States")[6]

    If a proposed juror were Catholic, Quaker, or any sect of any other religion,

and adamantly opposed to the death penalty, "death qualification" discriminates

against that juror's religion. If the juror interprets the Old Testament to say that

they cannot kill, or that "eye for an eye" (*lex talionis*) means that one who takes a

life should die for taking a life, that view must be respected by the parties and this

court. No rule ("conscientious scruples" against death) should masquerade as

religious discrimination.

    In Church of the *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,

532-33

---

[6]The No Religious Test Clause appears to have been subsumed into the First
Amendment because few cases discuss it.

(1993), the Court said:

> At a minimum, the protections of the Free Exercise
> Clause pertain if the law at issue discriminates against
> some or all religious beliefs or regulates or prohibits
> conduct because it is undertaken for religious reasons.
> *See, e.g., Braunfeld v. Brown*, 366 U.S. 599, 607 (1961)
> (plurality opinion); *Fowler v. Rhode Island*, 345 U.S. 67,
> 69-70 (1953). Indeed, it was "historical instances of
> religious persecution and intolerance that gave concern
> to those who drafted the Free Exercise Clause." *Bowen v.
> Roy*, 476 U.S. 693, 703 (1986) (opinion of Burger, C.J.).
> *See* J. Story, *Commentaries on the Constitution of the
> United States* §§ 991-992 (abridged ed. 1833) (reprint
> 1987); T. Cooley, *Constitutional Limitations* 467 (1868)
> (reprint 1972); *McGowan v. Maryland*, 366 U.S. 420,
> 464, and n. 2 (1961) (opinion of Frankfurter, J.);
> *Douglas v. Jeannette*, 319 U.S. 157, 179 (1943)
> (Jackson, J., concurring in result); *Davis v. Beason*, 133
> U.S. 333, 342 (1890). These principles, though not often
> at issue in our Free Exercise Clause cases, have played a
> role in some. In *McDaniel v. Paty*, 435 U.S. 618 (1978),
> for example, we invalidated a State law that disqualified
> members of the clergy from holding certain public
> offices, because it "impose[d] special disabilities on the
> basis of ... religious status," *Employment Div., Dept. of
> Human Resources of Ore. v. Smith*, 494 U.S., at 877. On
> the same principle, in *Fowler v. Rhode Island, supra*, we
> found that a municipal ordinance was applied in an
> unconstitutional manner when interpreted to prohibit
> preaching in a public park by a Jehovah's Witness but to
> permit preaching during the course of a Catholic mass or
> Protestant church service. *See also Niemotko v.
> Maryland*, 340 U.S. 268, 272-273 (1951). Cf. *Larson v.
> Valente*, 456 U.S. 228 (1982) (state statute that treated
> some religious denominations more favorably than
> others violated the Establishment Clause).

*See Good News Club v. Milford Central School*, 533 U.S. 98 (2001) (a school that opened its facilities to use by members of the community could not exclude a Christian children's club from meeting at the school after school hours). As the Supreme Court aptly summarized in *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972): "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." As demonstrated by fact that an increasing number of states do not provide for a penalty of death, there is no compelling governmental interest in killing one of its citizens on a conviction for murder.

## IV. CONCLUSION

Because there is no legislative enactment providing for the removal of jurors based upon their views on the death penalty, allowing the removal of such a juror by a challenge for cause violates due process under the Fifth Amendment and the Sixth Amendment right to an impartial jury. Moreover, the death-qualification of juries violates the Eighth Amendment ban on the arbitrary imposition of the death penalty by producing, in this federal context, a non-objective assessment of societal attitudes towards capital punishment. Finally, exclusion of jurors who will

not impose the death penalty because of their religious views violates the First and

Fifth Amendments.

WHEREFORE, for the foregoing reasons, Defendant John Charles
McCluskey moves this Court to grant the foregoing request.


Dated; March 30, 2012                    Respectfully submitted,

                                         /s/ Michael N. Burt

                                         Michael N. Burt

                                         Law Office Of Michael Burt

                                         1000 Brannan Street, Suite 400

                                         San Francisco, CA 94103-4888

                                         415/522-1508


                                         /s/ Theresa M. Duncan

                                         Theresa M. Duncan

                                         Freedman Boyd Hollander Goldberg
                                         Ives & Duncan P.A.

                                         20 First Plaza, Suite 700

                                         Albuquerque, NM 87102

                                         505/842-9960

                                         Attorneys for John McCluskey

**CERTIFICATE OF CONFERENCE**

I hereby certify that on March 30, 2012, my co-counsel Theresa Duncan contacted Assistant United States Michael Warbel to determine the government's position on this motion.  Mr. Warbel advised that the government is opposed to the motion.

/s/ Michael N. Burt

Michael N. Burt

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2012, a true and accurate copy of the foregoing pleading was emailed to counsel of record by CM/ECF.

/s/ Michael N. Burt

Michael N. Burt

17