IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     **Plaintiff,**

vs.              CR. No.  10-2734 JCH

JOHN CHARLES McCLUSKEY,

     **Defendant.**

## AMENDED MEMORANDUM OPINION AND ORDER[1]

   This case is before the Court on Defendant John Charles McCluskey's *Motion to Suppress Statements* [Doc. No. 293], filed January 30, 2012.  In the motion, Defendant seeks to suppress statements that he made to FBI Agent James Rominger on August 20, 2010 and statements that he made to FBI Agent James McCaskill and New Mexico State Police Agent Patrick Bucksath on August 24, 2010.  On May 29 through May 31, 2012, the Court held an evidentiary hearing on the motion (as well as on another motion to suppress filed by the Defendant as Doc. No. 295), for which Defendant was present.  After considering the evidence and reviewing the parties briefs, the relevant legal precedents, and counsel's written closing arguments, the Court concludes that the motion should be granted in part and denied in part.  Specifically, in accordance with *Miranda v. Arizona* and *Edwards v. Arizona*, the Court concludes that all of McCluskey's statements to law enforcement on August 20 and August 24, 2010 should be suppressed on the grounds that law enforcement

---

[1] In a unopposed motion filed August 10, 2012 [Doc. 623], the Government asked the Court to correct two factual findings set forth in its Memorandum Opinion and Order filed July 26, 2012 [Doc. 588].  In an Order entered August 24, 2012 [Doc. 641], the Court granted the Government's motion.  In accordance with that Order, the Court files this Amended Memorandum Opinion and Order correcting two factual findings.  The amended factual findings appear at pages 7 and 14 of this opinion.

officers improperly interrogated him after he invoked his right to counsel.  McCluskey's motion to suppress his statements on the grounds of (1) violation of his right to silence; (2) coercion; and (3) violation of his Sixth Amendment right to counsel will be denied.

## I.  LEGAL STANDARD

On a motion to suppress a defendant's statement allegedly obtained in violation of defendant's *Miranda* rights, the Government bears the burden of proving by preponderance of evidence that the Defendant's rights were not violated.  *See United States v. Gell-Iren*, 146 F.3d 827, 830 (10th Cir. 1998).  For example, "[w]henever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

## II.  FINDINGS OF FACT

For the purposes of the motion that is the subject of this Memorandum Opinion and Order, the Court finds the facts as follows:

### A.      August 20, 2010 Interviews

McCluskey was arrested on August 19, 2010 near Greer, Arizona.  On August 20, Agent James Rominger of the FBI interviewed McCluskey in a small interrogation room at the county jail in Apache County, Arizona.  As he was being led into an interrogation room, he told authorities several times that he did not want to talk to anyone without a lawyer present.  Hearing Transcript, May 29, 2012, at pp. 138-139.  In fact, his first statement on the recording of his discussion with Rominger was "I don't want to talk to nobody without a lawyer."  Ex. 1A-R at 2.  The two guards at the jail who accompanied McCluskey, along with Rominger, all heard McCluskey make this statement.  Tr. May 29, 2012 at 56, 139, and 166.  Rominger responded by introducing himself to

McCluskey and explaining his presence at the jail, as well as encouraging McCluskey to make a statement that would benefit Welch:

> Why don't you come in here just for a  second.  Have a seat.  We'll make this short and sweet it sounds like.  Thanks.  You want to take a seat?  I'll jut talk to you for a second.  My name is Jay Rominger.  I'm with the FBI out of Pine Top. . . . So I've been an agent for 24 years. . . .  You know, I've done a lot of good for guys like yourself and others.  I'm happy to help you out to testify on your behalf of what you tell me because *I understand that your friend, your partner who was in on this, that maybe she wasn't involved in a lot of this stuff.  You know, I think this is an opportunity for you to, you know, be a stand up guy for her benefit.*

Ex. 1A-R at 2 (emphasis added).  Rominger did not read McCluskey his *Miranda* rights at that time.

Instead, in the foregoing statement Rominger offered McCluskey the opportunity to clear his co-defendant, Casslyn Welch, of any involvement in the murders under investigation by "being a stand up guy for her benefit."  Shortly thereafter, McCluskey made some obliquely self-incriminating remarks, and Agent Rominger reiterated to McCluskey that now was his opportunity to explain Welch's role in the murders.

> Rominger:  But if -- if you and I can explain what her role was  in New Mexico and that, that's going to make a huge difference.

> McCluskey:  Her role was that she was irrelevant in New Mexico.  That was all me.

Ex. 1A-R at 5.  At this point, Rominger told McCluskey to let Rominger read him his rights, "and then if you're willing to talk to me, let's talk, you know." *Id*.  McCluskey responded, "Yeah, I'm not too good right now.  I'm kind–I'm kind of, maybe on another day.  But right now I'm–I'm telling you right now, I'm not too good.  Rominger responded, "I understand."  McCluskey elaborated, "In the head, okay?" *Id*.  Then, McCluskey made further self-incriminating remarks. Rominger again offered to read McCluskey his rights and encouraged McCluskey to explain Welch's role in the murders.  ("Let me read you your rights so you understand your rights. . . . And then you–you can only answer the questions you want to answer.  You know, just do that, and

3

we'll–we'll just talk about her and her role.  And that way at least you get that documented, right?")

*Id*. at 6-7.  McCluskey agreed, and Rominger explained his *Miranda* rights.  *Id*. at 7.  After another short exchange, McCluskey once again made an unambiguous assertion of his Fifth Amendment right to counsel, stating, "I don't want to talk to you without my lawyer."  *Id*. at 8.  Despite this second invocation of the right to counsel,  Rominger did not cease his interview of McCluskey. Instead he responded by pursuing the subject of McCluskey making a statement exculpating Welch by saying, "Okay.  Even now?  I mean, even with Casslyn?"  In response, McCluskey stated that "If she (Welch) needs my help, she knows how to get it. . . . And I'll do anything for her."  *Id*. at 8.  At this point, McCluskey made an unprompted proposition:

> McCluskey:  So if you (Rominger) want to go talk to her and say, hey, your cousin says he'll do anything for you.  If you tell him to do it, I'll do that.

> Rominger:  And then you'll come back in and talk to me?

> McCluskey:  Yeah, but she has got to tell me to talk to you.

*Id*. at 9.  After Rominger indicated his willingness to arrange a meeting between McCluskey and Welch, McCluskey stated, "I will come in here and tell you everything about New Mexico word for word how it went down."  *Id*. at 10.  This initial encounter between McCluskey and Rominger lasted less than eight minutes.  At that point, jailers escorted McCluskey back to his cell.  A few minutes later, they brought Welch to the interview room to meet with Rominger.

> After Welch sat down, Rominger introduced himself to her, and then he said,

> John says that he wants to help you out because they're talking death penalty, they're talking all kinds of horrible things for everybody.  I said, John, I can't believe Casslyn is involved in that part of this.  And he said, she's not. . . . And John said he will tell everything, do everything for your benefit.  He said you had nothing to do with it.  But I said I need specifics.  I need details. . . . but he said I would like Casslyn to give me the okay to do that and I'm going to do it.  Because he said that's what he wants to do.  So that's one thing that I'd like to do with you if you're willing.  And we'll just have you tell John just please do that.  You know, come in

and he'll explain everything.

Ex. 1B-R at 2-3.  At that point, Welch agreed to talk to McCluskey.  *Id*. at 3.  After further discussion by Rominger in which he explained to Welch why it could benefit her to talk to him, Welch asked him to have her taken off suicide watch so that her clothes and blankets would be returned to her.  *Id*. at 6.  Rominger agreed to look into that for Welch, though he made no express promise that he could achieve that for her.  *Id*. at 7.  After additional exchanges, Rominger told Welch, "They'll run you by and just say, please talk to the man.  And then when–when I bring you back in, I'll fill you in on what he said."  *Id*. at 12.   Welch again consented to talk to McCluskey. *Id*.  This encounter between Rominger and Welch lasted approximately ten and a half minutes.

Rominger arranged a meeting between McCluskey and Welch.  He told one of the jailers, Jacob Strang, to instruct Welch tell McCluskey that it was okay to talk to Rominger.  Tr. May 29, 2012 at pp. 142-43.  During their brief meeting, Welch directed McCluskey to "tell them what we did."  *Id*. at 143.  McCluskey asked Welch if she was sure, and she said, "Yeah, go ahead."  *Id*. After this brief exchange, the guards returned Welch to her holding cell and escorted McCluskey back to the interview room.  McCluskey did not appear surprised at their appearance, nor did he resist returning to the interview room.  *Id*. at 144.  However, there is no evidence that McCluskey asked to return to the interview room or to speak with Rominger.

Then, guards led McCluskey back into the interrogation room, where he had a second encounter with Rominger that began approximately eight minutes after Rominger's meeting with Welch had ended.  Exs. 1 and 1C-R.  Rominger informed McCluskey that he had arranged for Welch to be taken off suicide watch so that she could have a blanket, and that he had done what McCluskey had asked.  Ex. 1C-R at 2.  Then the following exchange took place:

Q.  So what do you think?  Are you willing to talk to me?
A.  Yeah, she told me to talk to you.
Q.  Okay.
A.  I'm not willing to talk to you, but she told me to talk to you so I'm willing to talk
to you.

