IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    CR. No.  10-2734 JCH

JOHN CHARLES McCLUSKEY,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The issue before the Court is Defendant John McCluskey's *Motion for Clarification of Court's Order Suppressing Statements (Doc. 588)* [Doc. 620]. In that motion, McCluskey asks the Court to determine that its Memorandum Opinion and Order [Doc. 588] of July 26, 2012 and amended on August 27, 2012 [Doc. 646], in which it granted in part McCluskey's motion to suppress certain statements he made to law enforcement officers, includes suppression of those statements during both the guilt phase and the penalty phase of his trial. Defendant argues that under *Estelle v. Smith*, 451 U.S. 454 (1981), there is no basis to distinguish between the guilt and penalty phases of a capital murder trial with regard to the protection of the Fifth Amendment privilege against self-incrimination. The Government, on the other hand, opposes the motion on the grounds, *inter alia*, that it is commonplace for federal judges making sentencing determinations to hear evidence that would be inadmissible during a trial to determine guilt or innocence. After considering the parties' briefs and the authorities cited therein, the Court concludes that the motion should be granted as set forth below.

**DISCUSSION**

The Court previously set forth the relevant background facts in its Amended Memorandum

Opinion and Order [Doc. 646] entered August 27, 2012, and incorporates them herein.  In that opinion, this Court held that McCluskey's statements to FBI Agent James Rominger on August 20, 2010 and to FBI Agent James McCaskill and New Mexico State Police Agent Patrick Busksath on August 24, 2010 are inadmissible in evidence because they were obtained in violation of McCluskey's Fifth Amendment right under *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966), to have counsel present during questioning.  In *Miranda*, the Supreme Court held that an interrogation must immediately cease when a defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking." *Id*. at 444-45.  The question now before the Court is whether McCluskey's statements are admissible during the penalty phase of his capital trial.  McCluskey asks the Court to clarify its prior ruling and to explicitly hold that his suppressed statements are inadmissible during the penalty phase.  In its response, the Government argues that the statements are admissible during the penalty phase, both in its case-in-chief and for a host of hypothetical scenarios in which the Government might wish to use the statements for rebuttal purposes.  The Court addresses each issue in turn.

I.    **ADMISSIBILITY OF THE STATEMENTS WHEN OFFERED BY THE GOVERNMENT TO MEET ITS BURDEN OF PROOF DURING THE PENALTY PHASE**

Any discussion of this issue must begin with the Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454 (1981).  Smith was indicted in Texas for murder, and the State announced its intention to seek the death penalty. At an ensuing psychiatric examination, ordered by the trial court to determine Smith's competency to stand trial and conducted in the jail where he was being held, the examining doctor determined that Smith was competent. Thereafter, a jury convicted Smith.  As required by Texas law, the court held a separate sentencing proceeding before the same jury and permitted the doctor who had conducted the pretrial psychiatric examination to testify.  His

2

testimony was based on the pretrial examination, and he testified in substance that Smith would be a danger to society. The jury then made findings which, under Texas law, mandated the imposition of the death penalty. The Texas Court of Criminal Appeals affirmed the conviction and death sentence. After unsuccessfully seeking a writ of habeas corpus in the state courts, respondent petitioned for such relief in federal district court. The Supreme Court held that the admission of the doctor's testimony at the penalty phase violated Smith's Fifth Amendment privilege against compelled self-incrimination because he was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a capital sentencing proceeding. *Id.* at 462. The Supreme Court rejected the Government's argument that the Fifth Amendment privilege against self-incrimination has no relevance to the penalty phase of a capital murder trial because "incrimination is complete once guilt has been adjudicated." *Id*. Citing its decision in *In re Gault*, 387 U.S. 1, 49 (1967), the Court observed that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." Further expanding upon those principles, the *Estelle* court held:

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees.

