IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**vs.**                                                                          **Cr. No. 10-2734 JCH**

**JOHN CHARLES McCLUSKEY,**

      **Defendant.**


## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant McCluskey's *(Corrected) Motion to Exclude Medical Investigator's Testimony, and Request for a Daubert Hearing* [Doc. 425]. The Court has considered the Defendant's Motion (205 pages, including exhibits), the Government's Response [Doc. 483], the Defendant's Reply [Doc. 526], and conducted a limited *Daubert* hearing on May 7, 2013. Being fully advised, the Court will deny the motion to exclude Dr. Aurelius from testifying at trial, but will preclude her from opining that the cause and manner of death were violent homicide and homicide, respectively.

## BACKGROUND

The Government intends to prove the following facts at trial. On August 4, 2010, law enforcement agents were dispatched to a location outside of Santa Rosa, New Mexico where a thirty-foot camper trailer stood burned down to its axles. Human remains later identified as those of Gary and Linda Haas, a vacationing Oklahoma couple, were found amidst the debris. The Haas' pickup truck was located in Albuquerque, New Mexico later the same day.

When investigators initially inspected the burned camper, they observed what appeared to

be a human skull.  Investigator Chris Griego, Office of the Medical Examiner for the State of New Mexico, later generated a report pertaining to the actions taken to recover the incinerated human remains.  Investigator Griego's report indicates the appearance of two sets of human remains lying side-by-side on the floor of the burned trailer.  *See* Motion, Doc. 425-3.  Griego's report also indicates that some larger bones were removed from the debris first and then Griego, together with New Mexico State Police Officers, carefully sifted through the ashes to retrieve smaller pieces of bones, teeth, dental crowns, a partial jaw, and certain other physical evidence.  Following these efforts, mere bone fragments remained in the ashes and debris.

Upon examination, Forensic Anthroplogist Dr. Wendy [Potter] McQuade determined that the skull and certain other bones retrieved from the ashes belonged to a woman, that others were those of a man, and that bones and fragments from only two humans were present in the remains.  Forensic Ondontologist Dr. Peter Loomis identified the human remains from the burned trailer as the Haases' based on the aforementioned evidence and his review of dental records belonging to Gary and Linda Haas.

Dr. Michelle Aurelius, Assistant Chief Medical Investigator for the State of New Mexico Office of the Medical Examiner ("OMI") and whose testimony is the subject of the present Motion, received the remains inside a sealed body bag.  Dr. Aurelius performed some tests on the charred remains, reviewed the information from the non-medical investigation, consulted with Dr. McQuade regarding her anthropological examination and findings, then reached certain conclusions.  Dr. Aurelius recorded her conclusions in her Autopsy Reports, and McCluskey challenges the admissibility of Dr. Aurelius' opinions regarding:  (1) the cause and manner of death being "homicide" and "violent homicide" respectively, and  (2) that the thermal injury to the victims' bodies occurred "perimortem," meaning at or near the time of death.  In support of his challenges,

McCluskey submits portions of discovery and an affidavit from his own expert, Dr. Werner Spitz, a physician specializing in forensic science. In addition, Dr. Aurelius and Dr. Spitz testified at the *Daubert* hearing on May 7, 2013. Dr. Wendy [Potter] McQuade, forensic anthropologist, presented testimony telephonically.

In a separate argument, McCluskey also contends that the Government violated Rule 16 and the Court's Scheduling Order with respect to its expert disclosures and asks the Court to disallow testimony at trial from Dr. Aurelius on this basis.

## **THE LAW GOVERNING ADMISSION OF EXPERT TESTIMONY**

Federal Rule of Evidence 702 governs admissibility of expert testimony and permits a witness qualified as an expert to offer opinion testimony if: (a) the expert's knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the witness has applied the principles and methods reliably to the facts of the case. As the Supreme Court has held, it is the trial judge's role to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 598 (1993). When considering the admissibility of proposed expert testimony, district courts "must first determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). "[I]f the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993)]." *Id.* In particular, the court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology

properly can be applied to the facts in issue." *Id*. at 592-93.

