# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        **Plaintiff,**

vs.                                                                    CR. No.  10-2734 JCH

JOHN CHARLES McCLUSKEY,

        **Defendant.**

## MEMORANDUM OPINION ORDER

This matter is before the Court on *Defendant McCluskey's Motion in Limine for a Taint Hearing, for Suppression or Exclusion of Evidence, and for Discovery* [Doc. 861].  For the reasons more fully set forth in this Court's *Memorandum Opinion and Order* entered June 14, 2013 [Doc. 1027], on June 27, 2013, the Court held an evidentiary hearing on the motion to determine whether the Government would have inevitably discovered evidence regarding McCluskey's alleged April 2010 assault on a fellow Kingman prison inmate, Stevenson Williams, were it not for the fact that McCluskey mentioned the assault while being interrogated by Agent Rominger on August 20, 2010.[1] Because the Court has suppressed McCluskey's statements from that interrogation as a result of its finding that Agent Rominger violated McCluskey's Fifth Amendment right to counsel, *see* Doc. 646, McCluskey argues that all evidence of his assault on Williams—including witness statements and recorded phone calls—should be suppressed as further "fruit of the poisonous tree."  The Government opposes the motion, arguing that even if the "fruit of the poisonous tree" doctrine

---

[1] McCluskey waived his appearance at the June 27, 2013 hearing for medical reasons. After an *ex parte* discussion with McCluskey's counsel, the Court found his waiver to be knowing and voluntary, and therefore valid.

applies to Fifth Amendment violations (which it disputes), the evidence should not be suppressed because the Government inevitably would have uncovered McCluskey's connection to the assault on Williams.  After concluding that the law on the constitutional issue  has not been clearly decided in the Tenth Circuit[2], the Court noted that it need not decide the constitutional question if, as the Government claimed, it inevitably would have discovered the evidence regarding the assault on Williams.  *See* Doc. 1027.

## **DISCUSSION**

To succeed in suppressing evidence, typically a defendant must show the discovery "would not have come to light but for the government's unconstitutional conduct."  *United States v. Nava–Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (emphasis added).  If the defendant shows "but for" causation, the Government must then prove the "evidence sought to be suppressed is not 'fruit of the poisonous tree' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  *Id.*; *see also United States v. Torres–Castro*, 470 F.3d 992, 999 (10th Cir. 2006) ("'But for' causality is a necessary, but not a sufficient, requirement for suppression.").

"The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (internal citation

---

[2] At the June 27, 2013 hearing, McCluskey's counsel provided the Court with a citation to *United States v. Griffin*, 48 F.3d 1147 (10th Cir. 1995), in which the Tenth Circuit stated in a footnote that "[a]lthough developed under the Fourth Amendment, the exclusionary rule exceptions apply to evidence obtained in violation of the Fifth and Sixth Amendments."  *Id.* at 1150 n.5.

and punctuation omitted).  The burden rests on the government to prove "by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  *Id.*  The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct."  *United States v. Larsen*, 127 F.3d 984, 986–87 (10th Cir. 1997).  "[I]t is possible for an investigation that begins after the violation to be independent of the illegal investigation." *Id.* at 987.

The Court concludes that the Government met its burden to prove by a preponderance of the evidence that it inevitably would have discovered McCluskey's assault on Williams through independent legal means.  The Court finds that Agent Mark McCaskill testified credibly about the type of thorough and detailed background investigation of the defendant that the Government generally, and he as the case agent specifically, must conduct in a capital case.  Transcript of June 17, 2013 hearing ("Tr. 6/17/2013")  at 70-77. This is particularly important in a case brought under the Federal Death Penalty Act, because in the penalty phase of the trial both parties may use a wide variety of evidence about the defendant and his past—including but not limited to his character, talents, intellectual abilities, history of violence (or non-violence), future dangerousness, familial relationships, circumstances of the crime, and criminal history—as evidence of aggravating and mitigating factors.  *See, e.g., Payne v. Tennessee*, 501 U.S. 808, 822 (1991) (stating that a capital defendant is entitled to submit any mitigating evidence in support of a sentence less than death); *Zant v. Stephens*, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."). *See also* Tr. 6/27/2013 at 73-75.  As a result, it is expected that the Government would conduct an extensive investigation into McCluskey's personal and penal history so that it

3

could both support its proposed aggravating factors and rebut McCluskey's mitigating factors.  That investigation would have included thorough research into every aspect of McCluskey's life, including interviews of McCluskey's family members and co-conspirators, Tr. 6/27/2013 at 72-73. It also would have included gathering and reviewing  all prison records relating to McCluskey, particularly since he has spent most of his adult life in prison.  Tr. 6/27/2013 at 73, 80.   The prison records included in an investigation of McCluskey's prison life would have included all recorded, non-privileged  telephone calls that McCluskey made or received from prison  Tr. 6/27/2013 at 77, 80-81, 87.

On Aug. 11, 2010, prior to McCluskey's suppressed statement to Agent Rominger, Agent McCaskill received a report from Arizona Department of Public Safety summarizing phone calls between McCluskey and his alleged co-conspirator, Casslyn Welch,  in which the two were planning McCluskey's escape from prison.  Tr. at 81-83; Gov't Ex. 1.  As a result of that report, McCaskill knew that recordings of phone calls made by McCluskey from Kingman prison were available, and McCaskill knew that in the future he would obtain and review those calls as part of his investigation into McCluskey's background.  Tr. at 85-86.