*Id*. at 2-3.  McCluskey then signed a written waiver of *Miranda* rights form (Ex. 2; Ex. 1C-R at 3)

and made various inculpatory statements.  At the conclusion of the interview, McCluskey gave the

following virtual soliloquy (with minor affirmations from Rominger) regarding his conversation

with Welch and Welch's lack of familiarity with the criminal justice system:

A.  I (McCluskey) wanted to tell her (Welch) when she knocked on the door, and
say, hey, what do you want to do?  I said it's not my decision.
Q.  But, you know--
A.  It's your (Welch's) decision.  I said, you either tell me yes or no, go talk to them
or not.  I said that's all it's going to be.
Q.  Yeah.
A.  But she–she don't know.  She don't know nothing about this world.
Q.  And the system.
A.  Or you or me.
Q.  Right.
A.  So you can go and manipulate her just as easy as I can.
Q.  Right.
A.  And–and it shows.  You manipulated her in saying what you wanted her to say
to me.
Q.  Yeah, I did.
A.  And I–and I allowed it.
Q.  Right.
A.  But I knew–
Q.  But, I mean, I did what you asked, you know.
A.  Well, you got–you got her to do what you wanted to do.
Q.  Right.
A.  What you needed her to do–
Q.  Right.
A.  –to make me talk.
Q.  Exactly.
A. Because you wasn't going to get it the other way.

Ex. 1D-R at 3-4.  McCluskey then went on to describe how he manipulated Welch into helping him

escape from prison by telling her that he could not take any more time in prison and that she had to

help him escape because he was surrounded by a bunch of bad guys.  *Id*. at 5-6.  This second encounter between Rominger and McCluskey lasted approximately 48 minutes.  Ex. 1.

At no point did Rominger threaten McCluskey, physically touch him, or make any promises that Rominger could not or did not keep.  Rominger used a calm, polite tone of voice throughout his interrogation of McCluskey, and Rominger was the sole law enforcement officer in the room during their discussions.  The tone of the conversation was not hostile; indeed, it was almost cordial. Rominger was dressed in plain clothes, not a uniform, and he was unarmed.  Rominger did not deprive McCluskey of food, water, or sleep.  Throughout the interrogation McCluskey appeared alert and unaffected by either drugs or alcohol; there is no evidence to the contrary.  At the time of the interrogation McCluskey was approximately 45 years old.  He appeared to be of normal, average intelligence and he understood the questions put to him.  He appeared to be a native English speaker. Although McCluskey dropped out of school in the eighth grade, he later obtained his general equivalency degree.

## B.   <u>August 24, 2010 Interviews</u>

On the evening of August 23, 2010, while in detention McCluskey cut his neck and arm with a razor, and then injured his rectum by stashing the razor inside.  At 4:43 a.m. on August 24, 2010, prison guards discovered McCluskey in his injured state, along with blood on his bed.  Authorities transported him via police vehicle to Kingman Regional Medical Center around 8:00 a.m. McCluskey was no longer bleeding and was ambulatory, and he was "awake, alert and cooperative with an affect that is calm and appropriate."  He was also found to be "alert and oriented to person, place and time."  At 8:08 a.m., he gave verbal consent for emergency medical treatment.  At 8:41 a.m., a nurse gave McCluskey a tetanus shot.  Shortly thereafter, at 9:10 a.m., McCluskey received 5 mg of intravenous morphine for his pain, which he rated a two on a scale of one to ten.  He also

received 4 mg of Zofran, an anti-nausea drug, and. McCluskey reported to the nurse taking his history that the morphine had relieved his pain and that he had "nothing to live for." At 9:27 a.m., the nurse reported, "The patient's mood is appropriate. The thought process is rational. The patient is having normal perceptions."

Doctors also ordered that McCluskey's blood be collected at 8:50 a.m. and tested. Those tests revealed that McCluskey's glucose, blood urea nitrogen (BUN), and creatinine levels were each slightly higher than the appropriate reference range. At the same time, his white blood cell count was high, while his red blood cell count and hematocrit (volume percentage of red blood cells) were slightly below their respective reference ranges. These indicators reveal a possible moderate blood loss and dehydration. Tr. May 31, 2012 at 490-94. An x-ray revealed a metal foreign body–the razor–in McCluskey's rectum, though he told hospital staff that he had thrown the razor away and denied putting it in his rectum. At 10:17 a.m., McCluskey received 1 g of Ancef, an antibiotic, to which he had no adverse reaction. The hospital admitted McCluskey to the operating room for surgical repair of his neck wound and removal of the razor. McCluskey consented to these procedures and appeared alert to his physician. At 11:07 a.m. McCluskey said that he was not experiencing pain, and at approximately 11:15 a.m. doctors started the anesthesia. Initially they gave McCluskey Versed, also known as midozolam. At 11:51 a.m. surgeons began his operation, which lasted approximately two hours. During the surgery doctors gave him Propofol and Fentanyl, and they continued to administer Fentanyl throughout the surgery. McCluskey's surgical procedure ended at approximately 1:18 p.m. His anesthesia ended at approximately 1:45 p.m. McCluskey was taken to the post-anesthesia care unit, where he received two 12.5 mg doses of Demerol at 1:46 p.m. and 1:51 p.m., respectively, for a total dose of 25 mg. He also received intravenous fluids. At 2:20 p.m., McCluskey's physician ordered him discharged to prison, and at 3:00 p.m. he was discharged

8

from the post-anesthesia care unit ("PACU") and transported back to the jail.  At 3:30 p.m. he

complained to the nurse of lightheadedness.

Morphine is a drug, typically administered for pain relief, that may cause mental cloudiness

and disinhibition, despite the patient appearing outwardly normal.  Disinhibition is a breakdown in

one's ability to discriminate behaviors, make effective judgments, and prioritize.  Tr. May 31, 2012

at 502.  It can, but does not always, impair one's ability to make important decisions.  *Id*. at 503.

Morphine may also result in sedation and a decrease in respiration and heart rate.  Tr. May 30, 2012

at 227.   Four other drugs administered to McCluskey—Versed, Fentanyl, Propofol, and

Demerol—may cause the same mental cloudiness, sedation, and disinhibition.  *See* Tr. May 30, 2012

at 228, 231, 264-65; Tr. May 31, 2012 at 501, 511.  A single dose of morphine has a half-life of two

to seven hours.  Tr. May 31, 2012 at 504.  The effects of Versed can last for two to three hours,

while Fentanyl and Propofol are shorter acting drugs.  Propofol lasts only 10 to 15 minutes.  Tr. May

30, 2012 at 237.  Fentanyl has a half-life of approximately 30 to 60 minutes.  Tr. May 30, 2012 at

236.  Demerol is active for two to seven hours after it is administered.  Tr. May 30, 2012 at 232.

Both morphine and Demerol produce metabolites, which themselves induce side effects and have

half lives of their own.  Tr. May 31, 2012 at 569-70.  The foregoing narcotic drugs, when given in

combination of two or more, can have a synergistic effect, meaning that together they amplify the

effects of the drugs more than one would expect from merely adding them together.  Tr. May 31,

2012 at 500.  Further, a significant loss of blood volume can contribute to the lightheadedness and

mental fogginess in a patient receiving these drugs.  Tr. May 20, 2012 at 266.  Given the schedule

on which McCluskey received the drugs, it is possible that his mental alertness would have been

affected at 4:00 p.m. on August 24, 2010.  Tr. May 30, 2012 at 239.  However, the effects (both in

nature and duration) that these drugs have on individuals vary.  Tr. May 31, 2012 at 538, 541, 544-

46.

### 1.   First Encounter

While McCluskey was waiting to be treated for his injuries, FBI Agent McCaskill and New Mexico State Police Agent Bucksath arrived at the hospital and attempted to interrogate McCluskey about the crimes in New Mexico, stating that they wanted to follow up on his prior statements to Rominger.  The time that McCaskill and Bucksath began speaking to McCluskey is unclear; both agents testified that they arrived at the hospital sometime between 8:00 a.m. and 9:00 a.m. on August 24, 2010.  McCaskill began the interview by introducing himself and Bucksath, and stating "You don't have to say anything to us right now but just listen to me for a second if you don't mind. We are down here because we wanted to talk to you and sort of follow up a little bit on what Jay talked to you about."  Ex. 4A-R at 2.  When McCluskey tried to interrupt him, McCaskill said, "Don't . . . don't say anything.  Just let me finish telling you what I have to tell you okay.  Because I don't want you to . . . I don't want you to feel like you're being treated unfairly."  *Id*.  McCluskey responded that he was not going to say that he was being treated unfairly and that what he did was wrong.  *Id*.  Then, McCaskill and McCluskey had the following exchange in which McCluskey simultaneously said that he was not in a situation to be talking to police but then offered to talk to the agents if they could help his mother, who had been arrested by Arizona authorities:

> McCaskill:     Okay.  Well listen what we want to do is we want to talk to you about that.  We want to talk –
>
> McCLUSKEY:  I'm in no situation to be talking to nobody right now.  I don't know if you understand.
>
> McCaskill:     I understand what you did.  I do.  And if you feel like talking, then now's a good time –
>
> McCLUSKEY:  My lawyer would shit if I did.