*Estelle*, 451 U.S. 462-63 (footnote omitted). The Court further held that admission of Smith's statements during the penalty phase was error because the psychiatric examination violated Smith's Sixth Amendment right to counsel. *Id*. at 469-71. Specifically, because the examination occurred after the time that adversary judicial proceedings had been initiated against Smith, and the interview was a critical stage of the proceedings, he was entitled to have counsel present. *Id*. Thus, in

addition to the Fifth Amendment considerations, the Supreme Court concluded that the death penalty was improperly imposed on Smith because the psychiatric examination was conducted in violation of his Sixth Amendment right to counsel. *Id.* at 471. It appears that *Estelle* governs the issue presented here and would prohibit the admission of McCluskey's suppressed statements during the penalty phase of his trial.

The Court is not persuaded by the Government's attempts to distinguish *Estelle*. The Government argues that *Estelle* is limited to its facts, relying principally upon the Supreme Court's opinion in *Penry v. Johnson*, 532 U.S. 782 (2001). In 1980, Penry was tried and convicted of committing rape and capital murder in the preceding year. At his trial, Penry called a clinical neuropsychologist, Dr. Price, who testified on direct examination that he believed Penry suffered from organic brain impairment and mental retardation. During cross-examination, Dr. Price cited as one of the records he had reviewed in preparing his testimony a psychiatric evaluation prepared by a Dr. Peebles in 1977, two years before the capital crime at issue. Dr. Peebles had evaluated Penry at the request of Penry's then-counsel to determine Penry's competency to stand trial on an earlier rape charge unrelated to the capital murder. Over a defense objection, Dr. Price recited a portion of that evaluation which stated that it was Dr. Peebles' professional opinion that if Penry were released, he would be dangerous to others. The jury then found that Penry was a continuing threat to society—a threshold finding requiring imposition of the death penalty under Texas law. Relying upon *Estelle*, Penry argued that the admission of his statements to Dr. Peebles violated his Fifth Amendment privilege against self-incrimination because he was never warned that the statements he made to Dr. Peebles might later be used against him in a capital sentencing proceeding. 532 U.S. at 793.

The section of the *Penry* opinion that discusses *Estelle* begins with the following statement:

"Penry contends that the admission into evidence of the portion of the 1977 Peebles report that referred to Penry's future dangerousness violated his Fifth Amendment privilege against self-incrimination because he was never warned that the statements he made to Dr. Peebles might later be used against him." 532 U.S. at 793. This indicates that the Court is addressing the question of whether Penry's Fifth Amendment rights were violated. The *Penry* court then distinguished *Estelle* on several grounds, but importantly it did so in reaching the conclusion that the Texas court's decision was neither unreasonable nor contrary to Supreme Court precedent.[1] *Id*. at 795. Because the Supreme Court upheld the Texas state court on its conclusion that Penry's Fifth Amendment rights were intact, it did not reach the question of whether evidence obtained as a result of a Fifth Amendment violation was admissible during the penalty phase of a capital trial. The following passage from *Penry* further illustrates that the Supreme Court was determining whether a Fifth Amendment violation occurred in the first instance and not the effect such a violation would have on the admissibility of evidence during the penalty phase of trial:

> The differences between this case and *Estelle* are substantial, and our opinion in *Estelle* suggested that our holding was limited to the "distinct circumstances" presented there. It also indicated that **the Fifth Amendment analysis** might be different where a defendant "intends to introduce psychiatric evidence at the penalty phase." 451 U.S., at 472, 101 S.Ct. 1866. Indeed, we have never extended *Estelle*'s

---

[1] First, the court pointed out that the defendant in *Estelle* had not placed his mental condition at issue, whereas Penry himself made his mental status a central issue in both the 1977 rape case and his later capital murder trial. Second, the court pointed out that in *Estelle*, the trial court had called for the competency evaluation and the State had chosen the examining psychiatrist, whereas it was Penry's own counsel in the 1977 case who requested the psychiatric exam performed by Dr. Peebles. Third, the court noted that in *Estelle* the State had called the psychiatrist to testify as a part of its affirmative case, whereas it was during the cross-examination of Penry's own psychological witness that the prosecutor elicited the quotation from the Peebles report. Finally, the Court distinguished *Estelle* because Smith was charged with a capital crime at the time of his competency exam, so it was clear that his future dangerousness would be a specific issue at sentencing, whereas Penry had not yet committed the 1979 murder at the time of his interview with Dr. Peebles. *Penry*, 532 U.S. at 794.