To assist courts in determining reliability, the *Daubert* Court set forth five non-exhaustive factors for consideration. They are: (i) whether the theory or scientific technique can be tested or has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether there is a known or potential error rate associated with the methodology; (iv) whether there are standards controlling the technique's operation and whether they were maintained; and (v) whether the theory or technique is generally accepted within the relevant community. *See Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. at 593-94. Courts "may" apply these factors if necessary, but the "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case. Indeed, district courts enjoy broad discretion to consider a variety of other factors. *See Id.* at 150.

"[T]he expert's data, method, or his application of the method to the data" may affect the reliability of the proposed testimony. *Id*. The proponent of the expert testimony must show that the proposed testimony is based on a methodology that is "scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Id*. (internal quotation marks omitted). If an expert's analysis is unreliable, the testimony is inadmissible. *Id*.

When executing its gatekeeping responsibility as to admissibility of expert testimony, a district court enjoys "broad latitude" in deciding how it will determine reliability. *Khumo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999) ("[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."); *See United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000); *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003), *cert. denied*, 540 U.S. 1003 (2003). A full-blown *Daubert* hearing is not always required and may be unnecessary where a district court

can properly assess the reliability of the proposed testimony based on the information before it. *See, e.g., United States v. Pena*, 586 F.3d 105, 111 n.4 (1st Cir. 2009) ("A district court does not abuse its discretion by dispensing with a *Daubert* hearing if no novel challenge is raised.").

## DISCUSSION

The Government intends to present trial testimony from forensic pathologist Dr. Michelle Aurelius, to include her determinations as to the cause and manner of the victims' deaths and her conclusion that the thermal injury to the victims' bodies occurred perimortem. Defendant McCluskey challenges the admissibility of this testimony on the following bases: (1) The Government violated Rule 16 with regard to timing and sufficiency of its expert disclosres and exclusion of the testimony is the proper sanction; (2) Dr. Aurelius' opinions rely on impermissible hearsay and are not based in science; (3) Dr. Aurelius' conclusion that the thermal injury to the bodies occurred perimortem is not only based on insufficient evidence and science, but is also more prejudicial than probative under Rule 403 of the Federal Rules of Evidence; and (4) Dr. Aurelius' conclusions as to cause and manner of death are not medical diagnoses.

**I.   The Court Will Not Exclude the Testimony as a Sanction for
      Perceived Violations of Rule 16 Disclosure Requirements**

As a threshold matter, Defendant McCluskey claims that the Government violated Rule 16 and this Court's Scheduling Order regarding the completeness and timing of its expert disclosures. As a sanction for these perceived violations, the Defendant seeks exclusion of the Government's witness(es). The Government responds that it has addressed these concerns previously, as well as in its response brief to McCluskey's Motion to Exclude Firearms Evidence, which it incorporates by reference. Resp. at 7. The Government also avers that it has been forthcoming with all data the defense has requested, including requests for "foundational data," has provided more than Rule 16

requires, and finds it "difficult to imagine what else Defendant might want." *Id*.

Rule 16(a)(1)(G) requires that, upon request, defense counsel is entitled to a written summary of the testimony of any expert witness the government intends to use during its case-in-chief, including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The Government's position is that Defendant's request exceeds what is required under Rule 16(a)(1)(F) and (G) and the Scheduling Order in this case does not impose disclosure requirements beyond those found in Rule 16.

First, the scope of expert disclosures required in criminal cases under Rule 16(a)(1)(G) (Government's obligations) and Rule 16(b)(1)(C) (Defendant's obligations) is more limited than that required in civil cases under Rule 26(a)(2)(B). In civil cases, a "complete statement" is required (*see* Fed.Civ.P. R. 26(a)(2)(B)(i)), where only a "written summary" is required in criminal cases. A written summary under Fed.R.Crim.P. 16(b)(1)(C) must include a description of the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. *Id.* §§ 16(a)(1)(G), 16(b)(1)(C). The required "written summary," however, falls far short of the "complete statement" required of civil litigants. *See United States v. Mehta*, 236 F. Supp. 2d 150, 155-56 (D. Mass. 2002). Specifically, Rule 16 does not require experts in criminal cases to provide written reports explaining their opinions or to make a written proffer containing the information required under the civil rules. *U.S. v. Nacchio*, 555 F.3d 1234, 1262 (10th Cir. 2009). The Advisory Committee Note to the 1993 amendment to Rule 16 requires a "summary of the bases relied upon by the expert" which in turn is described as "written and oral reports, tests, and investigation. . . ."