Those recorded phone calls, which the Government was destined to obtain and review at some point regardless of McCluskey's statement to Agent Rominger, reveal a great deal about the assault on Stevenson Williams.  For example, on April 20, 2010 , McCluskey made a recorded call to Welch.  Govt. Ex 7.  In that call, McCluskey asks Welch who the inmate was who asked her for money, and she identifies "Steve Williams."  *Id*. at 2-3.  McCluskey then says that he will "take care of it" tomorrow.  *Id*. at 4.  He explains that he confronted Williams about repeatedly calling his family and obtaining money from them, which Williams denied.  *Id*. at 5.  Later in the phone call, McCluskey says that "he," meaning Williams, is "on an entirely different yard," but "it's definitely

getting done tomorrow." *Id*. at 10.  McCluskey then informs his mother that the "guy that was bothering" her on the phone had just shown up at Kingman prison, and that he would never bother her again.  *Id*. at 11-12.  The next day, April 21, 2010, McCluskey tells Welch that he got no sleep the night before, but he did "get everything solved" and that he feels "better."  Gov't Ex. 8 at 11. McCluskey then instructs Welch to find out "his" number and to "keep track of him weekly."  *Id*. at 15.  The reasonable inference from this conversation is that McCluskey had some sort of confrontation with Williams that day, and that he wants Welch to electronically follow Williams in the online Arizona prisoner locator system in order to track his movements, as he may now be a threat to McCluskey or his son, Johnny.  Tr. 6/27/2013 at 115.  On the following day, April 22, 2010,  McCluskey tells Welch to tell "Johnny," McCluskey's son, to "stay on top of things" with regard to McCluskey's "buddy."  Gov't Ex. 10, pp. 9-10.  He further tells her to let Johnny know that "there's no way that he won't be able to recognize him if he sees him" because he's "ugly" and probably has 300 or 400 stitches.  Welch says, "Wow, got a bride of Frankenstein going on there, huh?" and McCluskey responds, "Yeah, yeah."  *Id*. at 10.  Welch responds, "Sometimes you get stitches when you have accidents."  *Id*.  Then, on April 25, 2010, McCluskey asks Welch for money in order to replace his "lost" sweat pants and sweat shirt, as well as the boots he had to throw away. Gov't Ex. 11 at 6-8.  About two and half months later, on July 11, 2010, Welch describes to McCluskey the trouble she is in as a result of getting caught trying to smuggle narcotics into Kingman prison, and about what she has told investigators from Phoenix and Kingman.  Gov't Ex. 14 at 3-6; Tr. 6/27/2013 at 123-24.  McCluskey tells her that if "they" try to hurt her or put her in jail, she should tell them about "Frankenstein."  Gov't Ex. 14 at 5.  The reasonable inference from the conversation is that McCluskey is advising Welch to give authorities information about his assault on Williams in return for leniency on the charge of smuggling drugs into the prison.  *See also*

Tr. 6/27/2013 at 123-25.

As Agent McCaskill testified, these telephone calls indicate a date when the assault on Williams could have taken place, as well as the potential victim's name. Tr. at 127-28. This was enough to cause investigators to want to follow up with the Arizona Department of Corrections. *Id*. at 125, 127-28. These calls inevitably would have led government investigators to inquire as to whether any inmates at Kingman prison were assaulted in the April 20-21, 2010 time frame, and to look with particular scrutiny at any inmate named Steve Williams. They inevitably would have examined Williams' prison file and would have discovered that his throat was slashed with a sharp object on April 21, 2010 and that while initially he told medical personnel that he had been assaulted by another inmate, he only later claimed the wound was self-inflicted. *See* Gov't Ex. 6. This would have placed suspicion directly upon McCluskey, who had indicated to Welch that he intended to punish Williams.

However, the recorded phone calls are not the only way in which the Government inevitably would have discovered the assault on Williams. As previously discussed, it is a normal part of the Government's investigation in cases such as these to interview co-defendants and cooperating witnesses in order to obtain as much information about a capital defendant as possible, including information about that defendant's past acts of violence and propensity for violence. On Feb. 16, 2011, the Government conducted just such an interview of Welch. *See* Gov't Ex. 3. At one point, the Government asks Welch, in open-ended fashion, if she has any information about other crimes of violence in which McCluskey has engaged in the past. *Id*. at 81. No one mentions the Williams assault to Welch or leads her in any way. *Id*. In response to a request that Welch tell investigators "the worst of the stories," Welch describes an incident in which McCluskey "cut up" a fellow inmate with a razor knife because the inmate had convinced Welch to put $20 in the inmate's prison

6

account by falsely stating that McCluskey had approved the transaction.  Gov't Ex. 3 at pp. 89-91; *see also* Tr. 6/27/2013 at 91-93.  Welch also states that McCluskey informed her of the assault on the same day that it happened, and that he asked her to send money so that he could replace his (presumably) bloody clothes.  Gov't Ex. 3 at 90-91.  Welch's statements in this interview, which do not stem from McCluskey's suppressed statements on August 20, 2010, inevitably would have led the Government to discover the assault on Williams.

Based on the foregoing, the Court concludes that the Government has met its burden to prove, by a preponderance of the evidence, that despite McCluskey's suppressed statements to Agent Rominger on August 20, 2010, the Government inevitably would have discovered evidence of McCluskey's alleged assault on Stevenson Williams in Kingman prison in April of 2010.  Thus, even assuming that the "fruit of the poisonous tree" doctrine applies to Fifth Amendment violations under *Edwards*[3], the evidence in this case falls under the "inevitable discovery" exception to that rule.  Accordingly,

---

[3] *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that an accused, having expressed his desire to consult with an attorney, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication with the police).

**IT IS THEREFORE ORDERED** that *Defendant McCluskey's Motion in Limine for a Taint Hearing, for Suppression or Exclusion of Evidence, and for Discovery* [Doc. 861] is **DENIED**.


_____

**UNITED STATES DISTRICT JUDGE**

8