McCaskill:     Well listen, we're going to tell you what your rights are again.  If you want to talk to us, you talk to us.

McCLUSKEY:  I would . . . I would . . . I would . . . I would probably be willing to talk to somebody, but it's going to have to be somebody that's willing . . . that's willing to help my mom.  The woman didn't have nothing to do with this shit.

Ex. 4A-R at 3.  Shortly thereafter, McCluskey made another unprompted offer to cooperate in return for help for his mother, stating "You guys take care of my mother.  You want something from me, you'll have the world from me.  Get my mother out of jail." *Id*. at 4.  McCaskill responded that he would see what he could do about McCluskey's mother, but he could not make any promises because neither he nor Bucksath worked for the agency that arrested her.  *Id*.  Once again, McCluskey offered to tell "anything and everything" if the agents could find the person with the authority to get his mother out of jail.  *Id*. at 5.  In response, McCaskill tried again to read McCluskey his rights, but McCluskey interrupted him both times.  *Id*.  McCaskill tried a third time, explaining to McCluskey why he and Bucksath wanted to talk to him.  "What we want to do today, tell you what your rights are, explain them to you and make sure you understand them and just ask the follow-up questions that Jay [Rominger] couldn't ask.  If you're willing to do that for us, I don't know . . . I don't know how much it's going to help, but it might."  *Id*. at 5-6.  Once again, McCluskey conditioned his cooperation on his mother's release from jail: "I ain't got no problem talking to either one of you if you got that guy with you who can make that decision to get my mother out of jail."  *Id*.  at 6.  McCaskill emphasized that he could not get McCluskey's mother out of jail.  He then told McCluskey again that he did not have to tell them anything, but "what I'm trying to get across to you is that sometimes these situations work out best when you put the first foot forward."  *Id*. at 7.  McCaskill then offered to leave McCluskey with a copy of the complaint that had been filed against him in federal court, and again suggested, "I want to be able to get a

11

better idea of what your whole story is and if we do that, that's maybe the first, that's maybe the best foot forward for you, for Cassie, for your mom, for everybody is getting the full details of it.  But it's up to you."  *Id*. at 8.  McCluskey said that he might be willing to talk to law enforcement in the future, but that "today is not the day for it.  I don't know what to tell you guys.  I mean, I'm sure you can look at me and see that my mind's not really here right now."  *Id*. at 8.  McCaskill acquiesced, saying "I understand.  How about if we come back and visit you when they get you out of this hospital and you get back to the jail."  *Id*.  Again, McCluskey proposed a bargain wherein the agents try to help McCluskey's mother in return for a candid statement from him.  Neither side guaranteed the other anything, *id*. at 9, and again McCaskill reminded McCluskey that he did not have the power to get McCluskey's mother out of jail.  *Id*. at 9.  Then, McCaskill said that he and Bucksath were leaving so that McCluskey could get "stitched up," but he promised to try to find out who had arrested McCluskey's mother, what the charges against her were, and whether she had an attorney in the hopes that obtaining that information would show his good faith and convince McCluskey to talk to him later at the jail.  *Id*. at 11.  In response to McCluskey's question, McCaskill confirmed that he wanted to discuss "New Mexico."  *Id*. at 11.  At this point, McCluskey backed off a bit, stating, "if you want to discuss New Mexico, when my head's straight, I'm sure you can call my lawyer and I can refer . . . I can . . . I can . . ."  *Id*. at 12.  McCaskill responded, telling McCluskey that his lawyer represented him "on Arizona," but "he don't have anything to do with New Mexico."  *Id*. at 12.  After McCaskill agreed with McCluskey that his lawyer could be present with him if McCluskey desired, Defendant said, "I can't think right now, dude. . . . They just gave me a shot of shit."  *Id*. at 12-13.  McCaskill responded, "Fine, that's fine," and said that they would visit McCluskey later at the jail.  *Id*. at 13.  And then for a third time, McCluskey brought up his mother, stating, "I hope you can tell me something about my mom getting out."  *Id*.  After McCaskill assured

McCluskey that he was going to see what he could find out, the agents left.  *Id*. at 13-14.  McCluskey made no self-incriminating statements during this encounter with McCaskill and Bucksath, which lasted approximately eleven minutes.  Ex. 4.

    2.    **Second Encounter**

At approximately 4:28 p.m. that day, McCaskill and Bucksath met with McCluskey again, this time in jail.  McCaskill began the interview by advising McCluskey of his *Miranda* rights, and McCluskey signed a written waiver form.  Ex. 4A-R at 15-17; Ex. 5.  McCluskey noted that he had already given a statement: I did this last time . . . I just told the dude just go ask Cassie what she wants me to do."  Ex. 4A-R at 17.  He then asked what Welch was being charged with.  After a brief discussion with the agents regarding the charges against Welch, McCluskey made incriminating statements.   Then, McCaskill told McCluskey what he had learned about the charges against McCluskey's mother and the identity of her attorney.  *Id*. at 19-22.  McCaskill then returned to the theme of McCluskey making a statement to benefit Welch: "I think you want to, you know, make sure that we understand that she didn't have anything to do with it."  *Id*. at 23.  Then McCaskill instructed McCluskey to discuss only what happened in New Mexico, as he was represented by counsel on his prison escape and other crimes in Arizona.  *Id*.  McCluskey agreed to do the best he could, stating, "I'm not shittin' you . . . I'm a little foggy, but I'm not bullshitting you."  *Id.* at 24.  McCluskey then proceeded to make incriminating statements.  The recorded portion of this encounter between McCaskill, Bucksath, and McCluskey lasted approximately one hour.

At no point in either interview did either McCaskill or Bucksath threaten McCluskey, subject him to physical punishment, touch him, or make any promises that they could not or did not keep.  McCluskey used a calm, polite tone of voice throughout both interrogations of McCluskey, and he and Bucksath were the sole law enforcement officers in the room during their discussions.  Both

McCaskill and Bucksath were dressed in plain clothes, not uniforms.  During the first interview at the hospital, both agents were armed but neither weapon was visible. Tr. May 29, 2012 at 186. Neither agent was armed during the afternoon interrogation at the jail.  *Id*. at 210-11.  McCluskey was not deprived of food, water, or sleep.  Throughout the interrogations McCluskey sounded alert and aware of his surroundings. As with the interrogations conducted by Rominger four days earlier, McCluskey appeared to be of normal, average intelligence, he understood the questions put to him, and he appeared to be a native English speaker.  Further, at no point during either encounter was McCluskey in extreme pain or discomfort.  He was no longer bleeding, and during both encounters he appeared oriented and rational.

## C.   Other Relevant Evidence

McCluskey's criminal history includes a 1986 conviction for disorderly conduct, a 1989 conviction for shoplifting, a 1990 conviction for assault, a 1991 conviction for spousal battery, and a 1992 conviction on conspiracy and drug-related charges.  In 1992, McCluskey was convicted in Pennsylvania of criminal conspiracy, aggravated assault, robbery, and theft.  Then, in 2009 McCluskey was convicted in Arizona of aggravated assault with a deadly weapon, attempted second degree murder, and discharge of a firearm at a structure.  He was serving a fifteen-year sentence for those crimes in Kingman, Arizona at the time of his alleged escape and commission of the crimes set forth in the Third Superceding Indictment.  Furthermore, McCluskey's criminal history includes numerous other arrests and charges, the disposition of which is unknown.  Thus, it is reasonable to infer that McCluskey has considerable experience in dealing with the police in a custodial setting, and that he has been informed of his *Miranda* rights on more than one occasion.

On March 12, 2009, at around 8:00 p.m., McCluskey was apprehended in Mesa, Arizona for a crime unrelated to this case.  Police spoke with McCluskey while he was detained in the back of

a police car. *See* Tr. May 30, 2012 at 445-49 and Ex. 12. McCluskey told police that if they let

McCluskey wipe his face and call his wife, he would tell them whatever they wanted to know about

his crime. *Id*. A detective told McCluskey that he could call his wife, informed him of his *Miranda*

rights, and interviewed him about the incident. *Id*. McCluskey did not invoke his right to remain

silent or his right to an attorney. Instead, he waived his rights and made a statement to police,

though he refused to implicate anyone else in the crime. *Id*. at 452-57.

On August 24, 2010, a United States Magistrate Judge for the District of New Mexico signed

orders appointing two attorneys to represent McCluskey on the charges against him in this case.

However, those orders were not entered until the next day, August 25, 2010.


### III.  DISCUSSION

#### A.    Fifth Amendment Right to Silence

In his brief in support of his motion to suppress, McCluskey argues that he asserted his Fifth

Amendment right to remain silent on August 24, 2010 during his initial interview with McCaskill

and Bucksath. Doc. No. 293 at 18-19. McCluskey reiterated his position in his reply brief. Doc.