> **Fifth Amendment holding** beyond its particular facts. *Cf., e.g., Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) (*Estelle* does not apply, **and it does not violate the Fifth Amendment**, where a prosecutor uses portions of a psychiatric evaluation requested by a defendant to rebut psychiatric evidence presented by the defendant at trial). We therefore cannot say that it was objectively unreasonable for the Texas court to conclude that Penry is not entitled to relief **on his Fifth Amendment claim**.

532 U.S. at 795 (emphasis added). This is a crucial distinction, because in this case the issue of a Fifth Amendment violation has already been decided. In this Court's view, *Penry* sheds little light on the question of whether it is bound by *Estelle*'s holding that evidence obtained in violation of the Fifth Amendment is admissible during the penalty phase of a capital trial because *Penry* found no Fifth Amendment violation in the first instance. The Government's reliance on *Buchanan v. Kentucky*, 483 U.S. 402 (1987) to attempt to undermine *Estelle* is similarly unavailing. In *Buchanan*, as in *Penry*, the issue was whether during the trial's guilt phase the prosecution's use of a psychologist's report solely to rebut the defendant's psychological evidence violated his Fifth and Sixth Amendment rights where defendant's attorney had requested the psychological evaluation and presented psychiatric evidence at trial. 483 U.S. at 421-25. The Supreme Court found no constitutional violation under the circumstances of that case. *Id*. at 423-25. *Buchanan* does not limit the Supreme Court's holding in *Estelle* that evidence obtained in violation of the Fifth Amendment is inadmissible during the penalty phase of a capital trial.

McCluskey also relies on the Tenth Circuit's opinion in *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), a capital case in which the court held that the Government had improperly coerced statements from the defendant, and that the trial court's admission of the evidence during the sentencing phase of defendant's trial was error. *Id*. at 1101. The Tenth Circuit concluded that the evidence in support of the defendant's guilt was overwhelming, such that the admission of the unconstitutionally obtained evidence during the guilt phase of the trial was harmless error. *Id*. at

6

1101-02. However, the court also held that the error of the admission of the coerced confession during the penalty phase was not harmless, and therefore the court remanded the case for resentencing. *Id*. at 1102. While the Tenth Circuit did not expressly state that unconstitutionally obtained statements by the defendant are inadmissible during the penalty phase, that assumption provides the foundation of the rationale of the *McCullah* opinion.

*Kordenbrock v. Scroggy*, 919 F.2d 1091, 1096-98 (6th Cir. 1990) (en banc) is in the same vein. In *Kordenbrock*, police obtained a confession from the defendant after continuing to interrogate him after he invoked his right to remain silent under *Miranda*. *See Edwards v. Arizona*, 451 U.S. 477 (1981) (questioning must cease once suspect invokes right to counsel unless suspect initiates communication); *Michigan v. Mosley*, 423 U.S. 96, 104–06 (1975) (invocation of "right to cut off questioning" protects suspect from "repeated efforts to wear down his resistance"); *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966) (once warnings have been given, "[i]f the individual indicates in any manner ... that he wishes to remain silent, the interrogation must cease."). The state then used the statements against Kordenbrock at trial and obtained both a guilty verdict and a sentence of death. The court did not expressly state that it was error to admit the statements during the penalty phase of the trial, but again, that assumption forms the basis of the court's analysis. The Sixth Circuit concluded that admission of the illegally obtained confession during Kordenbrock's capital murder trial was not *harmless* error in either the guilt or the penalty phase. *Id*. at 1097-98. Thus, the court granted Kordenbrock a retrial on both criminal liability and sentence. *Id*. at 1110.