In *United States v. Price*, 75 F.3d 1440 (10th Cir. 1996), the Tenth Circuit denied the defendant's discovery request for production of the underlying basis for the government chemist's conclusion that substances he tested were methamphetamine, information relating to reliability of

the chemist's equipment, and evidence of the chemist's credentials. Rule 16(a)(1)(F) only requires the prosecution to turn over "results or reports" of scientific tests. *See also United States v. Ashlock*, 105 Fed. Appx. 581 (5th Cir. 2004) (unpublished), *vacated on other grounds*, 543 U.S. 1136 (2005) (Rule 16(a) does not instruct the government to provide detailed step-by-step information regarding the routine protocols employed by the expert in performing chemical analysis); *United States v. Wilkerson*, 189 F.R.D. 14 (D. Mass. 1999) (denying defendant's request for the internal laboratory procedures where the court found the materials were not discoverable).

On March 30, 2012, the Government filed its *Supplemental Notice of Intent to Offer Expert Testimony* [Doc. 383], which summarizes Dr. Aurelius' testimony as follows:

> The United States plans to call Office of the Medical Investigator, Dr. Michelle Aurelius, Assistant Chief Medical Investigator, to testify regarding the autopsies conducted upon the remains of Gary and Linda Haas. Dr. Aurelius, who is board certified since 2005 in Anatomic and Clinical Pathology, and board certified since 2006 in Forensic Pathology, is expected to testify that she has conducted approximately 4000 autopsies, including the Haases autopsies. (A copy of Dr. Aurelius's report has been disclosed to Defendant and his counsel on February 24, 2011, (bates range 2335-3001) and April 15, 2011, (bates range 3709-3717).) Dr. Aurelius is expected to testify, consistent with her report, about how the cremains came to OMI, what procedures were taken to label the contents, what body parts, teeth and bones, as well as bone fragments, were identified, including the weight of the body bag received. Dr. Aurelius will discuss the overall extensive thermal damage of the cremains, the thermal fractures of the long bones and skull, and the commingled nature of soft tissue. Dr. Aurelius is also expected to testify regarding the microscopic examination of the tissue, the pathologic diagnoses noted, and the manner and cause of death of the cremains identified as Gary and Linda Haas, based on her review of the autopsy, reports and investigation, and as such is noted as homicidal violence. Dr. Aurelius will also testify regarding the toxicology report. Testimony will include her expert opinion and specialized knowledge derived from her education, training, and professional experience as a forensic pathologist.

Doc. 386 at 2-3. This notice, together with Dr. Aurelius' reports, is more than sufficient to satisfy

Rule 16 and there can no longer be a reasonable argument that McCluskey has been prejudice by any perceived shortcoming in the Government's disclosures of this particular witness' testimony. This is especially so where McCluskey has now had the opportunity at the *Daubert* hearing to cross examine Dr. Aurelius on her conclusions.

Moreoever, even if the disclosures were untimely, the Court finds that exclusion is not warranted. Federal Rule of Criminal Procedure 16(d)(2) provides in pertinent part:

> If a party fails to comply with this rule, the court may:
>
> > (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> > (B) grant a continuance;
> > (C) prohibit that party from introducing the undisclosed evidence; or
> > (D) enter any other order that is just under the circumstances

Fed. R. Crim. P. 16(d)(2). When McCluskey made his original argument that a Rule 16 violation had occurred, he requested that the Court permit him to depose the Government's experts. Presently, McCluskey asks that the Court prohibit each of the Government's experts, including Dr. Aurelius, from testifying at trial.