No. 358 at 9.[2]

#### 1.    The Law

Under *Miranda v. Arizona*, an interrogation must immediately cease when an "individual

indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent."

---

[2] However, in his written closing argument (Doc. No. 527), McCluskey argues for the
first time that he also invoked his right to remain silent before and during his August 20, 2010
interviews with Rominger. *Id*. at 1, 4. The Court will not consider this argument, as
McCluskey's failure to raise it in a timely manner has deprived the Government of the
opportunity to respond.

384 U.S. 436, 473–74 (1966).   Statements elicited by police after a defendant invokes this right are

inadmissible.   *See Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975).   *See also Davis v. United

States*, 512 U.S. 452, 458-59 (1994) (holding that custodial interrogation may continue unless and

until the suspect actually invokes his right to counsel; ambiguous or equivocal statements that might

be construed as invoking the right to counsel do not require the police to discontinue their

questioning).   To come within the ambit of this rule, however, a suspect's invocation of his right

to remain silent must be "clear and unambiguous."   *United States v. Rambo*, 365 F.3d 906, 910 (10th

Cir. 2004).   The Supreme Court reaffirmed this standard in *Berghuis v. Thompkins*, — U.S. ——,

130 S.Ct. 2250 (2010).   *Thompkins* held that a suspect's refusal to speak does not invoke the right

to remain silent; rather, a suspect must "unambiguously" invoke his *Miranda* rights. 130 S.Ct. at

2260.

In order to determine if a suspect's invocation of his *Miranda* rights is clear and

unambiguous, the Court must examine the entire context of the relevant statement.   *Rambo*, 365 F.3d

at 910.   Determining whether a suspect has invoked his rights "is an objective inquiry."   *Davis*, 512

U.S. at 459, 114 S.Ct. 2350.   The question is whether the suspect's statement is "sufficiently clear

that a reasonable police officer in the circumstances would understand the statement to be a request

for an attorney."   *Id*.   However, the defendant's subsequent statements cannot be used to determine

whether his purported invocation of a *Miranda* right is equivocal; rather, the court may consider

only the circumstances and his statements leading up to that moment.   *Smith v. Illinois*, 469 U.S. 91,

97-98 (1984).

### 2.   <u>Analysis</u>

McCluskey points to three separate statements that he made during his first encounter with

McCaskill and Bucksath on August 24, 2010, that he contends constitute an unambiguous invocation

16

of his right to silence.  The Court will address them chronologically.

First, early in the encounter when McCaskill said, "Well listen what we want to do is we want to talk to you about that.  We want to talk–," McCluskey responded "I'm in no situation to be talking to nobody right now.  I don't know if you understand."  The Court concludes that this is not an unambiguous invocation of McCluskey's right to silence.  It is not clear from the context of that statement if McCluskey is refusing to talk to the agents or if he is stating that he will talk to the agents at a later time.  McCluskey was in the hospital at the time, injured and awaiting surgery.  Several days earlier McCluskey had agreed to be interrogated by Rominger, a fact of which McCaskill was aware.  And by his use of the phrase "right now," McCluskey's statement could reasonably be construed as a preference to defer the interview to a more convenient time.

A short time later, McCluskey said that he might be willing to talk to law enforcement in the future, but "today is not the day for it.  I don't know what to tell you guys.  I mean, I'm sure you can look at me and see that my mind's not really here right now."  Again, this was not an unambiguous assertion of the right to silence.   In fact, his statement that "today is not the day for it," implies a willingness to answer questions, though at a later time.  And just moments earlier, McCluskey told the agents that he would give them "the world" and tell them "anything and everything" if they could help his mother.

Finally, McCluskey points to his statement, "I can't think right now, dude. . . . They just gave me a shot of shit."  Again, this is not an unambiguous invocation of the right to silence, particularly in light of everything that McCluskey had said before that indicated his willingness to talk under different conditions or at a later time.  Rather, the Court construes this remark as a commentary by McCluskey on the way he was feeling physically at that moment.

Accordingly, McCluskey's motion to suppress on the grounds that his right to remain silent

was violated will be denied.

**B.**     **Fifth Amendment Right to Due Process**

    **1.**     **The Law**

The Government bears the burden of showing, by a preponderance of the evidence, that a

confession is voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004). "Waiver of one's Fifth

Amendment privilege against self-incrimination requires that the individual 'voluntarily, knowingly

and intelligently' waive his constitutional privilege." *United States v. Morris*, 287 F.3d 985, 988

(10th Cir. 2002) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

> First the relinquishment of the right must have been voluntary in the sense that it was
> the product of a free and deliberate choice rather than intimidation, coercion, or
> deception. Second, the waiver must have been made with a full awareness both of
> the nature of the right being abandoned and the consequences of the decision to
> abandon it. Only if the totality of the circumstances surrounding the interrogation
> reveal[s] both an uncoerced choice and the requisite level of comprehension may a
> court properly conclude that the *Miranda* rights have been waived.

*Wilson v. Oklahoma*, 363 Fed. Appx. 595, 613 (10th Cir. 2010) (citing *Colorado v. Spring*, 479 U.S.

564, 573 (1987)).

The Tenth Circuit has held that the mere fact a suspect has consumed drugs or alcohol prior

to interrogation does not automatically render his or her waiver invalid. *See United States v. Burson*,

531 F.3d 1254, 1258 (10th Cir. 2008). *See also United States v. Muniz*, 1 F.3d 1018, 1022 (10th Cir.

1993) (noting that a state of intoxication does not automatically render a statement involuntary).

Instead, a court must look to the totality of the circumstances and ask whether the waiver was made

"with a full awareness of both the nature of the right being abandoned and the consequences of the

decision to abandon it." *Id.* at 1257 (quotation omitted). Among the factors the Court should

consider are "(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment." *United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009). Coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the Due Process Clause. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

It is clearly established that threats of harm to the accused or his family, as well as promises of leniency or of protection from harm in return for a statement, constitute improper coercion. For example, in *Griffin v. Strong*, 983 F.2d 1540 (10th Cir. 1993), the Tenth Circuit held that where defendant had (1) suggested that the plaintiff would not be able to see his daughter, (2) promised plaintiff lesser punishment, and (3) promised to protect plaintiff's health and safety in order to induce him to make a statement, that statement was involuntary. In reaching this conclusion, the Tenth Circuit relied upon Supreme Court precedent requiring that a confession be voluntarily and freely given, without any promises or threats by the government. *Id.* at 1543 ("The central consideration in determining whether a confession has been coerced always involves this question: did the governmental conduct complained of 'bring about' a confession 'not freely self-determined?'") (quoting *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 348 (1963)). Based upon this rationale, the Tenth Circuit has long looked askance at confessions obtained by promises and threats, finding that statements made under those circumstances are not the product of free will. Rather, "[i]ncriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment . . . ." *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991) (citing *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)).

Finally, the Supreme Court has noted that failure to provide outside assistance to a suspect, especially in view of the accused's statement that he desires counsel, is a factor to consider in determining whether his confession was involuntary.  *See Johnson v. State of New Jersey*, 384 U.S. 719, 730-31, 735 (1966) (citing cases).

### 2.      Analysis

McCluskey argues that his statements to Rominger on August 20 and his statements to Bucksath and McCaskill on August 24, 2010 were involuntary and therefore inadmissible at trial. As grounds for his motion to suppress, McCluskey argues that under the totality of the circumstances he was coerced because Rominger purposefully violated Mr. McCluskey's right to counsel, portrayed himself as an "advocate" for McCluskey and Welch, and preyed on McCluskey's concerns for Welch.  Doc. No. 293 at 19-21.  He further argues that McCaskill and Bucksath coerced him by exploiting his incapacitation following his suicide attempt and treatment for the same.  *Id*. at 19, 22-23.

### a.      August 20, 2010

McCluskey does not argue that his age, intelligence, or education were factors in the alleged coercion, or that Rominger ever subjected him to or threatened him with physical punishment. Similarly, he does not contend that the length of his detention or of the questioning were coercive. McCluskey also does not contend that the lack of a *Miranda* warning led  to coercion, nor does he take the position that he was mentally or physically impaired at any time during Rominger's interrogation.