In *United States v. Jacques*, 768 F. Supp. 2d 684 (D. Vt. 2011), *rev'd on other grounds*, 684 F.3d 324 (2d Cir. 2012), a recent case brought under the Federal Death Penalty Act, the district court addressed the question more squarely. In *Jacques*, the defendant argued that the Government violated his Sixth Amendment right to counsel by using his friend as an agent to gather written and

7

oral statements from him. *Id*. at 689. Indeed, the Supreme Court has held that "the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel[.]" *Illinois v. Perkins*, 496 U.S. 292, 299 (1990) (citing *Massiah v. United States*, 377 U.S. 201 (1964)). In *Jacques*, the Government made some of the same arguments that it makes in this case—for example, that in order to make a more informed decision a jury is entitled to more evidence, not less, with regard to the defendant, and that evidence that is inadmissible at trial on constitutional grounds is often admissible at sentencing proceedings. *Jacques,* 768 F. Supp. 2d at 695-96. The court rejected these arguments and, relying in part on *Estelle*, concluded that the defendant's unedited statements were not admissible during the penalty phase. *Id*. at 700. On appeal, the Second Circuit reversed the district court on the Sixth Amendment issue and, finding no constitutional violation, did not reach the issue of the admissibility of the evidence during the penalty phase of the trial. 684 F.3d 324, 330 n.3 (2d Cir. 2012).

The cases upon which the Government relies on do not alter the Court's conclusion. The Government urges the Court to apply the deterrence-balancing test set forth in *Kansas v. Ventris*, 556 U.S. 586, 591 (2009). In that case, the defendant was charged in state court with murder and other crimes. Prior to his trial, an informant planted in Ventris' cell heard him admit to robbing and shooting the victim. However, Ventris testified at trial that his co-defendant committed the crimes. Although the state conceded that the statement had been obtained in violation of Ventris' Sixth Amendment right to counsel, the trial court allowed the informant to testify for impeachment purposes. In evaluating the correctness of the trial court's ruling, the Supreme Court applied the exclusionary rule balancing test, weighing the constitutional interests safeguarded by excluding the tainted evidence against the need to prevent perjury and assure the integrity of the judicial process. *Id*. at 593. The Court agreed with the trial court, holding that "tainted evidence—evidence whose

8

very introduction does not constitute the constitutional violation, but whose obtaining was constitutionally invalid—is admissible for impeachment." *Id*. at 594.

*Ventris* is distinguishable from this case in several key respects. First, although the Government has offered very little information regarding the purpose for which it wishes to offer McCluskey's statements during the penalty phase, the Court infers that the Government's purpose extends far beyond mere impeachment of the Defendant. Rather, it appears that the Government wishes to offer McCluskey's statements in its case-in-chief in order to meet its own burden to prove one or more aggravating factors. This goes far beyond the holding in *Ventris*, and nothing in that opinion indicates that the Supreme Court's opinion may be stretched that far. As the Supreme Court pointed out, it has routinely permitted the admission of unconstitutionally obtained evidence in order to impeach the defendant and thus ensure the integrity of the judicial process. *Id*. at 594. However, that is nothing like allowing the Government to use the improperly obtained evidence to meet its own burden of proof at trial. Second, the question in this case is whether unconstitutionally obtained evidence may be used in sentencing. In this Court's view, because *Ventris* is limited only to the use of evidence to impeach the defendant who testifies in his own defense, it does not bear on that issue. Finally, this case, like *Estelle*, *McCullah*, and *Jacques*, is a capital case int which life and death swing in the balance. *Ventris* was not a capital case, and the outcome of its decision did not play a role in whether the defendant was to receive a death sentence. As we all know, "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (plurality opinion), and the United States Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). The death penalty is "unique in its total irrevocability," "its

rejection of rehabilitation of the convict as a basic purpose of criminal justice," and "its absolute renunciation of all that is embodied in our concept of humanity." *Harmelin v. Michigan*, 501 U.S. 957, 995-96 (1991) (quoting *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring)). It was precisely this concern that led the Supreme Court to state, "Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees." *Estelle*, 451 U.S. 463. Thus, the fact that the Supreme Court in *Ventris* was considering the admissibility of evidence for impeachment purposes only in a non-capital case renders it almost irrelevant to the matter at hand.