The summary describing the witness's opinions required by Rule 16 is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 Advisory Committee note. Moreover, the extreme sanction of preclusion is not warranted where the purposes of Rule 16 are ultimately not frustrated. *United States v. Cuellar*, 478 F.3d 282, 294 (5th Cir. 2007), *reversed on other grounds*, 553 U.S. 550 (2008). Here, there can be no dispute that McCluskey had the opportunity to consider and challenge the proposed testimony. Moreover, McCluskey was able to cross examine Dr. Aurelius

at during the May 7, 2013 hearing, at which hearing he also presented testimony from his own competing witness, Dr. Spitz. Accordingly, the Court will not impose the sanction of exclusion on the record before it.

## II.     Dr. Aurelius' Credentials Establish her as an Expert in Forensic Pathology

McCluskey mounts no challenge to forensic pathology as a valid science, nor does he attack Aurelius' qualifications as a bona fide forensic pathologist worthy of expert status. Instead, McClusky takes exception only to her application of the methodology and certain conclusions she reached in this particular case. For the record, the Court will review Dr. Aurelius' credentials.

Dr. Aurelius is the Assistant Chief Medical Investigator with the OMI and she performed the Haases' autopsies. She is an experienced pathologist who has been board certified in Anatomic and Clinical Pathology since 2005 and in Forensic Pathology since 2006. Dr. Aurelius has performed approximately 4,000 autopsies throughout her career. She obtained her B.S. in General Science from the University of Oregon and her M.D. from the Oregon Health Sciences University School of Medicine. From 2002-2003 she was a Co-Chief Resident in the Department of Pathology at the University of Iowa Hospitals and Clinics (UIHC), and from 2003-2004 she served as an Acting Autopsy Fellow at UIHC. From 1999-2004 she was also a Resident in Anatomic and Clinical Pathology at UIHC.

Dr. Aurelius came to the University of New Mexico Hospital (UNMH) as a Forensic Pathology Fellow in 2004. In 2009, she began a two-year study in pedagogy in the UNMH Medical Education Scholars Program, which she completed. Her past employment at UNMH includes Hospital Autopsy Co-Director, Hospital Autopsy Director, Associate Medical Investigator, and Associate Professor of Pathology. Presently, Dr. Aurelius is UNMH's Assistant Chief Medical Investigator.

Dr. Aurelius has authored and co-authored numerous publications. Her published works include: *Aortic Dissection and Toxicology*, American Society of Clinical Pathology Check Sample, August 2011, 53(6); *Understanding Status Asthmaticus*, American Society of Clinical Pathology Check Sample, June 2008, 50(6); and *Her-2/neu Expression in Salivary Duct Carcinoma: An Immunohistochemical and Chromogenic In-Situ Hybridization Study*, Applied Immunohistochemistry and Molecular Morphology, January 2008.

Dr. Aurelius has also presented on a number of subjects including: *When Lightning Strikes: 17 Fatal Lightning Strikes in New Mexico*, Presentation at 2011 American Academy of Forensic Sciences meeting; *Alcohol, Drugs of Abuse, and Circumstances in Death in Homicide Victims in New Mexico*, oral presentation at June 2009 Council of State and Territorial Epidemiologists Conference. Additionally, some of the studies she has been involved with include: *Mass Fatality Planning - State and Local, State of New Mexico* Department of Health and the Regents of the University of New Mexico (also coauthored a mass fatality plan for the State of New Mexico based on this research); *Methylation in Regions of Executive Function in Developing Human Brain*, through the Signature Program in Child Health Pilot Program; and Med-X infectious disease bioterrorism prevention.

In addition to the written materials presented in support of Dr. Aurelius' expert status, the Court also verified Dr. Aurelius' credentials through live testimony in the *Daubert* hearing. The Court finds that Dr. Aurelius is qualified to testify as an expert in forensic pathology and will turn to the particular testimony to which McCluskey objects.