Instead, McCluskey argues that Rominger coerced him by preying on his concern and love for Welch, continuing to interrogate him after he invoked his right to counsel, and representing himself as an advocate instead of as an interrogator.  According to McCluskey, Rominger suggested

that his cooperation would lead to leniency, and therefore avoidance of the death penalty, for Welch. In addition to mentioning at the beginning that McCluskey could "be a stand up guy for [Welch's] benefit," as discussed elsewhere in this opinion, Rominger also told McCluskey that, "some of the best things that happen for you is cooperation, helpfulness, you know, working with the government, you know, so I can do that. Plus we can explain to the – you know, what [Welch's] role was or what it wasn't, you know. Because that's going to become a big issue for her." Ex. 1A-R at 3. Rominger also told McCluskey that, "you can stand up now and – and – and go in knowing you did the right thing for her. And I'm with you the whole way." *Id*. at 4-5. Rominger also stated, "if you and I can explain what [Welch's] role was in New Mexico and that, that's going to make a huge difference." *Id*. at 5. Later, McCluskey (not Rominger) brought up the death penalty, saying that he intended to fight it and "if I lose, I lose, kill me." *Id*. at 6. After a brief exchange, Rominger said, "But we -- we don't want -- we don't want Casslyn to be in that same boat, right?" *Id*. In addition, McCluskey points to the fact that Rominger continued the interrogation despite the fact that McCluskey had invoked his right to counsel as further adding to the coercion.

After considering all of the foregoing, the Court concludes that the Government has met its burden to demonstrate by a preponderance of the evidence that McCluskey's confession was voluntarily given. First, Rominger did not make any promises of leniency regarding Welch. He did inform McCluskey that it would help Welch if there was evidence that she did not participate in murdering the Haases. However, Rominger's statements were not coercive. Rominger did not promise that the charges against Welch would be dropped or that she would receive a particular sentence if McCluskey confessed to the murders. He simply pointed out that a confession describing Welch's limited role would be helpful to her. Such vague statements do not support a finding of coercion. For example, in *United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997), the

21

Tenth Circuit concluded that the defendant's decision to cooperate in exchange for possible leniency was the result of calculation by the defendant, and not of coercion.  In that case, Zarate argued that his ability to make a rational decision was destroyed by agents' intimations that any cooperation would benefit him.  *Id*. at 783. But as the court stated, "[t]hat a defendant balanced personal considerations with the possible cost of disclosure does not render his subsequent statements involuntary."  *Id*.  The court relied, in part, on *United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990), wherein the arresting officer told the defendant that "his cooperation would be helpful."  The *Rutledge* court concluded that a defendant forced to weigh the costs and benefits of disclosure had not been coerced  by police.  *Id*. at 1130.  The officers did not magnify the defendant's "fears, uncertainties, and so forth to the point where rational decision becomes impossible."  *Id. See also United States v. Westbrook,* 125 F.3d 996, 1005 (7th Cir. 1997) ("It is not improperly coercive conduct for an officer to tell a suspect that the prosecutor will be informed of his cooperation and will evaluate his case in light of his cooperation."); *Allen v. McCotter*, 804 F.2d 1362 (10th Cir. 1986) (concluding that defendant's confession was not coerced when police told him that if he confessed, charges would not be brought against his wife, who aided in the commission of the crime). That is the case here as well.  The Court sees nothing in Rominger's statements or actions that would overcome McCluskey's ability to make a knowing and voluntary choice to waive his *Miranda* rights.  As a 45-year old man of normal intelligence who holds a GED and who has considerable experience with police interrogations, McCluskey made a calculated decision to help the woman he loved.  That decision was not unduly influenced by an unreasonably long detention (only approximately five hours at the time Rominger interrogated him), prolonged interrogation (less than an hour), lack of food or sleep, threats, or physical violence.  And, the Court sees nothing in the record to support McCluskey's claim that Rominger deceived him into believing that he was

22

McCluskey's advocate rather than an FBI interrogator.  In fact, McCluskey's criminal history, his own words and conduct during the interrogation, and the surrounding circumstances indicate that he understood Rominger's true role in the criminal justice system.  Finally, the Court considers that at the time of the interrogation McCluskey was a middle-aged man of normal intelligence who had some considerable experience with police and the criminal justice system.  The length of his detention and questioning were not coercive in the least, and never did Rominger, who was in plain clothes, ever display his weapon or either use or threaten to use force against McCluskey.

One factor does weigh in favor of finding that McCluskey was coerced—the fact that Rominger continued to interrogate him even after McCluskey twice invoked his right to counsel. However, under the totality of the circumstances the Court finds this factor to be outweighed by the other considerations discussed above. The cases McCluskey cites do not compel a different conclusion.  In *Arizona v. Roberson*, 486 U.S. 675, 686 (1988), the Supreme Court did observe that further interrogation after invocation of the right to counsel would exacerbate whatever compulsion to confess a suspect may be feeling.  However, in that case the Court upheld suppression of the confession on the grounds that the suspect's *Miranda* rights, as set forth in *Edwards v. Arizona*, had been violated.  The Court did not declare a *per se* rule that violation of the right to counsel would preclude a voluntary confession in violation of the suspect's Fifth Amendment right to due process. And in *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997), the Tenth Circuit held that "a promise of leniency may render a confession involuntary if it was sufficiently compelling and linked to the confession so that it could be said that the defendant's will was overcome by the offer." *Id*. at 1159.  That was the case in *Clanton*, where the interrogator told the suspect that he would get a twenty-five-year sentence if he did not confess, but would "get off lightly" if he confessed to a pattern of events suggested by the police.  Nothing that Rominger said to McCluskey approached

23

this level of specificity, nor did Rominger make any promises to McCluskey about what would happen if he confessed. Similarly, the coercive pressures brought to bear on the suspects in the other cases that McCluskey cites—which often included express or implied threats of violence or deprivation of food—are nothing like the situation in this case. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279 (1991) (finding confession to be involuntary where government informant offered to protect suspect from credible threat of prison violence in return for confession); *Blackburn v. Alabama*, 361 U.S. 199 (1960) (finding coercion where evidence indicated high probability that suspect was insane and was subjected to continuous nine-hour interrogation in small room crowded with police); *Payne v. Arkansas*, 356 U.S. 560 (1958) (finding confession involuntary where teenage suspect had been held for three days without *Miranda* warnings, a hearing or access to counsel; had been denied food for long periods of time; and was told by police that they would protect him from likely mob violence if he confessed); *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) (finding coercion where suspect confessed to a police informant after informant told him that he was targeted for death by a drug gang, but informant would protect suspect if he confessed). The totality of the circumstances surrounding McCluskey's interrogation on August 20, 2010 do not resemble the circumstances in these cases which contained express or implied threats to the safety of the accused.

Thus, while the Court concludes that Rominger's failure to honor McCluskey's invocation of the right to counsel created some coercive pressure, it was outweighed by the other relevant factors and, under the totality of the circumstances, McCluskey's confession was voluntary.

        b.      <u>August 24, 2010</u>

McCluskey also challenges his confession to McCaskill and Bucksath on August 24, 2010 as involuntary. He argues that the agents interrogated him when his mental and physical condition

24

rendered him vulnerable to coercion.  First, McCluskey contends that he was mentally distraught and in a suicidal state of mind that morning at the hospital, as evidenced by his attempt to kill himself the previous evening.  *See* Tr. May 31, 2012 at 524-25.  He also points to his statements showing his mental distress over his mother's incarceration and the criminal charges being brought against her as evidence that he was not in a state of mind to knowingly and voluntarily waive his *Miranda* rights.   Second, McCluskey argues that his physical condition contributed to the involuntary nature of his confession.  He inflicted a serious injury on his own neck that resulted in significant blood loss and which required major surgery to repair.  McCluskey further points out that he repeatedly told the agents at the hospital that he was in no condition to talk to them at that time. McCluskey said that  he "was in no situation to be talking to nobody right now" and that "today is not the day for it."  Third, McCluskey argues that the drugs he received at the hospital adversely affected his ability to make a knowing and voluntary waiver of his *Miranda* rights.  As he points out, in the morning on August 24, 2010 McCluskey told McCaskill and Bucksath, "I'm sure you can look at me and see that my mind's not really here right now" and that he "couldn't think right now" because "they just gave me a shot of shit."  McCluskey points to this as evidence of the effects of morphine on his mental state.[3]   And, he contends that the disinhibiting effects of the narcotics he

---

[3] There is considerable disagreement between the parties as to whether or not McCluskey had actually received morphine prior to his first encounter with McCaskill and Bucksath.  The question arises because there is no reliable evidence in the record regarding when that encounter took place.  Neither agent could remember a precise time, and there is nothing in the written record that documents when the interview commenced.  McCluskey did tell the agents that he could not think because he had just received a "shot of shit."  McCluskey contends that this statement referred to the dose of morphine.  The Government points out that a "shot of shit" could not refer to the morphine, which was administered intravenously, and that the only shot McCluskey received was a tetanus shot.  The Court concludes that either of the two is equally likely, and that it would require speculation to determine what actually happened on this score. Because the Government cannot meet its burden to prove by a preponderance of the evidence that McCluskey did not receive morphine before the encounter, the Court presumes that he did.

received that morning and then again later in the day were amplified by his blood loss.  He contends that he was still suffering the effects of those narcotics when the agents interviewed him at 4:00 p.m., just a few hours after his surgery had ended.  He points to the fact that at 3:30 p.m., the nursing notes state that he had complained of lightheadedness, a known side effect of those drugs.