The other cases the Government cites suffer from similar disparities, such that they offer the Court little guidance. *See, e.g., United States v. Graves*, 785 F.2d 870 (10th Cir. 1986) (holding that defendant in a non-capital case was not entitled to have alleged prior offenses stricken from her presentence report because evidence of those alleged crimes had been obtained through an unreasonable search and seizure in violation of the Fourth Amendment); *Harris v. New York*, 401 U.S. 222, 224 (1971) (in a non-capital case, finding that a statement which was inadmissible against defendant in prosecution's case-in-chief because defendant had not been advised of his rights to counsel and to remain silent prior to making statement, but which was otherwise trustworthy, was admissible to *impeach* defendant's contradictory trial testimony); *Michigan v. Harvey*, 494 U.S. 344, 345-46 (1990) (holding in a non-capital case that a statement taken in violation of a prophylactic rule—that once criminal defendant invokes his Sixth Amendment right to counsel, subsequent waiver of that right, even if voluntary, knowing, and intelligent under traditional standards, is presumed invalid if secured pursuant to police-initiated conversation—may be used to *impeach* defendant's false or inconsistent testimony, even though same statement may not be used as substantive evidence); *United States v. Jessup*, 966 F.2d 1354, 1356 (10th Cir. 1992) (declining to

10

apply exclusionary rule during the sentencing phase of a non-capital sexual assault case, and affirming trial court's consideration of unconstitutionally obtained evidence in order to determine whether defendant had met his burden to prove acceptance of responsibility, reasoning that there was no evidence that law enforcement officers acted with intent to secure an increased sentence for the defendant); *United States v. Ryan*, 236 F.3d 1268, 1271-72 (10th Cir. 2001) (in sentencing defendant convicted of drug crimes, trial court determining a defendant's offense level may consider drugs and weapons that the Government could not have used at trial because they were the product of an unconstitutional search and seizure); *United States v. Lujan*, 603 F.3d 850, 855 (10th Cir. 2010) (concluding that evidence of defendant's prior, unadjudicated crimes to be admissible in penalty phase because its probative value of his future dangerousness was not outweighed by risk of confusion or unfair prejudice to defendant; no issue of the admissibility of unconstitutionally obtained confessions). *United States v. Calandra*, 414 U.S. 338, 349-55 (1974), also cited by the Government, is particularly far afield. In that case, the Supreme Court held merely that a witness summoned to appear and testify before a grand jury may not refuse to answer questions on the ground that they are based on evidence obtained from an unlawful search and seizure. The issue of whether or not a grand jury witness has the right to invoke the exclusionary rule has no bearing on whether the Government may use evidence obtained in violation of the Fifth Amendment in order to meet its burden of proof during the penalty phase of a death penalty trial.

      The analogy to non-capital crimes is particularly inapposite, and nothing in the cases cited by the Government persuades this Court to overlook *Estelle*. In a non-capital case, the sentencing judge is entitled to hear a wide range of information about the defendant in order to arrive at an appropriate sentence. When that sentence involves a term of imprisonment, the judge hears information about the defendant's age, education, family connections, work history, and criminal

history in order to arrive at an appropriate number of months the defendant must serve. Depending on what information the parties and probation services present, the judge may adjust the sentence accordingly. The court exercises a considerable degree of discretion in imposing the sentence it believes to be most fitting.

On the other hand, the Federal Death Penalty Act ("FDPA") requires that the jury, not the court, decide whether to impose the sentence of death. Furthermore, the sentencing phase in a trial under the FDPA is wholly unlike that in a non-capital case. The FDPA sets forth sixteen statutory aggravating factors for homicide. *See* 18 U.S.C. § 3592(c). It also allows the jury to "consider whether any other aggravating factor for which notice has been given exists." *Id*. "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt." 18 U.S.C. § 3593(c). Further, the jury's finding with respect to any aggravating factor must be unanimous. *Id*. at § 3593(d). If no statutory aggravating factor is found to exist, the FDPA states that "the court shall impose a sentence other than death authorized by law." *Id*. These heightened burdens and safeguards exist for good reason, because—and it bears repeating—death is different. The Government has offered the Court no valid rationale why it should be allowed to use evidence obtained in violation of the Fifth Amendment to meet its considerable burden of proving that a defendant should be executed when it is not allowed to use that same evidence to prove that he is guilty in the first instance. The imposition of the ultimate sentence is final and irrevocable, and it is wholly unlike the process of sentencing a defendant in a non-capital case wherein the judge must decide whether the appropriate sentence is a term of, say, 60 versus 68 months of imprisonment.