### III.   Cause and Manner of Death

As detailed above, the remains Dr. Aurelius examined consisted of numerous charred bones, teeth and tissue. She also received personal effects that were destroyed by fire. According to the

autopsy reports, Dr. Aurelius also reviewed various investigative reports. Based on her entire examination, though she was unable to determined an anotomical cause of death, she concluded that the cause of the Haases' deaths was "homicidal violence" and the manner of their deaths was "homicide."

McCluskey challenges Dr. Aurelius' proposed expert testimony as to the cause and manner of death. He asserts that the conclusion that the cause of death, "homicidal violence," and the manner of death, "homicide," are subjective conclusions unsupported by medically based autopsy results and not the product of reliable scientific principles and methods. McCluskey contends Dr. Aurelius' conclusions are based solely on her review of investigative materials.

The Government responds that "Dr. Aurelius did a thorough autopsy, including testing of carboxyhemoglobin and gathered information from the investigation to render an opinion of the cause and manner of death." Resp. At 13. The Government contends Dr. Aurelius properly relied on reports and physical evidence in reaching her opinions, *United States v. Seale*, 600 F.3d 473 (5th Cir. 2010), and that forensic pathology is universally accepted as a valid science.

While the Government is correct that Dr. Aurelius conducted an autopsy and properly relied on investigative material, these facts do not advance the Government's position as to the cause and manner of death conclusions. The Court has reviewed the record and finds no correlation between the carboxyhemoglobin testing and the cause of death determination. Rather, the carboxyhemoglobin testing and results relate to Dr. Aurelius' determination that the thermal injury to the bodies occured perimortem, as discussed below, but not that the Haases were the victims of homicide. *See* Tr. At 326:1-333:22. Significantly, Dr. Aurelius testified that she could not determine an anatomical cause of death by autopsy alone. Tr. At 341:14-18.

The Government relies on *United States v. Seale*, supra, for the proposition that reports and forensic evidence are frequently relied upon in making a determination of cause and manner of death. The Court agrees with that basic proposition, but beyond that, the Court finds *Seale* to be distinguishable because that expert, in fact, relied on medical evidence in addition to investigative materials and testimony. In *Seale*, two teenagers' skeletal remains were found in a body of water after their disappearances in 1964. The Defendant was indicted forty years later in 2007, and was convicted of kidnapping related to the murders of the teens. On appeal, Seale unsuccessfully argued that it was error for the district court to allow the forensic pathologist to testify that the cause of death was consistent with fresh water drowning. That expert relied on medically based evidence - the autopsy - in addition to investigative information which included reports, 1964 video footage of the recovery of the bodies, interviews of divers who conducted the recovery effort, FBI reports, photographs of physical evidence and trial witness testimony. Additionally, it is noteworthy that the cause of death there, "consistent with fresh water drowning," is a physical determination that does not presuppose how the drowning occurred, or that it was the result of homicidal violence.

Rule 702 sets the analytic framework. In addition to the three stated requirements, type of knowledge, witness qualification and helpfulness to the jury, Rule 702 requires that 1) the testimony must be based on sufficient facts or data; 2) the testimony must be the product of reliable principles and methods; and 3) the expert must reliably apply the principles and methods to the facts of the case. The court must determine "whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert* at 592-93. "[T]he expert's data, method, or his application of the method to the data" may affect the reliability of the proposed testimony. *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. at 141.

Here, notwithstanding Dr. Aurelius' solid credentials and sound methodology, she was

unable to generate sufficient clinical data to form a conclusion on an anatomical cause of death because of the dearth of testable remains presented to her.  The Court finds Dr. Aurelius' conclusions insufficiently supported under *Daubert*/Rule 702, for purposes of presenting the jury with an expert opinion that the cause of death was homicidal violence and the manner of death was homicide.   As recognized in *Mitchell v. Gencorp., Inc.* 165 F.3d 778 (10th Cir. 1999), opinion evidence connected to the existing medical data only by the "ipse dixit" of the expert need not be admitted where there is simply too great an analytical gap between the data and the opinion offered.  *See also Dodge v. Cotter Corp.*, 328 F.3d 1212 (10th Cir. 2003), citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).   In this case, we are dealing with just such an analytic gap.