On the other hand, there is significant evidence that weighs in favor of concluding that McCluskey's waiver of his *Miranda* rights on August 24, 2010 was knowing and voluntary.  Many of the same circumstances that were present during McCluskey's encounter with Rominger apply here as well—McCaskill and Bucksath were dressed in plain clothes, did not display their weapons, spoke respectfully to McCluskey, and did not use force or threaten to use force against him.  They did not interrogate McCluskey for a prolonged period of time—they questioned him at the jail for approximately one hour.  And, while by this point McCluskey had been in custody for several days, that factor carries significantly reduced weight in light of the fact that he was both a convicted felon and a prison escapee who was *supposed* to be incarcerated at that time, and who was well-acquainted with jails and prisons.  Also in favor of a conclusion that McCluskey's statements were voluntary is the fact that at all times during his encounter, he appeared alert, oriented and rational.  McCluskey appeared to understand the questions put to him and his responses were appropriate.  And, he was thinking in a calculated manner as he attempted to use his confession as a bargaining chip to obtain aid for his mother, who had been arrested.  In fact, as McCluskey himself points out, he was eager to offer statements to the agents in return for obtaining help for his mother.  According to McCluskey, his willingness to be forthcoming (disinhibition) is a symptom that is consistent with the effects of narcotics.  However, that behavior is also consistent with McCluskey's own behavior during prior police encounters when he was not under the effect of narcotics.  For example, during his arrest in March of 2009, McCluskey offered to tell the police anything they wanted to know if

26

they would first allow him to wipe his face and call his wife.  And, during interrogation by Rominger just four days earlier, McCluskey offered to help Welch by telling the agent everything he wanted to know, provided that Welch directed McCluskey to do so.  Thus, McCluskey has a pattern of waiving his *Miranda* rights in return for some other benefit.  The fact that he did so again here does not necessarily show that his decision making abilities were adversely affected by narcotics.  In addition, McCluskey waived his rights only after McCaskill gave him the *Miranda* warnings.

The government bears the burden to prove by a preponderance of the evidence that McCluskey's waiver was knowing and voluntary.  This is a close case, with evidence on both sides of the issue.  However, the Court concludes that the Government has met its burden, though by only a slight margin, to prove a knowing and voluntary waiver.  At the time that McCluskey chose to make incriminating statements during the second encounter, his "capacity for self determination" was not greatly affected by the drugs he had been given or any other factor.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).  Thus, McCluskey's motion to suppress his statements on August 24, 2010 on the grounds that his waiver of his Miranda rights was not knowing and voluntary will be denied.

## C.    Sixth Amendment Right to Counsel

Defendant contends that his statements to McCaskill and Bucksath on August 24, 2010 were obtained in violation of his Sixth Amendment right to counsel.  As grounds for his argument, Defendant points to the fact that at the time of the interrogation he had been charged by a criminal complaint with the deaths of Gary and Linda Haas and that this Court had appointed counsel to defend him against those charges.  Defendant acknowledges that at the time of that questioning he had not yet been indicted or made an initial appearance in court, and that only a criminal complaint

against him had been filed.  Defendant further concedes that the Sixth Amendment right to counsel is offense specific and that the all of the federal courts of appeals that have reached the issue have held that the right does not attach with the mere filing of a criminal complaint.  *See, e.g., Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 213 (2008) ("[A] criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."); *United States v. States*, 652 F.3d 734, 741 (7th Cir. 2011); *United States v. Boskic*, 545 F.3d 69, 83 (1st Cir. 2008); *United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006); *United States v. Moore*, 122 F.3d 1154, 1156 (8th Cir. 1997); *United States v. Langley*, 848 F.2d 153, 153 (11th Cir. 1988); *United States v. Pace*, 833 F.2d 1307, 1312 (9th Cir. 1987); *United States v. Duvall*, 537 F.2d 15, 22 (2d Cir. 1976).

However, McCluskey argues that despite these precedents, the circumstances in this case support a finding that the Sixth Amendment right to counsel attached when McCaskill and Bucksath interrogated him on August 24, 2010.  In particular, McCluskey points to the fact that not only had the complaint been filed, but also McCluskey had previously invoked his right to counsel, this Court had appointed counsel to represent him, and the United States Attorney for the District of New Mexico had issued a press release manifesting a "commitment to prosecute" McCluskey for the deaths of the Haases.  Thus, McCluskey invites the Court to extend the Sixth Amendment right to counsel months before he was indicted or had made an initial appearance.  The Court declines the invitation.  Nothing in the Supreme Court cases[4] cited by McCluskey supports such a significant

---

[4] *Kirby v. Illinois*, 406 U.S. 682 (1972) (plurality opinion) (concluding that a police station showup conducted after defendant's arrest, but before the initiation of any adversary criminal proceeding—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment—is not a criminal prosecution at which the accused, as a matter of

extension of the Sixth Amendment.   Defendant relies in particular upon *Escobedo v. Illinois*, 378 U.S. 478, 490-91 (1964) for the proposition that there may be some circumstances when the government interferes with the defendant's Sixth Amendment right to counsel even before the initiation of criminal charges.   In *Escobedo*, the Supreme Court held that where an "investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect  has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'The Assistance of Counsel' in violation of the Sixth Amendment to the Constitution."   *Id*.   However, the Supreme Court has subsequently recast *Escobedo* in terms of the Fifth Amendment right against self-incrimination during investigative detention and interrogation.  *See Moran v. Burbine*, 475 U.S. 412, 429-30 (1986) (observing that "[a]lthough *Escobedo* was originally decided as a Sixth Amendment case, the Court in retrospect perceived that the prime purpose of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda*, to guarantee full effectuation of the privilege against self-incrimination.") (internal quotations omitted) and *United States v. Gouveia*, 467 U.S. 180, 188 n.5 (1984) ("we have made clear that we required counsel in *Miranda* and *Escobedo* in order to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel.").   Thus, *Escobedo* does not apply to

absolute right, is entitled to counsel); *Massiah v. United States*, 377 U.S. 201 (1964) (holding that the defendant's own incriminating statements, obtained by federal agents after he had been indicted and in the absence of his retained counsel, could not constitutionally be used by the prosecution as evidence against him at his trial); *Maine v. Moulton*, 474 U.S. 159 (1985) (concluding that the state violated the Sixth Amendment rights of defendant, who had already been indicted, when it arranged to record conversations between defendant and an informant).

McCluskey's Sixth Amendment argument.  The Court concludes that at the time of his interrogation, McCluskey's Sixth Amendment right to counsel had not yet attached.

Accordingly, McCluskey's motion to suppress his statements on the grounds that they were taken in violation of his Sixth Amendment right to counsel will be denied.

**D.**     **Fifth Amendment Right to Counsel**

McCluskey argues that Rominger obtained his statements on August 20, 2010 by violating his Fifth Amendment right to have counsel present during questioning, as that right has been explained by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966).  The Government concedes that McCluskey unambiguously invoked his right to counsel at the beginning of his first encounter with Rominger, and it does not dispute that McCluskey again invoked his right to counsel during the middle of that interrogation.  Thus, the Government does not seek to introduce any of McCluskey's statements from the first Rominger interrogation into evidence during its case-in-chief. However, the Government does intend to offer into evidence the incriminating statements McCluskey made during his second encounter with Rominger.  The Government contends that despite initially asserting his right to counsel, McCluskey then later initiated further discussion with Rominger which opened the door for further interrogation by Rominger.  Thus, the question before the Court is whether McCluskey initiated the encounter with Rominger that led to his confession.

**1.**     **The Law**

Under *Miranda*, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. 384 U.S. at 467–73, 86 S.Ct. 1602.  Although a suspect may waive those rights, all questioning must stop if the suspect requests an attorney at any time during the custodial interrogation.  *Edwards v. Arizona*, 451 U.S.

477, 484–85 (1981).  Questioning may resume only if a lawyer has been provided or the suspect

himself reinitiates communication with law enforcement.  *Id.*  This is a bright-line rule.[5]  *United*

*States v. Giles*, 967 F.2d 382, 386 (10th Cir. 1992).  "[I]f the accused invoked his right to counsel,

courts may admit his responses to further questioning only on finding that he (a) initiated further

discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."

*Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citing *Edwards*).

In *Davis v. United States*, 512 U.S. 452, 458–59 (1994), the Supreme Court set forth the

standard for evaluating whether a suspect has invoked the right to counsel during a custodial

interrogation. Under *Davis*, a suspect invokes that right only by "articulat[ing] his desire to have

counsel present sufficiently clearly that a reasonable police officer in the circumstances would

understand the statement to be a request for an attorney." 512 U.S. at 459.  "[I]f a suspect makes a

reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the

circumstances would have understood only that the suspect *might* be invoking the right to counsel,"

law enforcement questioning need not cease.  *Id.* (emphasis in original).  Here, the Government does

not dispute that McCluskey was in custody or that his statement at the beginning of his first

encounter with Rominger that "I don't want to talk to nobody without a lawyer" was an

unambiguous and unequivocal invocation of his *Miranda* right to counsel.