Finally, the Court does not ascribe to the Government's view of the weight to be given *Del Vecchio v. Ill. Dep't of Corrections*, 31 F.3d 1363 (7th Cir. 1994) (en banc), the only case cited by

the Government in which a federal court has upheld the admission into evidence of a statement obtained in violation of *Miranda* during the penalty phase of a capital trial. In *Del Vecchio*, the defendant had been convicted of two murders in state court, one in 1965 and one in 1977. *Id*. at 1367. At his trial in 1979 for the second murder, he faced the death penalty, and during the penalty phase the prosecution offered his confession to the 1965 murder. *Id*. at 1369. Del Vecchio, who had pled guilty to the earlier homicide and never challenged his confession, claimed that the 1965 confession violated *Miranda* and should not have been admitted at his 1979 murder trial. *Id*. at 1368. The Seventh Circuit rejected his claim on the grounds that *Miranda* had been decided after Del Vecchio's 1965 conviction. The Supreme Court had not applied *Miranda* retroactively, so the court concluded there had been no *Miranda* violation. *Id*. at 1388. However, the court went on to state that even if the confession had violated *Miranda* it still should not be excluded from the penalty phase because "[t]he exclusionary rule is generally inapplicable during sentencing." *Id*. In support, the Seventh Circuit cited several cases from other circuits, including the Tenth Circuit's opinion in *Graves*, though none were death penalty cases. The court also observed that exclusion of the evidence would have served no deterrent purpose because "any police misconduct would have occurred fourteen years before the confession was introduced." *Id*. The court did not mention the Supreme Court's opinion in *Estelle v. Smith*.

For several reasons the Court finds *Del Vecchio* to be of limited persuasive value. First, the lack of a *Miranda* violation effectively settled the question before the court, which was whether a confession obtained through violation of *Miranda* was admissible during the penalty phase. As a result of finding no violation, the court did not need to go any further. The court's statement that the confession would have been admissible even if there had been a *Miranda* violation was essentially *dicta*. Second, the facts in *Del Vecchio* supporting the Seventh Circuit's conclusion that

13

applying the exclusionary rule would have no deterrent effect on police misconduct are vastly different in this case. In *Del Vecchio*, the statements were made fourteen years earlier during the investigation of a different crime; it would have been impossible for law enforcement officers to know the statements could be used to support the imposition of the death penalty so far in the future, and for a crime that had not yet taken place. Here, in contrast, the Government seeks to introduce statements taken in violation of *Miranda* by agents investigating the same offenses with which McCluskey is now charged. Further, the surrounding facts strongly suggest that at the time of the *Miranda* violations, Agents Rominger, McCaskill, and Bucksath were aware that McCluskey could be facing the death penalty. Rominger mentioned the death penalty while interrogating co-defendant Casslyn Welch on August 20, 2010, and McCaskill made references to the death penalty during his interrogation of McCluskey on August 24, 2010. In addition, on August 23, 2010, one day before Rominger's interview, the Department of Justice issued a press release announcing its intent to prosecute McCluskey and noting that he and his co-defendants could receive the death penalty. Thus, unlike in *Del Vecchio*, excluding McCluskey's suppressed statements during the penalty phase of the trial would have a substantial deterrent effect. Third, the Seventh Circuit's failure to mention *Estelle v. Smith* does not mean the Supreme Court's opinion in that case is "strictly limited to its facts," as the Government contends. As McCluskey correctly points out, nothing in *Del Vecchio* indicates that either party alerted the court to *Estelle* or to cases distinguishing between capital and non-capital proceedings. This Court refuses to read anything into the *Del Vecchio* court's silence on the effect of *Estelle*.

In conclusion, in this Court's view the Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454 (1981) is controlling, and therefore the Government may not present McCluskey's suppressed statements during its case-in-chief during the penalty phase of his trial.