Additionally, even if Dr. Aurelius' opinions that homicide or violent homicide caused the deaths of the victims met the *Daubert* standards, the Court finds under Rule 702 that those opinions should be excuded because they will not meaningfully assist the jury in its determinations because they are not based on the forensic science that establishes her expertise.  Indeed, forensic pathologists are permitted to rely on all available information, including facts related to the non-fornesic investigation to which the expert has been made aware, in determining the cause of death.  Here, however, the cause and manner of death determinations were based solely on the external investigation and were not based on the medical findings.  The jury itself will hear testimony pertaining to the investigation and circumstances surrounding the victims' deaths and will reach its own conclusions.  To cloak such a determination in the authority of the medical examiner's expert conclusion will be unfairly prejudicial as well as usurp the province of the jury.

Accordingly, Dr. Aurelius' testimony regarding the cause and manner of death determinations will not be admitted into evidence at trial.

**IV.    Perimortem Thermal Injury**

Dr. Aurelius determined that the thermal injury to the victims' bodies occurred "perimortem," which means at or near the time of death. Specifically, in her Autopsy Report, she states that "Autopsy revealed extensive perimortem thermal damage . . . ." Tr. at 318:1-2 (quoting Govt. Ex. 38, Autopsy Report, at 2). In support of this determination, she relied on the presence of soft tissue attached to bone in what little remained of the bodies, as well as external evidence including the fact that the victims' daughter had spoken with them three days before they were found dead. Tr. at 332:22-25. Dr. Aurelius testified that if human bodies are exposed to the elements for long periods, the soft tissue decomposes, and she would not observe soft tissue attached to the bone. *Id.* at 343-347. Moreover, despite significant briefing and testimony as to carboxyhemoglobin levels and what they mean, Dr. Aurelius ultimately testified at the hearing as follows: "the carbon monoxide level doesn't have anything to do, for me, with the time of death. The presence of soft tissue, as does the information circumstantially from my scene investigation . . . fits with the thermal damage occurring around the time of death." Tr. at 332:18-25. Accordingly, it was her sound expert medical determination that soft tissue was present, in some cases adherent to bone, as well as Dr. McQuade's determination that the bones were not brittle, that lead her to conclude that the thermal injury occurred perimortem. *See generally* Tr. at 290-291, 294-298 (McQuade testimony on the condition of bones as having no evidence of healing and noting that bones appeared "fresh" when burned ).

McCluskey's primary concern with this testimony is that Dr. Aurelius is propounding a theory that the victims were burned alive. Dr. Aurelius testified unequivocally at the hearing as follows: "I don't know if they were alive or not alive during the fire . . .we just don't have enough remains." Tr. at 333:1-4. Additionally, the Government has stated repeatedly that they do not intend to argue that the victims were burned alive. Accordingly, Dr. Aurelius may not testify that

14

the bodies were alive at the time they were burned.  Otherwise, Dr. Aurelius will be allowed to testify as to her findings, and McCluskey will have the opportunity to challenge her determinations on cross examination.

## CONCLUSION

In summary, McCluskey's attempt to exclude the witness based on a Rule 16 violation is unavailing because Rule 16 was not violated as to disclosure of this evidence and McCluskey has now had the opportunity to cross-examine Dr. Aurelius on her conclusions  The Court further determines that the Government's proposed expert testimony from Dr. Aurelius is reliable, relevant, more probative than prejudicial, and grounded in credible science *with the exception of her conclusion as to the cause and manner of death*.  Accordingly, the request to exclude Dr. Aurelius' testimony in its entirety will be denied.   The motion will be granted as to her determinations of cause and manner of death.

**IT IS THEREFORE ORDERED** that Defendant McCluskey's *(Corrected) Motion to Exclude Medical Investigator's Testimony, and Request for Daubert Hearing* (Doc. 425) is **GRANTED IN PART** as to Dr. Aurelius' opinion testimony pertaining to cause and manner of death, and the remainder of the motion is **DENIED**.

_____
UNITED STATES DISTRICT JUDGE