"[O]nce a defendant in custody asks to speak with a lawyer, all interrogation must cease until

a lawyer is present."  *Rhode Island v. Innis*, 446 U.S. 291, 293 (1980).  In *Innis*, the Supreme Court

held that "interrogation" under *Miranda* refers not only to express questioning, but also to its

---

[5] This bright line rule differs significantly from the "totality of the circumstances"
analysis that the Court must apply when determining voluntariness under the Fifth Amendment
right to due process, discussed in Section B(1), *supra*.

"functional equivalent"—that is, any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301. Furthermore, once a suspect has invoked his right to counsel, "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. 675, 681 (1988).

### 2.   <u>Analysis</u>

#### (a)    *First encounter was an interrogation*

Though the Government admits that McCluskey unambiguously invoked his right to counsel, it contends that Rominger did not violate *Miranda* by actually interrogating McCluskey during the first interview, but instead merely introduced himself, explained his purpose for being there, and informed McCluskey of the benefits that might accrue if McCluskey made a statement. *See* Doc. No. 528.  However, in this Court's view there can be little doubt that Rominger's statements to McCluskey constituted "interrogation" for purposes of *Miranda*.  Despite McCluskey's clear invocation of his right to counsel, Rominger immediately encouraged McCluskey to make an incriminating statement by stating that McCluskey had the opportunity to "be a stand-up guy for [Welch's] benefit" and to explain Welch's minimal role in the murders.  Later, when McCluskey invoked his right to counsel a second time, Rominger continued in this vein, responding, "Even now?  I mean, even with Casslyn?"  There can be no doubt that when a law enforcement officer points out to a suspect that he can benefit his loved one by making an incriminating statement exculpating her of a serious crime, that officer intends to elicit an incriminating response.  Indeed, by not only offering, but also encouraging, McCluskey to be a "stand up guy" and protect Welch by making a statement as to her lack of culpability, Rominger was employing a well-established

interrogation technique.  As Justice Marshall noted, "the appeal to a suspect to confess for the sake of others, to 'display some evidence of decency and honor,' is a classic interrogation technique." *Innis,* 446 U.S. at 306 (dissent) (citing F. Inbau & J. Reid, Criminal Interrogation and Confessions 60-62 (2d ed. 1967)).  *See also id.* at 315 (observing that police interrogation manuals "recommend appealing to a suspect's sense of morality as a standard and often successful interrogation technique) (Stevens, J., dissenting).[6]  Thus, McCluskey's statements in his first encounter with Rominger are inadmissible because Rominger interrogated him in violation of *Miranda*.   However, the Government contends that McCluskey's statements during his second interview with Rominger are admissible because McCluskey initiated that discussion and then validly waived his *Miranda* rights. *See* Doc. No. 528 at 2.  In the Government's view, it was McCluskey who initiated the second interrogation and waived his right to counsel after the precondition that he himself demanded—specifically, that Welch direct him to talk to police about her non-involvement in the murders—had been satisfied.

> *(b)* *Did McCluskey initiate further exchanges with Rominger?*

Thus, the question before the Court is whether McCluskey initiated further "communication, exchanges, or conversations" with Rominger after he invoked his right counsel.  *See Edwards*, 451 U.S. at 485.  For guidance, the Court turns to decisions from the Supreme Court and the Tenth Circuit discussing similar issues.  In *Edwards*, the defendant invoked his right to counsel, but the

---

[6] Similarly, in *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004), the Tenth Circuit relied upon *Innis* to conclude that "the use of questions is not required to show that interrogation occurred."  In *Rambo*, the court concluded that a police officer improperly interrogated the defendant when, after the defendant invoked his right to remain silent, the officer told him that much of the blame would fall on his shoulders.  *Id*.  Relying on *Innis*, the court recognized that "one of the techniques used by police during interrogation is to posit the guilt of the subject."  *Id*. (internal quotation and citation omitted).

next morning detectives appeared at the jail, where the detention officer told the defendant that he "had to" speak with police and took the defendant meet with the detectives.  *Id*. at 479.  Thus, *Edwards* presented a clear case where the defendant did not reinitiate further communication with police.

In *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004), the defendant was taken into custody on suspicion of committing armed robberies, and his interrogation was videotaped.  At the beginning of the interview, the officer told Rambo that a lot of the responsibility for the crimes would be on his shoulders, and that he did not want to put more responsibility on Rambo's female accomplice than need be.  *Id*. at 908.  After Rambo asked whether his accomplice would be released or remain in jail, the officer said, "I don't know. [pause] You know if you want to talk to me about this stuff, that's fine." *Id*.  After Rambo inquired again about the welfare of his accomplice and her children, the officer again asked, "Do you want to talk to me about this stuff?" and Rambo responded, "No." *Id*.  This was an unambiguous invocation of the right to remain silent.  However, the officer did not terminate the interview.  Instead, he responded, "You don't? [pause] OK.  [long pause] That's fine.  [pause]  But that's what you're getting charged with." *Id*.  The officer then proceeded to attempt to coax Rambo to talk by informing him that other law enforcement agencies would be involved, and that "If you think back over the last two months since you've been out of prison, all the shit you've been involved in.  Think about this.  Think about the towns that are going to want to talk to you, ok?  Or that have stuff on you." *Id*.  At that point, Rambo began to talk about his lack of involvement in certain crimes, so the officer interrupted him and said, "Before we get into this stuff, Chris, I gotta know if you want to talk to me . . . I can't sit here and talk with you like this if you don't want to talk to me.  So do you want to talk to me?" *Id*.  Rambo assented, and the officer informed him of his *Miranda* rights.  *Id*. at 909.  Then, Rambo confessed his crimes.  *Id*.  The

Tenth Circuit rejected the government's contention that it was Rambo who reinitiated communication after invoking his right to remain silent:

> That argument ignores Moran's active role in continuing the interview after Rambo invoked his rights. When Rambo stated that he did not want to discuss the robberies, Moran made no move to end the encounter. Instead he acknowledged Rambo's request, but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo. Those comments reflect both further pressure on Rambo to discuss the crimes and a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further.

*Id.* at 911.  Thus, the Tenth Circuit concluded that the defendant's capitulation and agreement to talk to police was not at his own behest but rather was a product of the improper interrogation that continued after he invoked his right to silence.  *Id.*  That is essentially what happened in this case. Here, McCluskey unambiguously invoked his right to counsel both at the beginning and in the middle of the interview.  In neither instance did Rominger terminate the encounter. Instead, he proceeded to attempt to elicit an incriminating response from McCluskey by urging him to make a statement that would protect Welch.  And it was this persistent, improper continued interrogation that persuaded McCluskey to agree to talk if Welch told him to do so.  To reach any other conclusion, this Court would have to "ignore [Rominger's] active role in continuing the interview after [McCluskey] invoked his rights."

The other cases the Government cites do not alter this conclusion.  In *United States v. Glover*, 104 F.3d 1570, 1580-81 (1997), the Tenth Circuit held that the defendant's confession was admissible where the individual in custody, rather than the police, initiated further discussion after the defendant invoked his right to counsel.  There, the police arrested Glover and advised him of his *Miranda* rights.  *Id.* at 1575.  Glover indicated that he did not want to talk, and the officers immediately ceased questioning him.  *Id.*  The police then questioned Glover's co-defendant, who

was not in custody. *Id.*  After obtaining her statement, one officer approached Glover but a second officer immediately intervened and reminded him that Glover had invoked his rights.  When the officers began to discuss which particular right Glover had invoked, Glover reminded them that he had invoked his right to silence, but then he stated that he now wanted to talk.  *Id.*  The officers began to interrogate him and did not readvise him of his *Miranda* rights.  *Id.*  The Tenth Circuit concluded that Glover, rather than the police, had initiated the further discussion that led to his confession.  *Id.* at 1581.  The Court reasoned that after Glover invoked his right to silence, police ceased all questioning and it was only later, after the confusion over which *Miranda* rights he had invoked, that Glover himself volunteered that he wished to talk.  *Id.*  This subsequent willingness to talk, the court noted, did not stem from improper interrogation by the police.  *Id.*

Finally, *United States v. Alexander*, 447 F.3d 1290 (10th Cir. 2006), involved the interrogation of two friends who were prison inmates regarding their attack on a fellow prisoner.  The FBI questioned Alexander first, but he invoked his right to remain silent, so agents returned him to his cell.  *Id.* at 1292.  Agents then turned to his friend Sawyer, who waived his *Miranda* rights and confessed, implicating Alexander.  *Id.*  Then Sawyer, worried that Alexander's refusal to cooperate would result in a higher penalty, asked for the opportunity to speak to his friend to convince him to give a statement.  *Id.* at 1292-93.  The FBI agreed to place the two men in adjoining cells overnight, but they also told Sawyer that they would not resume any questioning of Alexander unless Alexander requested it.  *Id.* at 1293.  That evening, the two prisoners discussed their situation, and the next day Alexander contacted the FBI and agreed to give a statement.  *Id.*  After being informed of his *Miranda* rights again, Alexander waived those rights and proceeded to make incriminating statements.  *Id.*  In his motion to suppress those statements, Alexander argued that after he asserted his right to silence, the FBI improperly reinitiated questioning through the intervention of Sawyer,