## II.   ADMISSIBILITY OF THE STATEMENTS WHEN OFFERED FOR REBUTTAL PURPOSES DURING THE PENALTY PHASE

In its response brief [Doc. 640], the Government argues that it should be permitted to use McCluskey's suppressed statements for impeachment if he takes the stand and contradicts what he told Agents Rominger, McCaskill, and Bucksath. This is true as far as it goes. As discussed above, the Supreme Court has held as much. In *Harris v. New York*, 401 U.S. 222, 224 (1971), the Court found that defendant's unconstitutionally obtained statement was admissible to impeach defendant's contradictory trial testimony. Similarly, in *Michigan v. Harvey*, 494 U.S. 344, 345-46 (1990), the Court found that a statement taken in violation of the Sixth Amendment right to counsel may be used to impeach defendant's false or inconsistent trial testimony, even though the Government may not use that same statement as substantive evidence of guilt. Even McCluskey does not appear to dispute this point. Accordingly, the Court holds that if McCluskey takes the stand at trial and contradicts his suppressed statements, the Government may use those statements to impeach his credibility.

However, the Government takes its argument much further. It contends that it should be allowed to use the suppressed statements for "rebuttal" any time McCluskey "proverbially opens the door." Doc. 640 at 13. According to the Government, this extends to "statements, questions, or arguments" presented by McCluskey's attorneys that contradict their client's suppressed statements. *Id*. at 13-14. The Government also contends that it may use the suppressed statements during the penalty phase if doing so would help it to rebut a mitigating factor presented by McCluskey. *Id.* at 14. The Government's view of its right to use the suppressed statements in rebuttal is so broad that it contends there are "myriad ways" in which McCluskey could invite admission of the statements in either phase of the trial. *Id*. The list of examples the Government

15

provides illustrates its contention that McCluskey "opens the door" by disputing virtually any aspect of the Government's case. *Id*. at 15.

However, the Government cites no authority supporting its position that it is entitled to use the statements in rebuttal for such a broad range of purposes. Indeed, both *Harris* and *Harvey* make clear that suppressed statements may be used to impeach the credibility of a defendant whose testimony on the stand contradicts those statements, nothing more. Furthermore, *Walder v. United States*, 347 U.S. 62 (1954), also cited by the Government, actually undermines its position. The defendant was charged with the illegal sale of narcotics, but during direct examination he asserted that he had never purchased, sold or possessed any narcotics. *Id*. at 63. Over the defendant's objection, the Government then questioned him about the heroin capsule unlawfully seized from his home and presented the testimony of one of the officers who had participated in the unlawful search and seizure, as well as that of the chemist who had analyzed the illegally seized capsule. *Id*. at 64. The trial court charged the jury this unconstitutionally obtained evidence was not to be used to determine whether the defendant had committed the crimes for which he was on trial, but solely for the purpose of impeaching the defendant's credibility. *Id*. The Supreme Court affirmed, concluding that the illegal evidence was admissible to impeach defendant's credibility, though not as affirmative evidence of his crimes. Yet the Court also held that the Government could not use the evidence to rebut the defendant's efforts to raise a defense:

> Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. *He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it*, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.

16

*Id*. at 66 (emphasis added).

The only other case that the Government cites on this issue is *Buchanan v. Kentucky*, 483 U.S. 402 (1987), a case discussed *supra*. There, the Supreme Court held that it does not violate a defendant's Fifth Amendment rights when a prosecutor used portions of a psychiatric evaluation requested by the defendant to rebut other psychiatric evidence presented by the defendant at trial. *Id*. at 421-25. Nothing in *Buchanan* supports the Government's contention that it may use suppressed evidence to rebut arguments by defense counsel or to dispute McCluskey's arguments regarding mitigating factors. Accordingly, the Court will not allow the Government to introduce McCluskey's suppressed statements at trial unless he contradicts those statements on the stand. In that event, the Government may use the statements to impeach McCluskey's credibility.

**IT IS THEREFORE ORDERED** that McCluskey's *Motion for Clarification of Court's Order Suppressing Statements (Doc. 588)* [Doc. 620] is **GRANTED** as described herein.

_____
**UNITED STATES DISTRICT JUDGE**