36

who was acting on behalf of the Government to persuade him to confess, thereby overcoming his will through unconstitutional governmental coercion. Thus, he asserted that he did not reinitiate communication with the FBI, rendering his statement invalid under the Fifth Amendment. The Tenth Circuit disagreed, concluding that Sawyer was not acting as a government agent when he persuaded Alexander to talk. *Id*. at 1297. In so holding, the court noted that "prison officials acquiesced, indeed enabled, the conversation between Alexander and Sawyer. But that is all. They did not develop the planned encounter, nor suggest any techniques to help Sawyer convince Alexander to provide a statement to the FBI. To the contrary, they explicitly told Sawyer that it was Alexander's prerogative to reinitiate contact with them. Their sole complicity was in placing the inmates in adjoining cells." *Id*. at 1295. The court further observed that Sawyer acted for his own benefit, and the fact that the FBI hoped he would succeed did not render Sawyer the FBI's agent for purposes of interrogation. *Id*. at 1296. The court concluded that the conduct at issue was not coercive because from Alexander's perspective, he was merely chatting with a friend, Sawyer, who engaged in no deception. *Id*. Finally, the Tenth Circuit noted that Alexander admitted that he was motivated to give a statement by a desire to protect his friend Sawyer from the prison-yard retaliation that would accompany being labeled a snitch. *Id*. at 1296-97. Thus, the Court upheld denial of Alexander's motion to suppress on the grounds that Sawyer was not the FBI's agent and that it used no coercive tactics on Alexander:

> These facts show that Sawyer was not acting as an agent of the FBI. An agency relationship does not develop where the government is an incidental beneficiary of another party's actions, even where the government admittedly facilitates the conversation that leads to the suspect's decision to reinitiate questioning.

*Id*. at 1297. "Simply stated, a defendant—even if he has asserted the right to counsel—may choose to reinitiate contact with the police so long as the government does not coerce him into doing so."

*Id*. at 1294.

*Edwards*, *Rambo*, *Glover*, and *Alexander* persuade the Court that under the facts of this case, McCluskey did not validly reinitiate contact with Rominger after invoking his right to counsel. While it is true that it was McCluskey's own suggestion that he would talk if Welch told him to do so, he made that suggestion only after Rominger continued to interrogate him after he twice invoked his right to counsel.  It is undisputed that McCluskey invoked that right and that, despite the invocation, Rominger did not terminate the encounter.  As the Court has explained, Rominger continued not only to "explain the benefits of cooperation," (as the Government characterizes it), but also to interrogate McCluskey.  It was only after—and as a result of—that continued interrogation that McCluskey offered to confess if Welch directed him to do so.  It is this type of pressure to acquiesce that *Edwards* is intended to prevent.  As the Supreme Court stated in *Smith v. Illinois,* 469 U.S. 91, 98-99 (1984):

> *Edwards* set forth a "bright-line rule" that *all* questioning must cease after an accused requests counsel.  In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.

(internal citations and quotations omitted).  In that regard, this case is similar to *Rambo*, in which police did not terminate the interview when the defendant invoked his Fifth Amendment rights, but instead continued to interrogate him through means other than express questioning until he agreed to speak to them.  Here, McCluskey did not agree to talk to Rominger at the direction of Welch until after Rominger improperly interrogated him.  It was during this improper interrogation that Rominger convinced McCluskey to confess to protect Welch, and McCluskey agreed if Welch directed him to do so.  Thus, the plan to permit McCluskey and Welch to talk and then resume the interrogation if she told McCluskey to cooperate was the direct product of Rominger's

38

unconstitutional interrogation.  Further, this case is distinguishable from *Glover* and *Alexander*.  In both of those cases, unlike here, the police immediately ceased their interrogation when the defendant asserted his Fifth Amendment rights.  In *Glover*, it was the defendant who, long after the interrogation ended, offered to speak to police.  And in *Alexander*, the FBI ceased questioning the defendant when he asserted his rights, and his reinitiation of the interrogation was the product not of continued questioning, but of independent persuasion by his co-defendant.  Further, in *Alexander* it was the co-defendant who proposed the idea of convincing Alexander to talk to police.  The police did not tell the co-defendant what to say to Alexander; instead, they merely placed the two in proximity to converse.  In contrast, Rominger did instruct Welch to ask McCluskey to "please talk to the man [Rominger]."

The other cases from outside the Tenth Circuit upon which the Government relies also are distinguishable.  In both *United States v. Gaddy*, 894 F.2d 1307 (11th Cir. 1990) and *United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001), a third party played a role in persuading the defendant to confess to police, and the courts ruled that those defendants had reinitiated discussions with law enforcement after they had invoked their Fifth Amendment rights.  In *Michaud*, the defendant asserted her right to counsel and the FBI immediately ceased interviewing her.  268 F.3d at 732.  She was booked into jail, but two days later Michaud's cell mate, without any encouragement from the police, led Michaud to a guard and told him that Michaud wanted to speak to someone about a murder.  *Id*. at 735.  Michaud did not deny that statement, and guards placed her alone in an isolation cell, away from any outside influence.  *Id*.  An hour later the FBI agent arrived and asked if it was true that she wanted to speak to someone about something she needed to get off her chest.  *Id*. at 736.  Michaud assented and then waived her *Miranda* rights in writing.  *Id*.  In *Gaddy*, there was a fact dispute as to whether defendant Danner asserted his right to counsel and

made no statements, or whether the police simply did not conduct an initial interrogation. 894 F.2d at 1309. Either way, police did not interrogate Danner in violation of his Fifth Amendment rights. After photographing Danner, a detective spoke to Danner's sister-in-law, who was a police officer employed as an evidence technician, advising her that it would be in Danner's best interest to cooperate. *Id*. at 1309-10. However, the detective did not ask her to speak to Danner. *Id*. The sister-in-law then urged Danner to make a statement to police, and he agreed. She notified officials of Danner's wish to speak, and later that evening he provided police with a statement after he waived his *Miranda* rights in writing. *Id*. at 1310.

These cases are distinguishable in several important ways. First and most importantly, in *Gaddy* and *Michaud* law enforcement officers did not continue to interrogate the defendants after they invoked their Fifth Amendment rights, but instead the police immediately halted their interrogations. Thus, those defendants' decisions to make incriminating statements were not the product of improper continuing interrogation following the invocation of Fifth Amendment rights. That is not the case here, where McCluskey's offer to confess to police if Welch ordered him to was made during, and as a result of, an ongoing interrogation by Rominger that never ceased after McCluskey twice invoked his right to counsel. Second, in both *Gaddy* and *Michaud* the role of the third parties was somewhat different than that played by Welch. While Welch was certainly motivated by her own self-interest to encourage McCluskey to exculpate her, she did not initiate the conversation with him. Rather, that conversation was the product of the improper interrogation and was arranged by the Government. Furthermore, Rominger told Welch what to say to McCluskey to get him to talk, a fact that was absent in *Gaddy* and *Michaud*. Finally, in *Gaddy* and *Michaud* police did not begin interrogating the defendants until they had confirmed that the defendant did, in fact, want to speak with them. But in this case, Rominger began the second encounter by telling

McCluskey that he had helped Welch, who was cold, get taken off suicide watch so that she could have extra clothes and a blanket.  Only after making those statements—again, statements intended to remind McCluskey that his cooperation would benefit Welch, and therefore, following in the same manner of interrogation begun in the first encounter—did Rominger ask McCluskey if he wanted to speak with him.

Based on all the foregoing, the Court concludes that McCluskey did not initiate further conversation with Rominger after he unambiguously invoked his right to counsel.  As a result, all of McCluskey's statements to Rominger on August 20, 2010 were made in violation of his Fifth Amendment rights and will be suppressed from the Government's case-in-chief.  This conclusion also requires that the Court suppress from the Government's case-in-chief all of McCluskey's statements to McCaskill and Bucksath on August 24, 2010.  In *Maryland v. Shatzer*, 130 S.Ct. 1213, 1223 (2010), the Supreme Court held that police may reinitiate interrogation of a suspect who has previously invoked his *Miranda* rights, but only if there has been a break in custody of at least fourteen days.  As the Government has acknowledged, *see* Doc. No. 338 at 18, McCluskey did not experience a break in *Miranda* custody of at least fourteen days between his interrogation on August 20 and August 24, 2010, when McCaskill and Bucksath reinitiated questioning.[7]  As a result, The presumption is that a waiver of rights obtained after police reinitiate questioning is involuntary. *Shatzer*, 130 S.Ct. at 1219-20.  Therefore, McCluskey's statements on August 24, 2010 will be suppressed as well.

**IT IS THEREFORE ORDERED** that Defendant John Charles McCluskey's *Motion to*

---

[7] The Government does not assert that McCluskey initiated the conversations with McCaskill and Bucksath on August 24, 2010.

*Suppress Statements* [Doc. No. 293] is **GRANTED IN PART** and **DENIED IN PART** as further

explained herein.


_____

**UNITED STATES DISTRICT JUDGE**