IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        **Plaintiff,**

**vs.**                                  **Cr. No. 10-2734 JCH**

**JOHN CHARLES McCLUSKEY,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on McCluskey's *[Corrected] Renewed Motion To Strike Particular Aggravating Circumstances*.  [Doc. No. 892]  The Government filed a Response opposing the motion [Doc. No. 907], and McCluskey filed a Reply [Doc. No. 937].  Both parties incorporate their previous response and reply.  [Docs. No. 436, 514]  The Court has reviewed these pleadings and the relevant law.  The Court concludes that the motion should be granted with regard to McCluskey's motion to strike the non-statutory aggravating factor "Armed Fugitive from Justice," but denied in all other respects.

## BACKGROUND

The Government's *Corrected Amended Notice of Intention To Seek the Death Penalty* [hereinafter NOI] alleges a number of statutory and non-statutory aggravating factors.  [Doc. No. 755]  The Court previously ruled on some of the arguments set forth in McCluskey's earlier motion, *(Corrected) Defendant's Motion To Dismiss Particular Aggravating Factors from the Third Superseding Indictment, and To Strike Particular Aggravating Factors from the Notice of Intent To Seek the Death Penalty, and for Other Relief* [Doc. No. 396].  The Court denied McCluskey's motion to preclude the use of non-statutory aggravating factors.  [Doc. No. 645, pp. 6-11, filed 8/27/12]  The Court also denied McCluskey's motion to strike certain statutory and

non-statutory aggravating factors as vague, duplicative, unascertainable, lacking factual support, irrelevant, or unfairly prejudicial; the Court, however, ordered the Government to provide an informative outline of the evidence[1] it intends to offer in support of some of the factors.  In the same Memorandum Opinion and Order, the Court denied McCluskey's motion [Doc. No. 393] to declare the non-statutory aggravating factor of "Future Dangerousness" unconstitutional both on its face and as applied to McCluskey.  [Doc. No. 645, pp. 3-5]

The Government provided an informative outline on September 14, 2012 [Doc. No. 670], and a second informative outline on March 8, 2013 [Doc. No. 840].

## DISCUSSION

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'"  *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *see Tuilaepa v. California*, 512 U.S. 967, 971 (1994) ("To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment.").  The Federal Death Penalty Act (FDPA) narrows the class of defendants eligible to receive the death penalty by the requirements that the jury find the requisite intent and that the jury find at least one statutory aggravating factor.  § 3591(a)(2); § 3593(c), (e).

The intent requirements of § 3591(a) perform a gatekeeping function, narrowing the class of persons eligible for the death penalty.  *United States v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998); *United States v. Solomon*, 513 F. Supp. 2d 520, 534 (W.D. Pa. 2007); *United States v.*

---

[1] Although the Rules of Evidence do not apply in the penalty phase, and the FDPA refers to "information" instead of "evidence" to support aggravating or mitigating factors, *see* § 3593(c), the parties and caselaw also use the term "evidence."  This Memorandum Opinion and Order uses "evidence" and "information" interchangeably, without intending to imply that "information" admissible in the penalty phase is subject to the Rules of Evidence.

*Cooper*, 91 F. Supp. 2d 90, 97 (D.D.C. 2000).  For instance, in many felony murder convictions these intent requirements would not be satisfied.  *Cooper*, 91 F. Supp. 2d at 97.  In the eligibility phase, the jury is also required to find at least one statutory aggravating factor.  "At the eligibility stage, aggravators have a distinct constitutional function:  narrowing the range of conduct for which the death penalty may even be considered."  *United States v. Fields*, 516 F.3d 923, 944 (10th Cir. 2008) (citing *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998)).  A statutory aggravating factor may not be "overbroad"; it must not be applicable to every defendant convicted of murder.  *Tuilaepa*, 512 U.S. at 972.  Otherwise the aggravator would not provide a principled basis for distinguishing those who deserve capital punishment from those who do not.  *Arave v. Creech*, 507 U.S. 463, 474 (1993); *United States v. Friend*, 92 F. Supp. 2d 534, 541 (E.D. Va. 2000).

In the selection phase, the jury decides whether to impose the death penalty.  *Buchanan*, 522 U.S. at 275.  Non-statutory aggravating factors "play no role in the eligibility determination under the FDPA, but are relevant only in the weighing process at the ensuing sentence-selection stage."  *Fields*, 516 F.3d at 944.  Thus non-statutory aggravating factors are not required to narrow the class of defendants who are eligible to receive the death penalty.  *Solomon*, 513 F. Supp. 2d at 534.  Once a defendant has been rendered eligible for the death penalty, the use of non-statutory aggravating factors serves only to individualize the sentencing determination by focusing the jury's attention on the character of the defendant and the circumstances of the crime.  *Stephens*, 452 U.S. at 878-79; *see Fields*, 516 F.3d at 944-45 (stating that in the selection phase, "the critical constitutional imperative is no longer narrowing the range of potential defendants eligible for the death penalty but, rather, ensuring that the jury focuses on the particular case before it" and makes an individualized determination of the appropriate sentence).

3

An aggravating factor must not be "vague"; it must provide adequate guidance to the jury, having a "common-sense core of meaning . . . that criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at 973. And an aggravating factor must be relevant to the sentencing decision. *See Gregg v. Georgia*, 428 U.S. 153, 192 (1976) (observing that a sentencing jury must be given "guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision"). § 3593(c) does not define "relevant." The Tenth Circuit held that it is the "'same standard used throughout the federal courts under Federal Rule of Evidence 401.'" *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1212-13 (10th Cir. 1998)). "Thus, under § 3593(c), information is admissible at a capital sentencing if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information].'" *Id.* (quoting Fed. R. Evid. 401).

"What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976). The "'acute need for reliable decisionmaking when the death penalty is at issue'" militates in favor of admitting "'as much information as possible'" to the sentencing jury. *United States v. Lujan*, 603 F.3d 850, 859 (10th Cir. 2010) (quoting *Deck v. Missouri*, 544 U.S. 622, 632 (2005), and *Gregg*, 428 U.S. at 204)). "Reliability and accuracy in decisionmaking is actually enhanced by the introduction of evidence that paints a more accurate, fuller picture of the defendant as an individual, irrespective of whether that picture is positive or negative." *Lujan*, 603 F.3d at 859.

The same standards for sufficiency of evidence to support a conviction apply to sufficiency of evidence to support a finding of an aggravating factor. *See Fields*, 516 F.3d at 940. The Tenth Circuit observed that a defendant challenging the sufficiency of evidence on an aggravating factor "faces a 'high hurdle,' as we 'ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences therefrom—in the light most favorable to the government, a reasonable jury could [make the challenged finding] beyond a reasonable doubt." *Id.* (quoting *United States v. Jenkins*, 175 F.3d 1208, 1215 (10th Cir. 1999) (setting forth standard of review for conviction, not aggravating factor)); *see Revilla v. Gibson*, 283 F.3d 1203, 1216 (10th Cir. 2002) (controlling standard for sufficient proof of heinous, atrocious, or cruel aggravator is "whether any rational trier of fact could have found the aggravator beyond a reasonable doubt").

## I. Duplicative Factors

### A. Mental state threshold factors

The NOI alleges three mental state threshold, or "gateway," factors, under § 3591(a)(2)(A), (C), and (D):

2. The defendant intentionally killed Gary Haas and Linda Haas. 18 U.S.C. § 3591(a)(2)(A).

3. The defendant intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Gary Haas and Linda Haas died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(C).

4. The defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants [in the] offense, such that participation in the act constituted a reckless disregard for human life and Gary Haas and Linda Haas died as a direct result of the act. 18 U.S.C. § 3591(a)(2)(D).

[Doc. No. 755, p. 2]   Relying on *McCullah*, McCluskey argues that the three intent factors alleged in the NOI:  (1) impermissibly duplicate each other; (2) impermissibly duplicate some of the aggravating factors; and (3) impermissibly duplicate elements of the capital counts charged. *United States v. McCullah*, 76 F.3d 1087, 1106 (10th Cir. 1996).   The Court rejects all three arguments.

*McCullah* involved a prosecution under 21 U.S.C. § 848.  The intent elements under that statute are similar to the FDPA's threshold intent elements under § 3591(a)(2).  In *McCullah*, the district court submitted aggravating factors (including several intent factors) that overlapped with each other and with the substantive offenses in the indictment.  The Tenth Circuit held that this constituted "double counting" of aggravating factors, which "has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *Id.* at 1111.  The *McCullah* Court remanded for resentencing, holding that the sentencing jury was impermissibly allowed to weigh factors twice.

The Government states that "it is not clear that duplicative aggravating factors are necessarily unconstitutional," observing that the Supreme Court "expressed doubts about *McCullah*." [Doc. No. 907, p. 8]  The Supreme Court stated:  "We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in *McCullah*." *Jones v. United States*, 527 U.S. 373, 398 (1999).  [Doc. No. 907, p. 8]   In *Jones*, the Supreme Court held that "[e]ven accepting, for the sake of argument," the "double counting" theory, there was no impermissible duplication. *Id.* at 398-400.  The victim's "personal characteristics" were used in the aggravating factor of victim impact; to show the aggravating factor of victim vulnerability, the instruction cited the victim's "'young age, her slight stature, her background, and her

unfamiliarity with San Angelo.'" *Id.* at 399. Even though "personal characteristics" could conceivably include the latter group of characteristics, the Supreme Court held that there was no impermissible duplication because the evidence "went to entirely different areas of aggravation." *Id.* "[A]t best, certain evidence was relevant to two different aggravating factors." *Id.* In addition, the *Jones* Court observed, "any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury 'should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater [but rather] should consider the weight and value of each factor.'" *Id.*

The Court recognizes that the Supreme Court has not endorsed *McCullah*'s "double counting" approach, and also recognizes that *McCullah* involved a different statute. The Tenth Circuit, however, continues to apply *McCullah*. In 2008, the Tenth Circuit applied *McCullah* in an FDPA case. *United States v. Fields*, 516 F.3d 923, 940 (10th Cir. 2008) (applying *McCullah* to issue of duplicativeness between two statutory aggravating factors).

*McCullah* involved § 848, not the FDPA. Some of the reasoning and analysis of *McCullah* apply equally under the FDPA—e.g., to a challenge of duplicativeness between two statutory aggravating factors; this was the issue on which the Tenth Circuit applied *McCullah* in *Fields* in 2008. But McCluskey overextends *McCullah* when he argues—without considering critical distinctions between § 848 and the FDPA—that *McCullah* applies to all of his challenges of duplicativeness. The Government correctly argues that critical differences between the treatment of intent factors under § 848 and the FDPA make *McCullah* inapplicable to McCluskey's arguments about duplicativeness of the intent factors. In *McCullah* the intent elements were included among the aggravating factors that were weighed against mitigating factors; under § 848, therefore, submitting duplicative and overlapping intent factors did result in

a larger number of aggravating factors to be weighed by the sentencing jury. *McCullah*, 76 F.3d at 1111-12; *see also United States v. Tipton*, 90 F.3d 861, 899 (4th Cir. 1996) (holding submission of more than one intent factor under § 848 was error, but was harmless in that case). Under the FDPA, however, the intent elements of § 3591 are not aggravating factors; these threshold intent factors are not weighed along with aggravating factors against mitigating factors. *See* § 3591; § 3593(c), (e). "§ 3591(a) does not set forth aggravating factors, but rather serves as a preliminary qualification threshold." *Webster*, 162 F.3d at 355. "The fact that a defendant could satisfy more than one of these . . . does not, therefore, constitute impermissible double counting." *Id.*   Under the FDPA, "there is no risk of skewing because the jury finds intent, and then starts with a clean slate in evaluating separate aggravating factors." *Cooper*, 91 F. Supp. 2d at 110.  Submission of more than one intent factor under § 3591(a) does not skew the weighing process.  *United States v. Jackson*, 327 F.3d 273, 300-01 (4th Cir. 2003) (distinguishing *McCullah*).  The Court concludes that it is permissible to submit more than one of the gateway intent factors of § 3591(a)(2).  *See Jackson*, 327 F.3d at 300-01 (no error in submitting all four intent factors in § 3591(a)(2)); *Cooper*, 91 F. Supp. 2d at 109-10 (same).  The three gateway intent factors alleged in the NOI in McCluskey's case do not impermissibly duplicate each other.

For essentially the same reasons, the Court rejects McCluskey's argument that the gateway intent factors impermissibly duplicate some of the aggravating factors.  Since, under the FDPA, these intent factors are not weighed with the aggravating factors, there is no double counting and the jury's weighing is not skewed.  Duplication of a gateway intent factor and an aggravating factor is permissible.  *United States v. Chanthadara*, 230 F.3d 1237, 1261 (10th Cir. 2000); *Webster*, 162 F.3d at 354-55.  "If the jury finds one or all four of the [intent factors under

8

§ 3591(a)(2)], there is no risk of skewing because the jury finds intent, and then starts with a clean slate in evaluating separate aggravating factors." *Cooper*, 91 F. Supp. 2d at 110.

The Court also rejects McCluskey's third argument—that the gateway intent factors impermissibly duplicate elements of the capital counts charged against McCluskey in this case. As required for constitutionality, the FDPA narrows the class of persons eligible for the death penalty by means of the gateway intent requirements of § 3591(a). *Lowenfield*, 484 U.S. at 244; *Tuilaepa*, 512 U.S. at 971-72 (narrowing may be accomplished either at guilt phase or penalty phase). Although in McCluskey's case the intent elements of the capital crimes charged also satisfy some of the gateway intent factors of 3591(a)(2), this simply shows that the constitutionally required narrowing occurs in the guilt phase in McCluskey's case.

## B. Aggravating factors

McCluskey argues that aggravating factors cannot duplicate elements of the substantive offenses charged. This argument was rejected by the Supreme Court in *Lowenfield*. The "narrowing function required for a regime of capital punishment may be provided" either by the legislature's definition of capital offenses, or by jury findings of aggravating circumstances at the penalty phase. *Lowenfield*, 484 U.S. at 246. As the Tenth Circuit observed in *McCullah*, *Lowenfield* "held it permissible to count an element of the underlying offense as an aggravating factor where the 'narrowing' function is performed at the guilt phase." *McCullah*, 76 F.3d at 1107 (rejecting the defendant's argument that aggravating factors under § 848(n)(1) were unconstitutional for not narrowing the class of death-eligible defendants); *see United States v. Higgs*, 353 F.3d 281, 315 (4th Cir. 2003) (holding under FDPA that statutory aggravating factor may duplicate element of substantive offense). Since the FDPA has performed the narrowing function by imposing the gateway intent factors, it is constitutional for a statutory aggravating

factor to duplicate an element of the substantive offense.[2]  *See Lowenfield*, 484 U.S. at 246; *Chanthadara*, 230 F.3d at 1261; *Revilla v. Gibson*, 283 F.3d 1203, 1215 (10th Cir. 2002) (rejecting Eighth Amendment argument of duplication between aggravating factor and offense element because offense element performed the necessary narrowing function).  "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."  *Tuilaepa*, 512 U.S. at 972.  In addition, there is no double counting under *McCullah* because the elements of the substantive offenses are not weighed by the jury in the selection phase under § 3593(c).

McCluskey also argues that some of the aggravating factors must be stricken because they impermissibly duplicate each other.  [Doc. No. 892, p. 16]  In *McCullah*, the Tenth Circuit held that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally."  *McCullah*, 76 F.3d at 1111.  When the same aggravating factor "is counted twice, the defendant is essentially condemned twice for the same culpable act."  *Id.* (internal quotation marks omitted).  "When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot 'assume it would have made no difference if the thumb had been removed from death's side of the scale.'"  *Id.* at 1112 (quoting *Stringer v. Black*, 503 U.S. 222, 232 (1992)).  This aspect of *McCullah* is applicable to challenges that aggravating factors under the FDPA impermissibly duplicate each other.  *See Fields*, 516 F.3d at 940.

As explained in later Tenth Circuit cases, "to overlap impermissibly, one aggravating circumstance must ""necessarily subsume"" another."  *Medlock v. Ward*, 200 F.3d 1314, 1319

---

[2] Since non-statutory aggravating factors are not required to narrow the class of defendants who are eligible for the death penalty, *see Solomon*, 513 F. Supp. 2d at 534, there is no analogous issue.

(10th Cir. 2000) (quoting *Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998) (quoting *McCullah*, 76 F.3d at 1087)).  This means that if the jury finds one factor, the jury "necessarily had to" find the other factor.  *McCullah*, 76 F.3d at 1111; *see Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir. 1999) ("Here, although the jury may have relied on some of the same evidence—namely petitioner's past felony convictions—in finding the aggravating circumstance of future dangerousness, it did not necessarily have to find one in order to find the other.").  The same evidence may be used to support two aggravating factors, however, without rendering those factors impermissibly duplicative.  *Medlock*, 76 F.3d at 1319.  Thus, in *Medlock*, the Tenth Circuit held that it was permissible to use Medlock's criminal record to find both the "continuing threat to society" and "heinous, atrocious, or cruel" aggravating factors:

> The aggravators do not "necessarily subsume" one another under *McCullah*:  The "continuing threat" aggravator goes to Medlock's future dangerousness, while the "heinous, atrocious, or cruel" aggravator goes to the nature of Medlock's crime.  The former involves future conduct; the latter involves the nature of the act for which Medlock was convicted.  Under these circumstances the elements of one aggravator do not necessarily subsume those of the other.

*Id.*; *see Jones*, 527 U.S. at 399 ("at best, certain evidence was relevant to two different aggravating factors").  Similarly, in *Cooks*, the Tenth Circuit held that the "continuing threat" aggravator was not impermissibly duplicative of the "prior conviction" aggravator:

> First, although Mr. Cooks' jury may have considered evidence of his prior conviction of a violent crime in the context of determining the presence of both the "prior conviction" and "continuing threat" aggravators, the "prior conviction" circumstance focused the jury's attention on the particular nature and consequences of his *past* conduct, while the "continuing threat" aggravator focused attention on the likelihood of *future* violent conduct.

*Cooks*, 165 F.3d at 1289 (federal habeas review of Oklahoma state conviction, in which Tenth Circuit applied *McCullah* to issue of duplication).  The Eighth Circuit followed the same analysis, stating that "the Tenth Circuit is correct to conclude that the same facts can support

different inferences that form different aggravators." *United States v. Purkey*, 428 F.3d 738, 762 (8th Cir. 2005).

The Court will address McCluskey's challenges of duplicativeness in the discussion of each aggravating factor, below.

## II.   Statutory Aggravating Factor "Previous Conviction of Violent Felony Involving Firearm," § 3592(c)(2)

The Third Superseding Indictment states under Special Findings that "the Grand Jury finds that the defendant . . . [(f.)] has previously been convicted of violent offenses, punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm against another person (18 U.S.C. § 3592(c)(2))."  [Doc. No. 273, pp. 12-13] The NOI alleges:

> 1.   The defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm against another person, including at least:
>
> a.   1983 conviction for armed robbery, Case No. CR 0000-132088, Maricopa County, Arizona;
>
> b.   1992 convictions for robbery, criminal conspiracy, and aggravated assault, Case No. CR 2733-92, Lancaster County, Pennsylvania;
>
> c.   2009 convictions for attempted second degree murder, discharge of a firearm at a structure, and aggravated assault, Case No. CR 2009-118185, Maricopa County, Arizona; and
>
> d.   2011 convictions for kidnapping, armed robbery, and aggravated assault, Case No. CR 2010-00823, Mohave County, Arizona.
>
> 18 U.S.C. § 3592(c)(2).

[Doc. No. 755, p. 3]

### A.  Specific convictions not found by grand jury and not listed in indictment

McCluskey argues that "the grand jury never identified a specific conviction as the basis for this factor, and it certainly never identified the three specific convictions that are alleged in the government's death notice."  [Doc. No. 892, p. 17]  McCluskey contends that this statutory aggravating factor is an element of the offense and its omission from the indictment means that this statutory factor should be dismissed, or at least the three specific prior convictions should be stricken because they are not alleged in the indictment.  Assuming this proposition is correct, McCluskey next argues that the indictment cannot be amended to include the specific convictions.

The Court need not reach the second part of McCluskey's argument, because the Court disagrees with the first part.  The Court concludes that McCluskey has not provided authority to support his argument that the specific convictions had to be found by the grand jury and listed in the indictment.

The case on which McCluskey relies for the first part of his argument, *United States v. Sampson*, 245 F. Supp. 2d 327 (D. Mass. 2003), is based on the *Jones-Apprendi-Ring* line of cases.  *Jones v. United States*, 526 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002).  The *Sampson* court did not address the specific argument made by McCluskey; instead, McCluskey attempts to extend *Sampson*.  The *Sampson* court was addressing the defendant's more general argument that the FDPA was unconstitutional on the ground that the FDPA did not expressly require the grand jury to find the gateway intent factors and statutory aggravating factors; based on the *Jones-Apprendi-Ring* line of cases, the court concluded that these factors must be treated procedurally as elements of the offense and therefore "'"must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."'"  *Sampson*, 245 F. Supp. 2d at 332 (quoting *Ring*, 536 U.S. at 600 (quoting

*Jones*, 526 U.S. at 243 n.6)).  The *Sampson* court concluded that the FDPA was not rendered unconstitutional for lack of explicitly including such requirements.  As the preceding quotation demonstrates, the *Sampson* court's holding was based solidly on the *Jones-Apprendi-Ring* line of cases.  But, as the Government observes, these cases make an exception for prior convictions. *See Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Jones*, 526 U.S. at 243 n.6 (setting forth the principle that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt").  The Fourth Circuit addressed the specific issue raised by McCluskey, and held that Supreme Court caselaw continued to make an exception for prior convictions; although other statutory aggravators must be alleged in the indictment, prior convictions need not be.  *United States v. Higgs*, 353 F.3d 281, 302-03 (4th Cir. 2003); *see Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998).

McCluskey's attempt to extrapolate from *Sampson* is unsuccessful; the district court in *Sampson* did not address the specific issue raised by McCluskey and the caselaw on which *Sampson* relied specifically excepts prior convictions.  The Court is persuaded by the Fourth Circuit's opinion in *Higgs*.

### B.  Exception in § 3592(c)(2) for 924(c)

§ 3592(c)(2) provides:

**Previous conviction of violent felony involving firearm.**—For any offense, other than an offense for which a sentence of death is sought on the basis of section 924(c), the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.

14

(Emphasis added.)  Relying on the emphasized clause, McCluskey argues that this aggravating factor, "Previous Conviction of Violent Felony Involving Firearm," cannot apply to Counts 9 to 18, all of which allege violations of 18 U.S.C. § 924(c) and (j).  [Doc. No. 892, p. 20]

The Government responds that it would be irrational to permit the use of previous convictions of violent felonies involving a firearm as an aggravating factor in all homicide prosecutions except those under § 924(c) and (j), which necessarily involve firearms.  [Doc. No. 436, pp. 23-24]  The Government's interpretation of the emphasized language in § 3592(c)(2) is that the same violent felony involving a firearm that is used in the current prosecution to enhance the sentence under § 924(c) and (j) cannot also be used as an aggravating factor under § 3592(c)(2)—essentially, that the emphasized language merely prohibits such double use of the same violent felony.  The Government argues that it must rely on different previous convictions under § 3592(c)(2), and that it intends to do so; the Government will rely on the 1983, 1992, 2009, and 2011 convictions listed in the NOI to support the aggravating factor under § 3592(c)(2).

The Court is persuaded that the Government's statutory interpretation is correct.  There will be no double use of the type prohibited by § 3592(c)(2).

### C.  Whether prior convictions must include use of firearm as an element

McCluskey argues that the NOI does not show that the prior convictions qualify under § 3592(c)(2) as violent felonies "involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person."  McCluskey contends that this Court should follow the *Taylor* "categorical approach" to determine whether these are qualifying felonies.  *Taylor v. United States*, 495 U.S. 575 (1990); *see United States v. Smith*, 630 F. Supp. 2d 713 (E.D. La. 2007).  [Doc. No. 892, p. 20 (citing to *Smith* as 2007 WL 2668883, *5)]  The

"categorical approach" limits the inquiry to the fact of conviction and the statutory definition of the crime of conviction to determine whether a firearm was involved; the "categorical approach" does not allow consideration of the particular facts of the case.

In a previous Memorandum Opinion and Order, this Court concluded that it would not apply the *Taylor* categorical approach to prior convictions.  [Doc. No. 993, pp. 5-7, filed 5/28/13]  Accordingly, where the Government represents that the documents it intends to introduce support a finding that McCluskey's conduct in the course of committing an offense involved the use of a firearm, *Taylor* does not prohibit the use of that conviction under § 3592(c)(2).

### D.   Sequencing and finality of convictions

McCluskey argues that under § 3592(c)(2):  (1) the "previous conviction" must have occurred before commission of the capital offenses in the instant case; and (2) the "previous conviction" must not be subject to challenge in a habeas proceeding.  [Doc. No. 892, pp. 20-24]

### (1)  Sequencing

The NOI includes "2011 convictions for kidnapping, armed robbery, and aggravated assault, Case No. CR 2010-00823, Mohave County, Arizona."  [Doc. No. 755, p. 3]  McCluskey argues that the 2011 convictions cannot be included under § 3592(c)(2) as "previous convictions" because they occurred after commission of the August 2010 capital offenses charged.  McCluskey argues that "previous" in § 3592(c)(2) should be interpreted to mean that the convictions occurred before commission of the capital offenses; he argues that interpreting the statute to mean that the convictions must only pre-date the time of sentencing would violate accepted principles of statutory construction by rendering the word "previous" superfluous. McCluskey relies on caselaw interpreting a different statute containing different language.  The

16

Fourth Circuit interpreted 18 U.S.C. § 924(e)(1) of the Armed Career Criminal Act to require

that convictions which occurred after commission of the offenses in question, but prior to

sentencing, were not "previous convictions" which could be used to enhance the defendant's

sentence. *United States v. Pressley*, 359 F.3d 347, 350-51 (4th Cir. 2004). § 924(e)(1) provides:

> In the case of a person who violates section 922(g) of this title and has
> three previous convictions by any court referred to in section 922(g)(1) of this
> title for a violent felony or a serious drug offense, or both, committed on
> occasions different from one another, such person shall be . . . imprisoned not less
> than fifteen years . . . .

Relying on the specific language used in § 924(e)(1), the *Pressley* court concluded:

> The only remaining question then is what event this "previous conviction"
> must precede. The plain language of the statute also provides this answer—the §
> 922(g) violation. While the statute explicitly refers to previous *convictions* when
> discussing the predicate offenses, it looks to "a person who *violates* section
> 922(g)" when discussing the instant offense. Since the only reference in the
> statute to the § 922(g) offense speaks of a § 922(g) *violation*, the plain text
> dictates that this violation serves as the event which the "previous convictions"
> must precede.

359 F.3d at 349-50 (citations omitted). The *Pressley* court also reasoned that a conclusion that

any convictions obtained prior to sentencing counted as "previous convictions" would read the

term "previous" out of the statute. *Id.* at 350. The Fourth Circuit observed that "every other

circuit to consider this question" reached the same conclusion. *Id.* at 351.

   The Government argues that any conviction obtained before the date of the capital

sentencing hearing qualifies as a "previous conviction" under § 3592(c)(2). [Doc. No. 436, p.

26] The Government relies on a Fourth Circuit case interpreting a different section of the FDPA,

§ 3592(c)(12), which provides:

> (12)    Conviction for serious Federal drug offenses.—The defendant had
> previously been convicted of violating title II or III of the Comprehensive Drug
> Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more
> years may be imposed or had previously been convicted of engaging in a
> continuing criminal enterprise.

In *Higgs*, the Fourth Circuit held that "the § 3592(c)(12) statutory aggravating factor encompasses *all* predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges." *United States v. Higgs*, 353 F.3d 281, 318 (4th Cir. 2003). The *Higgs* court could see no basis on which to conclude that Congress intended that § 3592(c)(12) include only convictions occurring prior to the conduct underlying the murder or kidnapping charges involved in the instant case: "Unlike others contained within § 3592(c), the aggravator does not concern matters directly related to the death penalty offense. Rather, it is concerned with the characteristics of the offender as of the time that he is sentenced." *Id.* at 318. The court observed that Congress could easily have specified that the prior offense or conviction had to occur before the death penalty offense, but had not done so; the court cited other statutes explicitly stating such sequencing. *Id.* Instead, the entire section set forth factors to be considered at the time the capital sentencing hearing is conducted and the jury begins the weighing process. *Id.* Noting that § 3592(c)(12) uses "had" instead of "has," the *Higgs* court implied that those other aggravators did not require conviction to occur before commission of the capital offense; *Higgs* concluded that this grammatical distinction, however, was "far too tenuous a basis upon which to conclude that Congress intended that the prior serious drug offense aggravating factor for homicide was to be treated differently than every other prior conviction aggravating factor and every other prior serious drug offense aggravating factor for other crimes under the FDPA." *Id.* at 319.

A district court followed the analysis and conclusion of *Higgs* in considering the aggravator at issue in McCluskey's case, § 3592(c)(2). *United States v. Basciano*, 763 F. Supp. 2d 303, 350-51 (E.D.N.Y. 2011). "Like the Statutory Aggravating Factor considered in *Higgs*, § 3592(c)(2) 'does not concern matters directly related to the death penalty offense. Rather, it is

concerned with the characteristics of the offender as of the time that he is sentenced.'" *Id.* at 350 (quoting *Higgs*, 353 F.3d at 318).

The Court is persuaded by the reasoning and analysis of *Higgs* and *Basciano*, and concludes that McCluskey's 2011 convictions qualify as "previous convictions" under § 3592(c)(2). The cases upon which the parties primarily rely were both decided by the Fourth Circuit. *Pressley* was decided one year after *Higgs*, but the Fourth Circuit neither discussed nor questioned its holding in *Higgs*. *Pressley*'s analysis depended upon the specific wording of the statute considered, and the wording is different in § 3592(c)(2); *Pressley* therefore did not decide the "identical issue," as McCluskey contends. [Doc. No. 892, p. 22] The wording at issue in *Higgs* of § 3592(c)(12) ("had previously been convicted"), however, is the same in the relevant respect as § 3592(c)(2) ("has previously been convicted").

In addition, the Court is not persuaded by McCluskey's argument that the statutory construction adopted in *Higgs* and *Basciano* renders the words "previous" and "previously" superfluous. If these words were deleted from § 3592(c)(2), the statute would be headed "Conviction of violent felony involving firearm" and would require that the defendant "has been convicted" of an offense punishable by more than one year, involving a firearm, as follows:

> **Conviction of violent felony involving firearm.**—For any offense, other than an offense for which a sentence of death is sought on the basis of section 924(c), the defendant has been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person.

So written, the statute would allow aggravation based on conviction within the same capital case of such a felony, in addition to the capital offense(s) in the case—rather than requiring that conviction to be from a different case. The addition of the words "previous" and "previously" is necessary to inform the jury that the conviction must be from a different case. The statutory

construction adopted by the Court therefore does not render superfluous the words "previous" and "previously."

McCluskey argues that if his approach is not adopted, the result will be arbitrary and may allow for prosecutorial manipulation.  [Doc. No. 892, p. 23]  The Court notes that the disputed 2011 convictions were in Arizona state court; the Court will not presume prosecutorial manipulation, particularly when different sovereigns are involved.  More important, such policy arguments were for Congress to consider; this Court is construing the statute in accordance with the plain language used by Congress.  And the Court disagrees with McCluskey's assertion that consideration of his other convictions has no relation to his character or the appropriate sentence; a defendant's prior criminal history and prior convictions are extremely relevant and appropriate considerations in determining the appropriate sentence.

### (2)  Finality

McCluskey also contends that his 2011 convictions are the subject of a pending habeas petition and, if they are determined to be invalid, his sentence would have to be reversed.  [Doc. No. 892, pp. 21, 23-24]  McCluskey does not assert that these convictions are still subject to direct appellate review.  McCluskey provides no caselaw specifically supporting his argument.

Citing *Basciano*, the Government argues that § 3592(c)(2) does not even require a previous conviction to be final.  [Doc. No. 436, pp. 26-27]  The district court in *Basciano* rejected the defendant's argument that a conviction could not be used to support the statutory aggravating factor under § 3592(c)(2) because that conviction was on direct appeal.  *Basciano*, 763 F. Supp. 2d at 349-50.  The *Basciano* court reasoned that § 3592(c)(2) did not explicitly require that a conviction be "final"—in contrast to other statutes that specified that a conviction be "final."  763 F. Supp. 2d at 349.  The lack of an express requirement of finality in §

20

3592(c)(2) indicates that Congress did not intend to impose such a requirement; the *Basciano* court held that a previous conviction need not even be final to be used under § 3592(c)(2).  The Court is persuaded by the reasoning of *Basciano*, and rejects McCluskey's argument that the possibility of a successful habeas petition precludes use of a previous conviction under § 3592(c)(2).

### E.  Duplication

McCluskey argues that there is impermissible duplication between "Previous Conviction of Violent Felony Involving Firearm" and "Previous Conviction of Other Serious Offenses." [Doc. No. 755, pp. 3-4]  Two sets of convictions are cited in support of both factors:  1992 convictions for robbery, criminal conspiracy, and aggravated assault, Case No. CR 2733-92, Lancaster County, Pennsylvania; and 2009 convictions for attempted second degree murder, discharge of a firearm at a structure, and aggravated assault, Case No. CR 2009-118185, Maricopa County, Arizona.  [Doc. No. 755, pp. 3-4]  Two additional sets of convictions are cited in support of "Previous Conviction of Violent Felony Involving Firearm."  Under *McCullah*, there is no impermissible duplication unless one aggravating circumstance "necessarily subsumes" another.  *Medlock*, 200 F.3d at 1319; *McCullah*, 76 F.3d at 1087.  The same evidence may be used to support two aggravating factors.  *Medlock*, 200 F.3d at 1319.  As the Government argues, the § 3592(c)(2) factor requires convictions involving use of a firearm, while the § 3592(c)(4) factor requires convictions involving the infliction or attempted infliction of serious bodily injury or death.  [Doc. No. 436, p. 27]  The two factors are not impermissibly duplicative because they focus the jury's attention on different aspects of McCluskey's criminal history—his use of firearms and his infliction (or attempted infliction) of bodily injury or death. *See Cooks*, 165 F.3d at 1289; *Medlock*, 200 F.3d at 1319.  Finding of one factor does not

necessarily require finding the other; there is no impermissible duplication.  *See McCullah*, 76 F.3d at 1111 (one factor "necessarily subsumes" the other only if a jury finding one factor "necessarily had to" find the other factor).

McCluskey argues that there is impermissible duplication between the aggravating factor of "Previous Conviction of Violent Felony Involving Firearm" and the "Continuing pattern of violence" sub-factor of "Future Dangerousness."  [Doc. 755, pp. 3, 5]  Under the "Continuing pattern of violence" sub-factor, the NOI alleges the same four previous convictions (along with two others) as those alleged in support of "Previous Conviction of Violent Felony Involving Firearm." In *Cooks*, the Tenth Circuit rejected the argument that there was impermissible duplication under similar circumstances.  *Cooks*, 165 F.3d at 1289 (federal habeas review of Oklahoma state conviction).  The aggravator in *Cooks* was entitled "continuing threat to society," which is the same as "Future Dangerousness" in McCluskey's case.  Applying *McCullah*, the Tenth Circuit held that there was no impermissible duplication between "continuing threat to society" and "prior conviction":

> First, although Mr. Cooks' jury may have considered evidence of his prior conviction of a violent crime in the context of determining the presence of both the "prior conviction" and "continuing threat" aggravators, the "prior conviction" circumstance focused the jury's attention on the particular nature and consequences of his *past* conduct, while the "continuing threat" aggravator focused attention on the likelihood of *future* violent conduct.

*Cooks*, 165 F.3d at 1289.  Again applying *McCullah*, the Tenth Circuit in *Johnson* again held that there was no impermissible duplication between "future dangerousness" and "prior felony conviction."  *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir. 1999).  "Even though the jury relies on the same evidence to find two aggravating factors, there is no impermissible duplication when the jury "did not necessarily have to find one [factor] in order to find the other."  *Id.*

McCluskey also alleges impermissible duplication with the "catchall non-statutory aggravating factor ("the offenses of conviction as described in the Indictment")." [Doc. No. 892, p. 24] The Government responds that it does not intend to rely on any "catch-all" non-statutory aggravating factor. [Doc. No. 907, p. 7 n.6] To the extent that McCluskey asserts impermissible duplication between statutory aggravating factors and elements of the substantive offenses in the instant case, the Tenth Circuit has rejected this argument. *See McCullah*, 76 F.3d at 1109-10.

The Court concludes that there is no impermissible duplication and will deny McCluskey's motion to strike or dismiss this factor.

## III. Statutory Aggravating Factor "Previous Conviction of Other Serious Offenses," § 3592(c)(4)

With respect to the aggravator "Previous Conviction of Other Serious Offenses," McCluskey makes three of the same arguments addressed above with respect to "Previous Conviction of Violent Felony Involving Firearm." [Doc. No. 892, pp. 24-25 (omitting argument regarding § 924(c) and timing of 2011 conviction)] Under the same reasoning and analysis previously set forth in Section II above, the Court will deny McCluskey's motion to strike or dismiss this factor.

## IV. "Heinous, Cruel, or Depraved Manner of Committing Offense," § 3592(c)(6)

McCluskey argues that the Court must strike this aggravating factor. [Doc. No. 892, pp. 25-28] He recognizes that this factor is not unconstitutionally vague under the Eighth Amendment when limited by the statute's additional requirement that "it involved torture or serious physical abuse to the victim."[3] *United States v. Chanthadara*, 230 F.3d 1237, 1262 (10th

---

[3] McCluskey earlier raised issues of vagueness and overbreadth. [Doc. No. 874-1] The Government states that it incorporates its earlier responses on these issues. [Doc. No. 907, p. 11; Doc. No. 436, pp. 28-30, filed 4/30/12] But McCluskey states that his current motion includes all of his current arguments and also omits issues on which the Court has already ruled. [Doc. No. 892, p. 1 n.2] At any event, the Tenth Circuit in *Chanthadara* rejected these arguments. The Court therefore addresses only issues raised in McCluskey's April 5, 2013 motion, Doc. No. 892.

Cir. 2000); *United States v. Jones*, 132 F.3d 232, 249 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999).

McCluskey argues, however, that the information the Government intends to present to support

this aggravating factor "does not constitute 'serious physical abuse' within the meaning of 18

U.S.C. § 3592(c)(6)."  [Doc. No. 892, p. 28]  This argument is based on the assertion that the

"serious physical abuse" alleged in this case "is limited to conduct occurring long after the

alleged killing, in a separate location from the killing, and in an alleged effort to dispose of the

Haases' camper-trailer and bodies."  [Doc. No. 892, p. 27]   McCluskey characterizes his

argument as one of statutory interpretation.

> The NOI sets forth the following information in support of this factor:

> In this case, the Government will establish that, after killing the victims, the
> Defendant burned their bodies inside of the victims' camper-trailer using an
> accelerant to ignite the very hot fire.  The fire almost completely consumed the
> victims' bodies and the trailer.

[Doc. No. 840, p. 3][4]  Under another section of the informative outline (regarding "Future

Danger—Lack of Remorse"), the Government stated that it "will present testimony from

cooperating co-defendants indicating Defendant's actions that demonstrate a lack of remorse in

the days after Defendant killed the Haases," including "Defendant's decision to burn the victims'

bodies after recognizing blood was leaking from the camper trailer while at a gas station along

Interstate 40 in New Mexico."  [Doc. No. 840, p. 9]

McCluskey recognizes that the Tenth Circuit held that "serious physical abuse" under §

3592(c)(6) may be inflicted either before or after death and does not require that the victim be

conscious of the abuse at the time it was inflicted.  *Chanthadara*, 230 F.3d at 1261-62; *see also*

*United States v. Hall*, 152 F.3d 381, 415 (5th Cir. 1998), *abrogated on other grounds by United*

*States v. Martinez-Salazar*, 528 U.S. 304, 310 (2000); *United States v. Sampson*, 335 F. Supp. 2d

---

[4] McCluskey cites the Government's earlier informative outline, Doc. No. 670, filed 9/14/12, which
is the same as Doc. No. 840 in the portions discussed here.

166, 204 (D. Mass. 2004). He argues, however, that *Chanthadara* is limited to evidence showing that the killing was committed in a depraved manner, and that the reasoning of *Chanthadara* does not apply here. McCluskey cites a district court case to support his argument that § 3592(c)(6) is not proved by evidence of conduct separate from the murder if that conduct was rationally performed to conceal and dispose of the victims' bodies. *United States v. Taveras*, 488 F. Supp. 2d 246 (E.D.N.Y. 2007).

In *Taveras*, the government's notice of intent alleged that, after each of two victims died, the defendant dismembered their bodies and placed the body parts into garbage bags, which he then drove to another location and dumped. *Id.* at 249. The district court stated that federal courts differ on whether "serious physical abuse" under § 3592(c)(6) must occur before the victim's death—but did not cite cases containing reasoned analysis and holdings to that effect. For instance, the *Taveras* court cites *United States v. Pretlow,* 779 F. Supp. 758, 773 (D.N.J. 1991) (involving nearly identical language of previous statute, 21 U.S.C. § 848(n)(12), "especially heinous, cruel, or depraved way in that it involved torture or serious physical abuse to the victim"). The *Pretlow* court, however, merely stated—without discussion or authority regarding the timing of the abuse—that "this aggravating factor is facially valid to the extent that it requires proof that Mr. Pretlow subjected Mutah Sessoms to serious physical abuse prior to his death." *Id.* The focus of *Pretlow*'s discussion was on vagueness.

The *Taveras* court held that the defendant's alleged acts of post-mortem dismemberment did not "constitute 'serious physical abuse' within the meaning of 18 U.S.C. 3592(c)(6)." *Taveras*, 488 F. Supp. 2d at 253. The court reasoned that the statute covered post-mortem abuse only if there was an inference that the defendant "'relished the killing'" or inflicted "gratuitous serious physical harm." *Id.* at 252 (citing *Hall*, 152 F.3d at 415; *Sampson*, 335 F. Supp. 2d at

208). Deciding that there was no evidence that Taveras relished the murders or committed acts of gratuitous violence in dismembering the corpses, the *Taveras* court concluded that the "post-mortem dismemberment of the victims was for the rational purpose of concealing and disposing of the corpses in order to evade prosecution." *Id.* "The fact that the victims were dismembered post-mortem in an attempt to conceal the crime is not evidence relevant to heinous, cruel or depraved manner issues." *Id.* The *Taveras* court thus found that mutilation of the corpses for the rational purpose of concealment and disposal did not allow an inference supporting this aggravating factor.

The Court observes that the district court in *Taveras* reached this finding despite its suggestion that the characterization of such acts was a matter of inference for the jury to make from the circumstances. *Id.* (as noted in parenthetical on *Sampson*: "noting that jury could reasonably infer that defendant intended to inflict gratuitous serious physical harm by cutting the first victim's throat and stabbing the second victim in chest and throat 15 times"). The Court also notes that a subsequent opinion in the case from the Second Circuit held that the district court had erred in excluding evidence of post-mortem dismemberment from the guilt phase of the trial. *United States v. Pepin*, 514 F.3d 193, 207-09 (2d Cir. 2008) (noting that district court referred to defendant as "Humberto Pepin Taveras"). The Second Circuit declined to reach the question of whether this evidence must be permitted at the penalty phase:

> Much will have happened between now and then, particularly the likely use of evidence of dismemberment at the guilt phase. We cannot know with anything approaching certainty what the precise issue before the court will be if and when it actually is framed.

*Id.* at 209.

The Government responds that the Tenth Circuit held in *Chanthadara* that post-mortem mutilation satisfies the "serious physical abuse" prong of § 3592(c)(6). [Doc. No. 907, p. 11]

The Government states that McCluskey burned the Haases' bodies "not long after he killed them" and that, "while there was a break between the killing and the burning of the bodies and while Defendant moved the bodies to a different location before he burned them, the post-mortem incineration of the bodies was part of a continuing course of conduct and still indicates the depraved manner in which Defendant acted."  [Doc. No. 970, pp. 12-13]

The Government argues that McCluskey unjustifiably attempts to limit *Chanthadara* to its facts.  McCluskey asserts in his Reply that the violence was inflicted "in the course of the killing."  [Doc. No. 937, p. 1]  The Court agrees with the Government that the Tenth Circuit did not limit its holding in this manner, instead approving *Hall* and holding that the abuse may occur after death.  The Tenth Circuit did not focus on how soon the abuse may have occurred after death.  Instead, the opinion approved the reasoning of the Fifth Circuit in *Hall*:  "The *Hall* court concluded that the jury could consider conduct that occurred after the victim lost consciousness because it indicated that 'the killing was committed in a depraved manner in that it provide[d] an indication that Hall relished in the killing.'"  *Chanthadara*, 230 F.3d at 1262 (quoting *Hall*, 152 F.3d at 415).  The Tenth Circuit agreed that "gratuitous violence" may support a "heinous and depraved" aggravating circumstance.  *Id.* (citing *Richmond v. Lewis*, 506 U.S. 40, 51 (1992) (support for "heinous and depraved" aggravator in evidence that defendant ran over victim twice with car, regardless of whether defendant knew victim had died after the first pass)).  And the Tenth Circuit approved as additional pertinent factors the senselessness of the killing or helplessness of the victim.  *Id.* at 1263 (approving instruction given in *Hall*, 152 F.3d at 414). The Tenth Circuit's reasoning shows that the focus is not on timing, but on inferences about the defendant's blameworthiness that a jury may draw.  The Court interprets *Chanthadara* to allow

the jury, on a variety of bases, to make inferences that reflect on the defendant's character and the appropriateness of the death penalty.

Another case further explains the Tenth Circuit's broad approach.  In *Hanson*, the Tenth Circuit reversed the district court's denial of an upward departure under the sentencing guidelines when the defendant's conduct is "unusually heinous, cruel, brutal, or degrading to the victim." *United States v. Hanson*, 264 F.3d 988, 998-99 (10th Cir. 2001).  The district court held it had no authority for an upward departure because the victim was dead at the time of the defendant's alleged conduct.  *Id.* at 997-98.  The guideline stated:  "Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation."  *Id.*  The Tenth Circuit stated that this "extreme conduct" provision focuses on the nature of the offender's conduct, and that the defendant's conduct may meet this standard even though the victim is already dead.  *Id.* at 998-99.  *Hanson* lists a number of additional definitions that may describe unusually heinous, cruel, or brutal behavior:  hateful, odious, highly criminal, wicked, infamous, or atrocious.  *Id.*  "Similarly, the defendant's conduct may involve the 'inflict[ion] [of] suffering . . . pain or distress,' not only on the victim but on the victim's family and friends and members of the community in which the crime is committed; it may thus be 'cruel' in that sense." *Id.* at 999.  In a footnote, the Tenth Circuit stated that its conclusion was supported by *Chanthadara*:  "Although *Chanthadara* involved a statutory provision rather [than] a Guideline, the two provisions contain similar language and serve similar aims—providing guidance to the factfinder regarding grounds for increased punishment."  264 F.3d at 999 n.4.  *Hanson* shows that the Tenth Circuit takes a relatively broad view of what conduct may support aggravation for "heinous, cruel, or depraved" conduct.  It is noteworthy that *Hanson* also held that the effect of the defendant's conduct on the victim's family and friends may be considered.  *Id.* at 999.

*Hanson* suggests that conduct like incinerating the Haases' bodies may be found cruel because of its effect on the Haases' family and friends.

The *Hanson* court approved and followed the reasoning of *United States v. Quintero*, 21 F.3d 885 (9th Cir. 1994). In *Quintero*, the Ninth Circuit approved the district court's upward sentencing departure on the basis of "extreme conduct." The jury found Quintero guilty of voluntary manslaughter upon evidence that Quintero had struck his two-year-old daughter multiple times and, when she was dazed but still breathing, carried her inside and asked his wife to look after her; the child soon stopped breathing, but Quintero resuscitated her. *Id.* at 888. The child stopped breathing again, and could not be revived. *Id.* at 889. Quintero refused to take his daughter to a hospital for fear that he and his wife would be accused of child neglect and that their son would be taken away from them. *Id.* Quintero wrapped his daughter's body in a blanket and drove out to find a place to bury her; finding the ground too hard, Quintero built a fire and burned the body. *Id.* "To avoid identification of the remains, he removed the head with a shovel and left it at a different location several miles away." *Id.* Without identifying a guideline in support, the district court stated that it was departing upward based on the defendant's conduct after the victim died—burning her body, severing her head, and "the whole business of the traveling around trying to hide it." *Id.* at 893. The Ninth Circuit affirmed the district court's authority for departure, identifying the "extreme conduct" provision as the basis, but remanded for a detailed explanation, finding that the district court's explanation was insufficient and did not refer to the guidelines. *Id.* at 894-95.

The *Quintero* opinion, approved by the Tenth Circuit, is inconsistent with *Taveras*. *Quintero* found that post-death efforts to conceal the crime and prevent detection by concealing and disposing of the corpse could constitute heinous, cruel, or brutal conduct; *Taveras* found that

similar acts were merely rational acts to conceal and dispose of the corpses in order to evade prosecution.   Although this aspect of *Quintero* was not the focus of the Tenth Circuit's discussion, *Hanson*'s approval of *Quintero* suggests that the Tenth Circuit would disagree with *Taveras*.   The Court thus rejects McCluskey's argument that this Court should adopt the reasoning of *Taveras*.

The Government cites additional cases in support.   The Tenth Circuit in *Chanthadara* approved the Fifth Circuit's opinion in *United States v. Hall*, 152 F.3d 381, 415 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000).   In *Hall*, the victim was led to a grave site, hit with a shovel by one defendant, grabbed by another defendant as she started running, and then hit repeatedly by all three defendants; she was then gagged, dragged into the grave, covered with gasoline, and covered with dirt.   *Id.* at 390.   As with *Chanthadara*, McCluskey attempts to limit *Hall* to violence inflicted "in the course of a killing."   [Doc. No. 937, pp. 1-2]   But again the opinion does not focus on the timing of the killing and the abuse, instead holding that the jury could consider conduct after the victim lost consciousness; the Fifth Circuit saw "no reason why the jury should have been precluded from considering such conduct because it constituted evidence that the killing was committed in a depraved manner in that it provides an indication that Hall 'relished the killing.'"   *Hall*, 152 F.3d at 415 (quoting *Jones v. Murray*, 947 F.2d 1106, 1118 (4th Cir. 1991)).   *Hall* suggests a wide variety of bases for finding the aggravating factor:   gratuitous violence, needless mutilation of the victim's body, gross disfigurement, sexual assault on a corpse or unconscious body.   *Id.*

The Government also cites *Mitchell*, in which the Ninth Circuit stated:   "There is no question that post-mortem mutilation may constitutionally be considered as an aggravating factor in death sentence determinations."   *United States v. Mitchell*, 502 F.3d 931, 976 (9th Cir. 2007).

"This is so even when the mutilation occurs the next day and <u>is done to conceal evidence</u>; such a factor plainly narrows the class of those eligible for the death penalty and rationally identifies those who are more blameworthy on account of their depravity or cold-bloodedness." *Id.* at 977 (emphasis added). McCluskey correctly observes that these statements are dicta because *Mitchell* held that any error in allowing consideration of post-mortem mutilation was harmless. *Id.* McCluskey also correctly observes that *Mitchell* observed that a "good argument" could be made that the text of the statute "on its face does not encompass post-mortem mutilation, as this factor is narrowed to focus on the manner of committing the murder" and "not what happens afterwards"; the court also recognized contrary holdings in three circuits. *Id.* Nevertheless, the Court believes that the first two sentences from *Mitchell* quoted above reflect a reasonable and thoughtful view of the purpose and reach of § 3592(c)(6)—and a view completely consistent with that of the Tenth Circuit in *Chanthadara*. The focus of § 3592(c)(6) is "in large part on the defendant's intent and state of mind." *United States v. Sampson*, 335 F. Supp. 2d 166, 204 (D. Mass. 2004); *see United States v. Webster*, 162 F.3d 308, 324 (5th Cir. 1998) (observing that focus is on defendant's intent and actions; case concerns a co-defendant to *Hall*).

The issue of whether "serious physical abuse" could be inflicted post-mortem, as held in *Chanthadara*, did raise a question of statutory interpretation. But McCluskey's issue appears to be more a question of sufficiency of evidence to support the aggravating factor. McCluskey argues that there was too much separation in time and distance between the killing and the abuse. The Government argues that the burning occurred soon after the killing, and that the killing and burning were part of a continuous course of conduct. These issues of degree appear to raise questions about sufficiency of evidence—not statutory construction. To the extent that caselaw recognizes that the focus is on the defendant's intent, this is ordinarily a matter of inference by

the jury from the facts and circumstances; the jury need not accept the defendant's view of the circumstances. *See United States v. Agofsky*, 458 F.3d 369, 374-75 (5th Cir. 2006) (standard of review). The same standards for sufficiency of evidence to support a conviction apply to sufficiency of evidence to support a finding of an aggravating factor. *See United States v. Fields*, 516 F.3d 923, 940 (10th Cir. 2008) (defendant challenging sufficiency of evidence on aggravating factor "faces a 'high hurdle,' as we 'ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences therefrom—in the light most favorable to the government, a reasonable jury could [make the challenged finding] beyond a reasonable doubt" (quoting *United States v. Jenkins*, 175 F.3d 1208, 1215 (10th Cir. 1999) (setting forth standard of review for conviction, not aggravating factor))); *Revilla v. Gibson*, 283 F.3d 1203, 1216 (10th Cir. 2002) (controlling standard for sufficient proof of heinous, atrocious, or cruel aggravator is "whether any rational trier of fact could have found the aggravator beyond a reasonable doubt"). The *Taveras* court may have usurped the function of the jury in deciding what inferences could be drawn about the defendant's intentions and blameworthiness.

In addition, the Court observes that when it used its discretionary power to order the Government to file an informative outline, the Court "emphasize[d] that the outline need not reveal evidentiary detail"—requiring instead that the Government "address the general nature" of the evidence that would be offered to prove each aggravating factor. [Doc. No. 645, p. 14, filed 8/27/12] Although McCluskey assumes that the "only evidence" the Government can or will present is that contained in the informative outline, the Court's Order does not impose such a limitation. Further, as was noted by the Second Circuit in *Pepin*, 514 F.3d at 209, it would be premature for this Court to attempt to assess sufficiency of the Government's evidence on aggravation at this stage, pre-trial.

This Court cannot make a finding, at this stage of the proceedings, that McCluskey's conduct could only be viewed as rational acts to conceal and dispose of the Haases' bodies for the purpose of evading prosecution—and could not be viewed by a jury as demonstrating depraved or cold-blooded conduct supporting the aggravating factor.  The Court believes that a rational jury could infer from the post-mortem burning of the Haases' bodies that McCluskey exhibited cold-bloodedness and depravity—mutilating the bodies, preventing easy identification, desecrating bodies that the Haases' relatives and friends would have wanted respectfully buried. *See United States v. Green*, 2008 WL 4000870, *11 n.7 (W.D. Ky. 2008) (unpublished) (suggesting, without deciding, that post-mortem burning of victim's body could constitute "serious physical abuse" under § 3592(c)(6)).

The Court concludes that McCluskey's motion to strike this aggravating factor is not well taken and will be denied.

## V.  Multiple Killings or Attempted Killings, § 3592(c)(16)

The Supreme Court has "found only a few factors vague" and has upheld "numerous factors" against vagueness challenges. *Tuilaepa*, 512 U.S. at 974.  Because the "proper degree of definition of eligibility and selection factors often is not susceptible of mathematical precision," the Court's "vagueness review is quite deferential." *Id.* at 973 (internal quotation marks omitted).  A factor "is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Id.* (quoting *Jurek*, 428 U.S. at 279 (White, J., concurring)).  McCluskey does not repeat his earlier contention that § 3592(c)(16) is vague, and the Court would reject this argument if it were repeated. *See United States v. Mitchell*, 502 F.3d 931, 978 (9th Cir. 2007) (holding § 3592(c)(16) neither vague nor overbroad).

McCluskey does make a conclusory contention that § 3592(c)(16) is impermissibly duplicative. [Doc. No. 892, p. 29] The Court disagrees.

As discussed above, there is no impermissible duplication between an aggravating factor and either the elements of the substantive capital counts or the § 3591(a)(2) gateway intent factors. *Chanthadara*, 230 F.3d at 1261; *Webster*, 162 F.3d at 354-55.

McCluskey also asserts that "Multiple Killings or Attempted Killings" is impermissibly duplicative of three sub-factors of the "Future Dangerousness" factor: "Continuing pattern of violence," "Low rehabilitative potential," and "Callous disregard for human life." [Doc. No. 755, pp. 5-7] The "Future Dangerousness" factor includes many other pieces of information not included in "Multiple Killings or Attempted Killings." These factors do not "necessarily subsume" each other; the jury could find one factor without finding the other. *See McCullah*, 76 F.3d at 1111; Johnson, 169 F.3d at 1252; *Medlock*, 76 F.3d at 1319. Even if the same evidence is used in support, there is no impermissible duplication because the focus is different. "Multiple Killings or Attempted Killings" focuses on the nature of the acts with which McCluskey is charged, while "Future Dangerousness" focuses on the likelihood of future violent conduct. *See Cooks*, 165 F.3d at 1289; *Medlock*, 76 F.3d at 1319.

In a footnote, McCluskey argues that there is an Eighth Amendment and Equal Protection violation because the elements of this factor "arbitrarily and irrationally vary from circuit to circuit and even within the Tenth Circuit depending upon whether a district court follows *Chanthadara* or instead instructs per Instruction 3.08.6." [Doc. No. 892, p. 28 n.5] McCluskey's argument is based on the Tenth Circuit's Instruction 3.08.6 not including the statement that serious physical abuse may be inflicted either before or after death. This Court must determine

and apply the law in accordance with its best judgment.  The instructions to be given in this case will be determined at a later time.

The Court will deny McCluskey's motion to strike this aggravating factor.

## VI.  Victim Impact Evidence

McCluskey contends that the "Victim Impact" factor should be stricken because it "does not sufficiently narrow the class of murderers for whom the death penalty is available."  [Doc. No. 892, pp. 29-30]  McCluskey appears to contend that there is "injury, harm, and loss" to the victim's family in every case and that victim impact evidence therefore fails to sufficiently guide the jury's discretion.  These arguments have been specifically rejected by the Supreme Court and the Tenth Circuit.

The Supreme Court upheld the constitutionality of victim impact evidence in *Payne*, concluding that this factor is constitutional when the jury is directed to the individual circumstances of the case.  *Payne v. Tennessee*, 501 U.S. 808, 819-27 (1991); *see Jones v. United States*, 527 U.S. 373, 395, 401 (1999); *Chanthadara*, 230 F.3d at 1273.  § 3593(a) expressly permits the introduction of victim impact evidence.  The defendant in *Chanthadara* raised the same arguments that victim impact evidence does not narrow the class of defendants or provide sufficient guidance to the sentencing jury; the Tenth Circuit rejected both arguments. *Chanthadara*, 230 F.3d at 1273 (citing *Jones*, 527 U.S. at 395).

In McCluskey's case, the Court ordered the Government to provide "a written informative outline describing how it intends to prove victim impact."  [Doc. No. 645, p. 17, filed 8/27/12]  The Court then concluded that the informative outline was sufficient.  [Doc. No. 1017, pp. 6-7]  The informative outline on "Victim Impact" states:

> By killing the Haases, the Defendant caused injury, harm, and loss to the victims and the victims' families and friends.  The Government will present victim impact

testimony from multiple family members and friends establishing the witnesses'
close relationships with the victims, how they learned the victims had been killed,
how their lives have been changed without the victims, and the deep
psychological and emotional impact the loss of the victims has caused each of the
witnesses.   The Government will prove this factor through witness testimony,
photographs, and family heirlooms, such as wedding, anniversary, and reunion
announcements and programs, memorial service programs and materials, and
other mementos.   The Government may present testimony from Cathy Byus
(daughter), Vivian Haas (mother of Gary Haas), Linda Rook (sister of Gary
Haas), Erma Patrick (maternal aunt of Gary Haas), Sandra Roden Morgan (sister
of Linda Haas), Talford Perkins (brother of Linda Haas), Bill Perkins (brother of
Linda Haas), Steve Walker (close friend of Gary and Linda Haas), and Sheila
Walker (close friend of Gary and Linda Haas).

[Doc. No. 670, pp. 3-4; Doc. No. 840, pp. 3-4] The Court concludes that this description of

"Victim Impact" evidence "sufficiently direct[s] the jury to the individual circumstances of the

case," as required.  *Jones*, 527 U.S. at 401.  The victim impact evidence upheld by the Tenth

Circuit in *Chanthadara* was less detailed and less specific, and yet the Tenth Circuit upheld the

factor.  *Chanthadara*, 230 F.3d at 1273.  The Court concludes that the information identified by

the Government properly directs the jury to impose an individualized sentence, and is

constitutionally permissible.

McCluskey also appears to suggest that this factor is impermissibly

duplicative—asserting that a non-statutory aggravating factor must "be an 'aggravating'

circumstance 'other' than the crime itself and the remaining aggravating circumstances."  [Doc.

No. 892, p. 30]  To the extent that McCluskey asserts that this factor duplicates the elements of

the crime, that argument has been rejected by the Court.  *See Chanthadara*, 230 F.3d at 1261;

*Webster*, 162 F.3d at 354-55.  McCluskey fails to identify any other aggravating factors with

which there is duplication, fails to develop his conclusory assertion, and fails to cite specific

persuasive authority.  This Court need not develop Defendant's conclusory arguments or address

arguments unsupported by authority; the Court declines to address this issue further.  *See Cahill*

*v. American Family Mut. Ins. Co.*, 610 F.3d 1235, 1238-39 (10th Cir. 2010); *Arizona Pub. Serv.*

*Co. v. United States EPA*, 562 F.3d 1116, 1130 (10th Cir. 2009).

The Court will deny McCluskey's motion to strike victim impact evidence.

## VII.  Contemporaneous Serious Criminal Acts

McCluskey argues that the non-statutory aggravating factor, "Contemporaneous Serious

Criminal Acts," is duplicative of other factors.

The NOI states:

Contemporaneous Serious Criminal Acts.
The defendant killed Gary Haas and Linda Haas during a contemporaneous and continuing episode of serious criminal activity that included, but is not limited to the July 30, 2010, escape from Arizona State Prison—Kingman; the July 31, 2010, robbery and kidnapping of Prahbjeet Bains and Gurdop Singh; the purchase of illegal drugs in Albuquerque, New Mexico, on or about August 2, 2010; and the August 11, 2010, armed robbery of the Kut and Kurl hair salon in Gentry, Arkansas.

[Doc. No. 755, pp. 4-5]  The Government's informative outline states:

The Government will prove the following unadjudicated acts:

a.  August 2, 2010, purchase of illegal drugs in Albuquerque.  The Government will present testimony from cooperating co-defendants establishing that Defendant and his accomplices purchased unknown quantities of marijuana and heroin near Central Avenue and Fourth Street in Albuquerque in the early evening hours of August 2, 2010.

b.  August 11, 2010, robbery of Kut and Kurl Hair Salon.  The Government will prove that Defendant participated in the armed robbery of the Kut and Kurl Hair Salon in Gentry, Arkansas, on August 11, 2010.  At approximately 10:30 a.m., on August 11, 2010, Defendant entered the hair salon and demanded money at gunpoint.  He took a bank bag full of money from the salon.  Witnesses may include the victim, Joyce Cooke, and investigating officers. Evidence may include the stolen bank bag, which was recovered from Defendant's vehicle following his arrest in this case, 9-1-1 recordings, and photographs.  *See* Discovery at 4601-02, 7388-7416.

[Doc. No. 840, p. 4, filed 3/8/13]

McCluskey argues that this factor is impermissibly duplicative of the "Armed Fugitive from Justice" factor.  The Government responds that the conduct to support the two factors is "the same or similar," but the purpose of the factors is different.  The informative outline does not indicate that the unadjudicated acts listed to support "Contemporaneous Serious Criminal Acts" will be used to support the "Armed Fugitive from Justice" factor.  And the Government's outline cites evidence in support of the latter factor that is not cited to support the former.  But even if the same evidence were used to support both factors, the Government argues that the focus is different:

> The contemporaneous acts factor is intended to show that the Defendant committed other serious criminal acts close in time to when he killed the Haases.  The Armed Fugitive factor is intended to show that the Defendant was armed and on the run for 20-plus days, including the day he killed the Haases.

[Doc. No. 436, p. 37]  The Court does not see a clear enough distinction in focus to support two separate factors.  *See Medlock*, 76 F.3d at 1319; *Cooks*, 165 F.3d at 1289.  Both factors appear to address the danger to the public from an armed fugitive.  As addressed below, however, the Court will conclude that the "Armed Fugitive from Justice" factor will be stricken; a decision on duplicativeness is therefore unnecessary.

McCluskey also argues that "Contemporaneous Serious Criminal Acts" is impermissibly duplicative of four sub-factors under the "Future Dangerousness" factor.  First, the focus should be on duplicativeness between factors, not sub-factors.  *See Umana*, 707 F. Supp. 2d at 635 n.7 (stating that duplicative sub-factors are not unconstitutional, because they are part of only one aggravating factor).  Second, the Court agrees with the Government's response that the focus of the factors is different. "Contemporaneous Serious Criminal Acts" focuses on the particular nature of the past episode of criminal acts committed around the time of the capital offenses, while "Future Dangerousness" focuses on the likelihood of future violent conduct.  Similar

distinctions in focus led the Tenth Circuit to hold there was no impermissible duplication in *Medlock*:  "The 'continuing threat' aggravator goes to *Medlock*'s future dangerousness, while the 'heinous, atrocious, or cruel' aggravator goes to the nature of *Medlock*'s crime."  *Medlock*, 76 F.3d at 1319.  The *Medlock* court continued:  "The former involves future conduct; the latter involves the nature of the act for which *Medlock* was convicted."  In McCluskey's case, the "Contemporaneous Serious Criminal Acts" factor (like the "heinous, atrocious, or cruel" aggravator in *Medlock*) focuses on the nature of the crimes committed.  As in *Medlock*, "the elements of one aggravator do not necessarily subsume those of the other," and there is no impermissible duplication.  *Id.*; *see also Cooks*, 165 F.3d at 1289 ("prior conviction" factor focused jury's attention on "particular nature and consequences of his *past* conduct, while the 'continuing threat' aggravator focused attention on the likelihood of *future* violent conduct").

The Court will deny McCluskey's motion to strike this factor.

## VIII.  Obstruction of Justice

The NOI alleges:

> The defendant killed Gary Haas and Linda Haas with the intent to prevent the victims from providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of another offense or offenses, including but not limited to escape, kidnapping, carjacking, and robbery.

[Doc. No. 755, p. 5]  The informative outline alleges the following information in support of this factor:

> The Government will prove this factor through testimony from cooperating co-defendants, arresting officers, and investigating officers.  These witnesses will testify that Defendant made statements indicating that he had to kill the Haases in order to prevent them from reporting his crimes, including escape, carjacking, kidnapping, and robbery.  The Government has provided full discovery of the interviews of the cooperating co-defendants, interviews of the Defendant, and the reports of investigating officers setting forth Defendant's statements.  *See, e.g.*, Discovery at 51-76, 710-46, 5939-7095, 7465-7526, and Discs A, A1, C, E, UU, WW, YY.

[Doc. No. 840, p. 5]

McCluskey argues that "Obstruction of Justice" is impermissibly duplicative of Counts 4 and 5 of the indictment. As addressed above, there is no impermissible duplication between an aggravating factor and the substantive crimes charged in the instant case. *See Lowenfield*, 484 U.S. at 246; *Tuilaepa*, 512 U.S. at 971-72; *Chanthadara*, 230 F.3d at 1261. The Government states it will not offer a "catchall aggravator." But even if such a factor were offered as characterized by McCluskey ("catchall aggravator ('the offenses of conviction')" [Doc. No. 892, p. 31]), there would be no impermissible duplication, for the same reason.

McCluskey also argues that "Obstruction of Justice" is impermissibly duplicative of one sub-factor of "Future Dangerousness"—the "Low Rehabilitative Potential" sub-factor. [Doc. No. 755, p. 6] As discussed above, "Future Dangerousness" directs the jury's attention to "the likelihood of *future* violent conduct." *Cooks*, 165 F.3d at 1289. The Government states that the "Obstruction of Justice" factor, on the other hand, directs the jury's attention to "Defendant's obstructionist motive for killing the Haases," and that "[t]his specific theme is not repeated in the sub-factors supporting future dangerousness." [Doc. No. 436, p. 39]

McCluskey cites two cases in support of his contention that an aggravating factor cannot duplicate an element of the substantive offense. [Doc. No. 892, p. 31] *United States v. McVeigh*, 944 F. Supp. 1478, 1489-90 (D. Colo. 1996); *United States v. Kaczynski*, 1997 WL 716487 (E.D. Calif. 1997). The reasoning of these cases, however, has been roundly criticized; there is no double counting or skewed weighing because the elements of the substantive offenses are not weighed along with aggravating factors under the FDPA. *See, e.g., United States v. Hall*, 152 F.3d 381, 417 n.16 (5th Cir. 1998); *United States v. Johnson*, 136 F. Supp. 2d 553, 559 (W.D. Va. 2001); *United States v. Mayhew*, 380 F. Supp. 2d 936, 946-47 (S. D. Ohio 2005). As

discussed above, the Supreme Court held in *Lowenfield* that it is permissible "to count an element of the underlying offense as an aggravating factor."  *McCullah*, 76 F.3d at 1107 (citing *Lowenfield*, 484 U.S. at 246).

"Obstruction of Justice" is a proper non-statutory aggravating factor, for acts committed either at the same time as the charged offenses or afterward.  *See United States v. Bolden*, 545 F.3d 609, 612-13, 624 (8th Cir. 2008) (upholding aggravating factor "obstruction of justice" as established by evidence defendant killed bank security guard to prevent him identifying defendant as bank robber); *United States v. Higgs*, 353 F.3d 281, 322-23 (4th Cir. 2003) (upholding "obstruction of justice" aggravator and holding that planning to eliminate witness was included among "highly relevant aggravating circumstances which were properly submitted to the jury for its consideration in making the requisite individualized determination").

The Court will deny the motion to strike the "Obstruction of Justice" aggravator.

## IX.  Armed Fugitive from Justice

The NOI states:

> The defendant was an armed fugitive from justice wanted by Federal, State, and local law enforcement agencies who traveled across several states from July 30, 2010 through August 19, 2010.

[Doc. No. 755, p. 5]  The informative outline sets forth the following information in support:

> The Government will prove this factor through testimony from Deputy United States Marshall Bill Noble.  The witness will establish the following facts: Defendant was reported as an escapee from prison in Kingman, Arizona on or about July 30, 2010; Defendant was reported to be armed and dangerous; national bulletins were posted to alert law enforcement agencies and the general public of Defendant's escapee status; the United States Marshal Service ("USMS") conducted a nationwide manhunt for Defendant that required a great number of personnel and resources; personnel from the USMS, the New Mexico State Police, Arizona Department of Public Safety, and other law enforcement agencies traveled to several states following leads in search of the Defendant; news agencies were alerted that Defendant was wanted; Defendant remained at large

from July 30, 2010, through August 19, 2010.  *See, e.g.*, Discovery at 747-51, 868-97, 1103-08, 1234-37, 1590-91, 2247-51, 2301-03.

[Doc. No. 840, pp. 5-6]

McCluskey contends that the "Armed Fugitive from Justice" factor is duplicative of Count 20 of the indictment, fugitive in possession of firearms.  As discussed previously, there is no impermissible duplication between an aggravating factor and elements of a substantive offense.  *See Lowenfield*, 484 U.S. at 246; *Tuilaepa*, 512 U.S. at 971-72; *Chanthadara*, 230 F.3d at 1261.

McCluskey also asserts that "Armed Fugitive from Justice" is duplicative of two sub-factors of "Future Dangerousness":  the "Continuing pattern of violence" sub-factor, and the "Low rehabilitative potential" sub-factor.  The Court disagrees. "Armed Fugitive from Justice" focuses on the particular nature of the past episode of criminal acts committed around the time of the capital offenses, while "Future Dangerousness" focuses on the likelihood of future violent conduct.  Because the focuses are different and neither factor "necessarily subsumes" the other, there is no impermissible duplication.  *See Medlock*, 76 F.3d at 1319; *Cooks*, 165 F.3d at 1289.

In this *[Corrected] Renewed Motion To Strike Particular Aggravating Circumstances*, McCluskey argues that evidence of the report that he was "armed and dangerous" and evidence of the amount of resources devoted to the search for him are irrelevant to the question of the appropriate sentence.[5]  McCluskey further argues that, even if this evidence is marginally relevant, it should be excluded under § 3593(c) as more prejudicial than probative.  [Doc. No. 892, p. 31 (quoting *United States v. Cuff*, 38 F. Supp. 2d 282 (S.D.N.Y. 1999) (dismissing commission with firearm as aggravating factor))]  McCluskey argues there would be unfair prejudice because the information conveys to the jury the "wholly irrelevant determination" by

---

[5] The Court acknowledges that some of this evidence came in at the guilt phase.

multiple law enforcement agencies that McCluskey was dangerous to the public, and also because the evidence "invites the jury to speculate regarding the cost of the search for, and arrest of, Mr. McCluskey."  [Doc. No. 892, p. 33]  The Government's response presents conclusory assertions that this evidence is admissible, is "highly probative" of the appropriate sentence, and that the purpose is to give the jury "a more complete view of Defendant's character and background."  [Doc. No. 907, p. 15]  The Government fails to present caselaw or other authority for these assertions.  The Court is not persuaded by the Government's assertions.  The Court concludes that evidence of the "great number of personnel and resources" expended in the search would invite the jury to speculate about the cost to the public, including the jurors, and that such evidence and suggestion would be unfairly prejudicial.  The Court further concludes that there is minimal probative value in the evidence cited by the Government in support of this factor; it appears that the jury will already hear about the escape and the criminal acts (both adjudicated and unadjudicated) alleged to have been committed from July 30 to August 19, 2010—including information that McCluskey was armed.  The Government presents no convincing argument that the opinions of multiple law enforcement agencies about McCluskey's dangerousness are relevant.  The Government fails to explain or substantiate its assertion that this factor would give the jury "a more complete view of Defendant's character and background."  As McCluskey argues, the Government's evidence relates instead to "the *government's* responses and actions." [Doc. No. 937, pp. 3-4]

The Court concludes that evidence of the resources expended in the search must be excluded as more prejudicial than probative under § 3593(c).  The Court agrees with McCluskey's argument that the opinion of multiple law enforcement agencies is not particularly relevant or probative.  Excluding this evidence leaves the Government's evidence that:

McCluskey had escaped; he was at large from July 30 to August 19; and he was armed.  In arguing that "Armed Fugitive from Justice" is not impermissibly duplicative of "Contemporaneous Serious Criminal Acts," the Government asserts:

> [The "Armed Fugitive from Justice" factor] asks the jury to give weight to the fact that the Defendant was an armed fugitive who traveled across several states for three weeks with law enforcement in pursuit.  In contrast, the contemporaneous serious acts factor looks at specific crimes the Defendant committed while he was a fugitive.  They are offered for separate and distinct purposes and do not unconstitutionally overlap.

[Doc. No. 436, p. 41]  These assertions do not demonstrate that "Armed Fugitive from Justice" is an appropriate aggravating factor, or provide a reasonable explanation of the different purposes for which these factors are offered.  Even if the Government had presented a cogent argument that this constituted an aggravating factor, the Court would conclude that "Armed Fugitive from Justice" is impermissibly duplicative of "Contemporaneous Serious Criminal Acts."  The Government presents no persuasive argument that these two factors rely on different evidence or are directed at different aspects of proper sentencing considerations.

The Court will grant McCluskey's motion to strike the "Armed Fugitive from Justice" factor for all of these reasons.

## X.  Future Dangerousness

### A.  "Continuing pattern of violence" sub-factor

The Government alleges that this factor "shows that Defendant has engaged throughout his adult life in continuous acts of violence, and thus, the jury may conclude this is a characteristic that indicates the Defendant is likely to engage in future acts of violence."  [Doc. No. 436, p. 44]  *See Lujan*, 603 F.3d at 854 (holding that a double homicide allegedly involving "cold, calculated, and brutal conduct" is "strongly probative of future dangerousness," and observing that past criminal acts suggest that the defendant "poses a future danger, even if that

future danger is limited to a penal setting"); *Fields*, 516 F.3d at 942-43 (concluding that future dangerousness was appropriately tied to prison setting when life sentence was alternative). In support of this sub-factor, the Government lists six convictions and alleges two unadjudicated criminal acts: "(1) the August 11, 2010, robbery of the Kut and Kurl Hair Salon in Gentry, Arkansas"; and "(2) the June 13, 2011, assault of Detective Jason Elsbury in Mohave County Court." [Doc. No. 755, pp. 5-6; Doc. No. 840, p. 6]

### (1) Duplicativeness

The Government argues that the "Continuing pattern of violence" sub-factor "shows that Defendant has engaged throughout his adult life in continuous acts of violence, and thus, the jury may conclude this is a characteristic that indicates the Defendant is likely to engage in future acts of violence." [Doc. No. 436, p. 44] The Court agrees that a rational jury could make such an inference, which is relevant to an individualized sentencing decision.

McCluskey argues that "many of the offenses alleged in support of" the "Continuing pattern of violence" sub-factor "are duplicative of the offenses alleged in support of other factors and must therefore be stricken." [Doc. No. 892, p. 33] As discussed previously, sub-factors are not the proper focus of an argument of duplicativeness; sub-factors combine to form only one aggravating factor and are not independently weighed. *See Umana*, 707 F. Supp. 2d at 635 n.7. There is no double-counting of the sort found impermissible in *McCullah*. The question is whether there is impermissible duplicativeness between the factor of "Future Dangerousness" and any other aggravating factors. The "Future Dangerousness" factor focuses the jury's attention on the likelihood of future violent conduct, which differs from the focus of the other factors alleged. *See Medlock*, 76 F.3d at 1319; *Cooks*, 165 F.3d at 1289.

### (2) Insufficient gravity

McCluskey asks the Court to strike the second unadjudicated criminal act listed in the informative outline, the alleged assault on Detective Jason Elsbury in Mohave County Court on June 13, 2011.  [Doc. No. 840, p. 6]  McCluskey argues that this alleged act "lacks sufficient gravity to warrant consideration in favor of the death penalty."  [Doc. No. 892, pp. 33-34; Doc. No. 937, pp. 6-7]

§ 3593(c) provides that at the sentencing hearing, "information may be presented as to any matter relevant to the sentence."  (Emphasis added.)  "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  *Id.*  Information presented at capital sentencing must be relevant to sentencing.  *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010).  § 3593(c) does not define "relevant."  The Tenth Circuit held that it is the "'same standard used throughout the federal courts under Federal Rule of Evidence 401.'"  *Id.* (quoting *McVeigh*, 153 F.3d at 1212-13).  "Thus, under § 3593(c), information is admissible at a capital sentencing if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information].'"  *Id.* (quoting Fed. R. Evid. 401).

Some courts have imposed an additional requirement that information be of "sufficient gravity" to warrant consideration in a capital sentencing hearing.  McCluskey relies on several cases in arguing that some information in the informative outline should be excluded on this basis.  [Doc. No. 892, pp. 8-9, 33-34]  *United States v. Davis*, 912 F. Supp. 938, 944 (E.D. La. 1996); United *States v. Friend*, 92 F. Supp. 2d 534, 543-45 (E.D. Va. 2000); *United States v. Gilbert*, 120 F. Supp. 2d 147, 152-53 (D. Mass. 2000).

The district court in *Davis* reasoned that the statutory aggravating factors "provide a ready framework for determining Congressional intent and for evaluating the relevance and admissibility of the proposed nonstatutory aggravating factors."  *Davis*, 912 F. Supp. at 944. Each statutory factor was intended to be "substantial enough" to sustain the death penalty, and the "ultimate purpose" of statutory and nonstatutory aggravators "is the same—to provide information to the jury that is *relevant* to their deciding which convicted capital offenders should be sentenced to death."  *Id.*  The *Davis* court concluded:  "If a factor would not have been severe enough, *ergo* 'relevant' enough, to warrant consideration of the death penalty in the first place, then it likewise should not be a factor in tipping the scale for death in the last analysis."  *Id.*  The *Davis* court determined that information not rising to the "level of severity or relevancy" to support the "continuing threat" aggravator was:  (1) information that the defendant, a police officer, failed to investigate or arrest a person for criminal conduct of which the defendant was aware; and (2) threatening words and "warped bravado" without affirmative acts.  *Id.* at 945. Not rising to the level of "severity" to be considered in sentencing were offers to obtain names and addresses so another person could retaliate against them; the possibility of the defendant filing a false police report; and a suggestion to keep a dying shooting victim quiet to protect the person suspected of shooting him:

 g. On or about October 6, 1994, Len Davis, in a telephone conversation with Paul Hardy, told Paul Hardy that he would, in his capacity as a then—New Orleans police officer, "... get the fucking report. We'll know where they live at and every fucking thing else," in response to Paul Hardy's request to Len Davis to obtain the names of individuals who had earlier stolen Paul Hardy's Jeep Cherokee, so that Paul Hardy could retaliate.

 h. On or about October 12, 1994, Len Davis discussed with Paul Hardy the merits of having Davis file a bogus supplemental police report, which would have falsely stated, with the express purpose of helping Paul Hardy to shield his connection to said firearms, that several handguns owned by Paul Hardy were stolen from his Jeep Cherokee.

47

    i. On or about October 19, 1994, Len Davis, in a telephone conversation with Damon Causey, indicated Davis' willingness to keep a dying shooting victim quiet in order to protect Damon Causey, whom Len Davis then suspected of shooting said victim.

*Davis*, 912 F. Supp. at 950-51.   These pieces of information were excluded as mere "[t]hreatening words and warped bravado," not worthy of consideration by the sentencing jury.

    The district court in *Friend* also reasoned that a non-statutory aggravating factor "must have a substantial degree of gravity," comparable to the seriousness of the factors Congress established as statutory aggravating factors.   *Friend*, 92 F. Supp. 2d at 544.   The court recognized that the factor at issue—alleging that the defendant and a co-defendant discussed killing someone who might be a potential witness after they killed another person—was "without doubt, quite serious conduct" which "might be considered a conspiratorial agreement" if construed favorably to the United States. *Id.* at 535, 544.  But the court in *Friend* concluded that this allegation was "not of sufficient relevance and reliability to assume the important role of an aggravating factor," when measured against the statutory aggravating factors. *Id.* at 545.

    In *Gilbert*, the defendant was charged with four counts of murder, three counts of attempted murder, and six counts of assault with intent to murder—all committed upon patients at the medical facility where the defendant was a nurse.  *Gilbert*, 120 F. Supp. 2d at 149.  The *Gilbert* court followed the same analysis as *Friend* and held that various allegations lacked "the necessary weight and high degree of reliability" to warrant consideration by the sentencing jury; under this approach, the court excluded allegations that the defendant had eight years earlier scalded a young, mentally retarded patient with hot bath water, and had assaulted her husband with a large kitchen knife. *Id.* at 153.

    The Government responds with general principles set forth by the Tenth Circuit in *United States v. Lujan*, 603 F.3d 850, 858-59 (10th Cir. 2010).  [Doc. No. 907, p. 16]  In discussing

balancing of probative value against "*unfair* prejudice," the Tenth Circuit observed that the "objective of the sentencing stage of a capital case is to allow the jury a full appraisal of the defendant," and the Supreme Court "has emphasized that the jury should receive 'as much information as possible when it makes the sentencing decision.'" *Id.* at 859 (quoting *Gregg*, 428 U.S. at 204). "Reliability and accuracy in decisionmaking is actually enhanced by the introduction of evidence that paints a more accurate, fuller picture of the defendant as an individual, irrespective of whether that picture is positive or negative." *Id.* "Where the defendant has wide latitude to put on mitigating evidence of his positive characteristics and sympathetic past, there is nothing inherently 'unfair' with allowing the government some latitude to present the unfavorable aspects of the defendant, so long as that evidence is relevant to a properly identified aggravator . . . ." *Id.* at 858. Evidence of unadjudicated offenses may be used to support a "continuing threat" aggravator. *Boyd v. Ward*, 179 F.3d 904, 922 (10th Cir. 1999). The Government argues that even though "Detective Elsbury may not have sustained serious injuries, the fact and nature of the assault are highly probative of the future dangerousness equation," because McCluskey attacked a law enforcement officer in a courtroom and "the brazen nature of this conduct—assaulting an officer while in custody and in a no-win situation—is indicative of Defendant's violent character." [Doc. No. 907, pp. 18-19]

The Court is not persuaded by the additional requirement imposed by the courts in *Davis*, *Friend*, and *Gilbert*. These courts blur the distinction between the different functions of statutory and non-statutory aggravating factors—respectively, to narrow the field of defendants eligible for the death penalty and to individualize the sentence by consideration of "all possible relevant information," *Jurek*, 428 U.S. at 276. These courts purport to divine Congress's intent to impose an additional, unstated restriction—while failing to properly consider broad statutory

language that the jury may consider "any other aggravating factor for which notice has been given," and "information may be presented as to any matter relevant to the sentence."  § 3592(c) (emphasis added); § 3593(c) (emphasis added).  A district court in Virginia rejected the analysis and holding in *Friend*, reasoning that "a broad rule of law that all non-statutory aggravating factors must 'equal' statutory aggravating factors in severity . . .  would be inconsistent with Congress' directive for the jury to consider "any other aggravating factor for which notice has been given"'" under § 3592(c) and "the Supreme Court's mandate of 'individualized' sentencing." *United States v. Lentz*, 225 F. Supp. 2d 666, 672 (E.D. Va. 2002) (citing *Tuilaepa*, 512 U.S. at 972-73).  The Supreme Court has emphasized that a wide range of additional information is allowed in capital sentencing.  *See Jurek*, 428 U.S. at 276 (stating that it is "essential" that the sentencing jury "have before it all possible relevant information about the individual defendant whose fate it must determine"). The Court believes that the restriction imposed in *Davis*, *Friend*, and *Gilbert* is also inconsistent with the Tenth Circuit's statements of relevance as being the same standard as Federal Rule of Evidence 401, under which "information is admissible at a capital sentencing if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information].'" *Lujan*, 603 F.3d at 854 (quoting Fed. R. Evid. 401 (emphasis added)).  Congress could have easily included in the statute a restriction that non-statutory aggravating factors must be "comparable in severity" to the statutory factors.   Declining to impose this additional restriction does not mean that the Government has "a virtual blank check at the penalty phase," as McCluskey argues [Doc. No. 937, p. 4]; information must be relevant, reliable, and more probative than prejudicial.

Persuaded by these considerations, the Court rejects the analysis of *Davis*, *Friend*, and *Gilbert*. The Court will deny McCluskey's motion to exclude information regarding an alleged "assault of Detective Jason Elsbury in Mohave County Court."

In his Reply, McCluskey asserts that the Government's allegation that the assault occurred "in a courtroom" gives the wrong impression because "the assault is alleged to have been committed as Mr. McCluskey was being led out of the courtroom and not during court proceedings."  [Doc. No. 937, pp. 6-7]  Such factual issues are matters for development at the sentencing hearing, if that stage is reached; McCluskey can address the circumstances and inferences at that time.  McCluskey raises a new argument in his Reply—that the probative value is outweighed by unfair prejudice.  [Doc. No. 937, p. 7]  The Court will not address the new argument at this point, but will make a ruling if and when such evidence is presented and the factual details are fully developed.

### B.  "Low rehabilitative potential" sub-factor

### (1)  Relevance

McCluskey argues that "Low rehabilitative potential" is not relevant and should be stricken, because if convicted he will be spend the remainder of his life incarcerated.  [Doc. No. 892, p. 34; Doc. No. 937, pp. 7-8]  The Government argues that McCluskey "misapprehends the Bureau of Prisons' goals of incarceration for any person, even those serving life sentences," and that "[u]pon information and belief, the BOP follows a regimen of programming, even for life prisoners, that will help the prisoners reform and lead productive, safe lives."  [Doc. No. 436, p. 44]  The Government further argues, however, that "it does not believe Defendant can live a safe and productive life, even in the most secure prison" and that "Defendant's low potential for

rehabilitation increases the likelihood that he will commit acts of violence against other persons and correctional officers throughout his incarceration."  [Doc. No. 436, pp. 44-45]

The Government argues that there "is no question" that Future Dangerousness is relevant to capital sentencing, and that the "Low rehabilitative potential" sub-factor has "also been routinely found to be relevant, particularly in the future dangerousness context."  [Doc. No. 436, p. 45]  The district court in *Umana* held that it was permissible to allege sub-factors under the "Future dangerousness" aggravating factor, observing that sub-factors can "clarify the factor's 'common-sense core of meaning.'"  *Umana*, 707 F. Supp. 2d at 635 (quoting *Jurek*, 428 U.S. at 279 (White, J., concurring)).  "For this reason, Future Dangerousness is often alleged with multiple sub-factors, including Low Rehabilitative Potential and Lack of Remorse."  *Id.*  "The Supreme Court has discussed with approbative language the submission of a defendant's future dangerousness as a subject for a penalty jury's consideration."  *United States v. Bin Laden*, 126 F. Supp. 2d 290, 303 (S.D.N.Y. 2001).  "Not surprisingly, lower courts have uniformly upheld future dangerousness as a non-statutory aggravating factor in capital cases under the FDPA, including instances where such factor is supported by evidence of low rehabilitative potential and lack of remorse."  *Id.* at 303-04 (citing cases); *see United States v. Cooper*, 91 F. Supp. 2d 90, 111-12 (D.D.C. 2000) (upholding aggravating factor of future dangerousness and limiting evidence to that pertaining to any threat defendant may present while incarcerated); *United States v. Spivey*, 958 F. Supp. 1523, 1534-35 (D.N.M. 1997) (recognizing that low rehabilitative potential is relevant to future dangerousness).

In holding that "Low rehabilitative potential" was relevant to "Future Dangerousness," the *Umana* court observed that the criminal behavior alleged would not be "wholly prevented" by the defendant's incarceration and approved the government's argument "that the defendant's

low potential for rehabilitation increases the likelihood that he will commit acts of violence against other prisoners and correctional officers throughout his incarceration." *Umana*, 707 F. Supp. 2d at 636. Another district court observed that "low rehabilitative potential" as measured by a defendant's longstanding involvement in criminal activities "is best understood as a predictor of [the defendant's] future behavior based on his prior criminal history." *United States v. Gooch*, 2006 WL 3780781, *29 (D.D.C. 2006) (unpublished); *see United States v. Davis*, 912 F. Supp. 938, 946 (E.D. La. 1996) (recognizing "low rehabilitative potential" as permissible sub-factor supporting "future dangerousness"; holding impermissibly duplicative only because these two were alleged as separate aggravating factors). A showing that a defendant has a low rehabilitative potential constitutes a showing of increased risk "that he would remain a danger to other prisoners and prison officials." *Id.*; *see United States v. Allen*, 247 F.3d 741, 788 (8th Cir. 2001) ("A defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without the possibility of parole greatly reduces the future danger to society from that particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence."), *vacated on other grounds*, 536 U.S. 953 (2002). "Prisoners deserve protection from their fellow prisoners." *Gooch*, 2006 WL 3780781, *29; *see also United States v. Taylor*, 316 F. Supp. 2d 730, 742-43 (N.D. Ind. 2004) (holding "low rehabilitative potential" is a circumstance supporting "future dangerousness"); *United States v. Nguyen*, 928 F. Supp. 1525, 1543-44 (D. Kan. 1996) (recognizing low potential for rehabilitation as supporting "future dangerousness" factor; holding impermissibly duplicative only because these two were alleged as separate aggravating factors); *United States v. O'Driscoll*, 203 F. Supp. 2d 334, 345 (M.D. Pa. 2002) (recognizing as "clearly permissible" use of "low rehabilitative potential" to support aggravating factor of "future dangerousness").

The Court concludes that "Low rehabilitative potential" is relevant and permissible as a sub-factor in support of the "Future Dangerousness" aggravating factor.

### (2) Information alleged in support of "Low rehabilitative potential" sub-factor

McCluskey contends that the alleged information to support the "Low rehabilitative potential" sub-factor is not "of sufficient gravity to be relevant to the sentencing decision." [Doc. No. 892, p. 34]  As discussed above, the Court concludes that a wide range of information is relevant, and that to be admissible such information need only have "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information].'"  *Lujan*, 603 F.3d at 854 (quoting Fed. R. Evid. 401).  The Court rejects McCluskey's attempt to add another restriction, the "sufficient gravity" restriction advocated by *Davis*, *Friend*, and *Gilbert*.

The Government argues that "Low rehabilitative potential" is relevant because a defendant "who re-offends following periods of incarceration, who escapes from prison, and who commits serious rules violations while in prison (including possessing contraband and making illegal calls while pending capital trial) is exactly the type of person who has low rehabilitative potential." [Doc. No. 436, p. 45]  The Government asserts that the alleged acts are not "minor" and that they support "the Government's theory that Defendant is likely to break rules and be a threat to others in prison." [Doc. No. 907, pp. 19-20]

### (a)  Possession of a contraband cell phone at Arizona State Prison - Kingman

The informative outline alleges that McCluskey possessed a contraband cell phone while incarcerated and used it to arrange with Cassyln Welch for sale of illegal drugs within the prison and for McCluskey's escape from the prison.  [Doc. No. 840, p. 7]  McCluskey argues that this evidence would not be probative of "Future Dangerousness" because the security level of

Kingman was significantly lower than any prison in which McCluskey is likely to be incarcerated in the future.  The Court is not persuaded by this argument.  First, it is not clear where McCluskey would be incarcerated in the future.  Second, McCluskey's assertion is of a factual nature, but there is no evidence upon which the Court could base a finding of the comparative security levels of different prisons and whether McCluskey might be prevented from such conduct under a different security level.  McCluskey also argues that "the use of a cell phone is not an inherently dangerous activity likely to pose a risk to the safety of other inmates or prison staff."  [Doc. No. 892, p. 35]  This argument ignores the fact that this allegation is in support of the sub-factor "Low rehabilitative potential," which in turn the Court has concluded is relevant to the "Future Dangerousness" factor; use of the cell phone does not need to directly support "Future Dangerousness."

    As discussed above, the caselaw supports presenting as much information as possible to the sentencing jury, provided that the information is relevant and that its probative value is not outweighed by the risk of unfair prejudice, confusing the issues, or misleading the jury.  The Court concludes that possession of a contraband cell phone, used to arrange for criminal acts, is relevant to and probative of "Low rehabilitative potential."  *See Lujan*, 603 F.3d at 854 ("information is admissible at a capital sentencing if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]'") (quoting Fed. R. Evid. 401; emphasis added)).  As the Government argues, repeated criminal acts and flouting of rules can support an inference that such behavior will be repeated in the future.  The Court further concludes that the probative value of this evidence is not outweighed by the danger of creating unfair prejudice under § 3593(c).  McCluskey has not shown that any prejudice would be "unfair."  McCluskey

appears to suggest that there would be prejudice because possession of the cell phone was not of "sufficient gravity."  The other side of the coin is that an incident of lesser gravity also carries lesser prejudice.  The Court believes that it is for the jury to determine what weight to give this information.

### (b) Possession and distribution of illegal drugs in Arizona state prison system

McCluskey argues that this evidence "lacks sufficient relevance to the sentencing decision" and should be excluded for the same reasons as the cell phone.  [Doc. No. 892, p. 35] For the same reasons discussed above, the Court concludes that this evidence does support the "Low rehabilitative potential" sub-factor, that the evidence is relevant, and that its probative value is not outweighed by the danger of unfair prejudice under § 3593(c).

McCluskey also requests an evidentiary hearing to determine the reliability of the Government's evidence on this matter.  [Doc. No. 892, p. 35]  The Court will deny that request.

### (c) Possession of contraband weapons while incarcerated

McCluskey argues that the Court should exclude alleged information that he possessed contraband weapons in prison, without allegations that he used or threatened to use any of these items as weapons.  [Doc. No. 892, p. 36]  The Court is persuaded by the Government's argument that possession of a weapon in prison is a serious matter, which supports the sub-factor of "Low rehabilitative potential" and "Future Dangerousness."  The Court concludes that such evidence is relevant, and that its probative value is not outweighed by the danger of "unfair" prejudice.

McCluskey makes a number of detailed factual assertions about each of the items cited in the Government's informative outline.  The circumstances surrounding each incident and the inferences that may be drawn are matters properly addressed in the selection phase, if there is a selection phase in this case.

**(d) Illegal contact with a witness via telephone from the New Mexico Department of Corrections - Santa Fe on or about January 9, 2012.**

McCluskey argues that the allegation in the informative outline does not prove that his contact with his ex-wife, Joy Glattfelder, was illegal in that he was prohibited from contacting her or that he threatened her.  [Doc No. 892, p. 38]  But the Government was not required by this Court's order to "reveal evidentiary detail" in the informative outline, but instead to "address the general nature" of the information the Government would offer.  [Doc. No. 645, p. 14]  The Government's allegation that this contact was "illegal" is sufficient to make such evidence probative of the sub-factor of "Low rehabilitative potential."  Whether the Government can prove its allegations is not a matter for decision at this point.

**(e) August 3, 2012, outburst at New Mexico Department of Corrections - Santa Fe.**

The Government alleges that McCluskey "punched walls and acted in a fit of rage, causing personal injury to himself."  [Doc. No. 840, p. 9]  McCluskey argues that this allegation is irrelevant because the Government does not allege that McCluskey threatened or harmed anyone other than himself.  [Doc. No. 892, p. 38]  The Court concludes that the allegations of rage and violent acts—even though that particular conduct did not threaten anyone else—is sufficiently relevant to "Low rehabilitative potential."

**C.  "Lack of remorse" sub-factor**

**(1)  Constitutionality**

McCluskey argues that the Fifth and Sixth Amendments preclude the Government's use of either McCluskey's silence or his decision to proceed to trial as information supporting the "Lack of remorse" sub-factor.  [Doc. No. 892, pp. 39-42]  The Government agrees and states in its earlier Response that, as indicated in the informative outline, the Government "affirmatively

states that it will show the Defendant's lack of remorse 'by his actions' and 'his statements.'"
[Doc. No. 436, p. 46 (quoting Doc. 396, pp. 69-70); *see* Doc. No. 840 (informative outline), p. 9]
In its later Response, the Government repeats that it will not rely on silence:  "The Government
is aware of its obligations to establish this factor through affirmative statements and acts, not
silence, and has given Defendant adequate notice of how it intends to do so."  [Doc. No. 907, p.
20]

McCluskey argues that "Lack of remorse"—which he defines as "the absence of an
admission of guilt and expression of contrition"—cannot be used to "enhance" his punishment or
make an upward departure.  [Doc. No. 892, pp. 40-42]  First, the Government affirms that it will
not rely on "the absence of an admission of guilt and expression of contrition" (i.e., silence), but
only on McCluskey's affirmative statements and acts.   Second, the Government correctly
observes that the non-statutory aggravating sub-factor "Lack of remorse" will only be used if this
case reaches the selection phase; in the selection phase, a defendant's punishment is not
"increased" and non-statutory aggravating factors may properly be used to individualize
punishment.

McCluskey also argues that use of "Lack of remorse" as a sub-factor violates the Eighth
Amendment's requirement for heightened reliability.  [Doc. No. 892, pp. 42-43]  Cases cited by
McCluskey do not support his argument.

The citation to the Florida case, *Pope v. State*, 441 So. 2d 1073, 1078 (Fla. 1983), is
inapposite; the quotation in McCluskey's Motion is at best dictum.  The Florida court held that,
under the Florida statute at issue, only statutory aggravating circumstances can be considered
and "lack of remorse" was neither an independent statutory aggravator nor properly included in
the definition of the "heinous, atrocious or cruel" statutory aggravator.  *Id.* at 1077-78; *see*

58

*McCampbell v. State*, 421 So. 2d 1072, 1075 (Fla. 1982) (per curiam).  The *Pope* court held that "lack of remorse" should have been excluded because it was not relevant to the "heinous, atrocious or cruel" statutory aggravator.  *Pope*, 441 So. 2d at 1078.  The Florida court was deciding an issue of statutory construction under Florida law.  Further, the excerpt quoted by McCluskey is merely a comment that the trial judge should not have relied on the defendant's silence or decision to go to trial.  *Pope* does not support McCluskey's argument under the Eighth Amendment.

> McCluskey also cites *United States v. Davis*, 912 F. Supp. 938, 946 (E.D. La. 1996):
>
> Lack of remorse is a subjective state of mind, difficult to [gauge] objectively since behavior and words don't necessarily correlate with internal feelings.  In a criminal context, it is particularly ambiguous since guilty persons have a constitutional right to be silent, to rest on a presumption of innocence and to require the government to prove their guilt beyond a reasonable doubt.

[Doc. No. 892, p. 43]  First, determining a defendant's subjective state of mind is routinely required and done in criminal proceedings.  Second, and more important, the *Davis* court is only discussing "lack of remorse" as determined by silence or a decision to go to trial; as discussed above, the Government will not rely on such bases in supporting the "Lack of remorse" sub-factor.  Third, the *Davis* court did not allow "lack of remorse" as an independent statutory factor, but did allow the government to argue "lack of remorse" based on Davis's statements or acts (his alleged exultation) as information probative of Davis's future dangerousness.  *Id.* at 946.  *Davis* does not support McCluskey's argument under the Eighth Amendment.

McCluskey cites *United States v. Walker*, 910 F. Supp. 837, 855 (N.D.N.Y. 1995), as holding that "highly prejudicial statements that the government claimed showed lack of remorse, but that were subject to competing inferences, could not be the basis for an independent aggravating factor because in this context they were much more prejudicial than probative and

because of the 'triviality' of the government's arguments, which would 'not bear the weight of being singled out . . . and presented to the jury as non-statutory aggravating factors.'"  [Doc. No. 892, p. 43]  First, a separate aggravating factor was based solely on the allegation that Walker used the epithet "motherf***r" in referring to the victim.  Second, the *Walker* court's holding was that this allegation was more prejudicial than probative and could be presented to the jury at trial or sentencing, but was not sufficient to be "singled out" as a separate non-statutory aggravating factor.  910 F. Supp. at 855.  In contrast to "singling out" one epithet to constitute a separate aggravating factor in *Walker*, in McCluskey's case a number of statements and actions are alleged in support of the "Lack of remorse" sub-factor, which then is combined with numerous other allegations in support of only one aggravating factor of "Future Dangerousness." *Walker* does not support McCluskey's argument under the Eighth Amendment. To the extent that McCluskey raises an argument that any evidence supporting "Lack of remorse" would be more prejudicial than probative, the Court concludes that this balancing is best left until the penalty phase, if this stage is reached, when the specific information, circumstances, and context will be before the Court.

McCluskey cites *United States v. Nguyen*, 928 F. Supp. 1525, 1542 (D. Kan. 1996). [Doc. No. 892, pp. 43-44]   *Nguyen* recognized that "[t]here does not appear to be any constitutional problem with a 'lack of remorse' factor *per se.*"  *Id.* at 1541.  *Nguyen* noted that the Supreme Court had indicated that "lack of remorse" can be used in aggravation:  "Any lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes is admissible in aggravation."  *Zant*, 462 U.S. at 885 n.22.  In *Nguyen*, similar to McCluskey's case, the government stated that it intended to show lack of remorse through the defendant's actions, statements, and demeanor.

*Nguyen*, 928 F. Supp. at 1541.  The *Nguyen* court discussed *Davis*, 912 F. Supp. at 950-53, and recognized the concerns expressed in *Davis* were limited to the use of silence.  The *Nguyen* court denied the motion to strike the "lack of remorse" factor but cautioned the government that:  its evidence must be relevant and reliable; the probative value must outweigh the danger of unfair prejudice under § 3593(c);  and the evidence "must be more than mere silence."  *Nguyen*, 928 F. Supp. at 1542.

Given the informative outline in McCluskey's case, and the Government's affirmation that it will rely only on McCluskey's statements and affirmative acts, *Nguyen* supports the Government's argument that it is constitutional to use "Lack of remorse" in aggravation—particularly as a sub-factor of "Future Dangerousness."  *See also United States v. O'Driscoll*, 203 F. Supp. 2d 334, 345 (M.D. Pa. 2002) (recognizing as "clearly permissible" use of "lack of remorse" to support aggravating factor of "future dangerousness"); *Bin Laden*, 126 F. Supp. 2d at 303-04 (allowing aggravation and observing that "lower courts have uniformly upheld future dangerousness as a non-statutory aggravating factor . . . including instances where such factor is supported by evidence of low rehabilitative potential and lack of remorse"); *Umana*, 707 F. Supp. 2d at 636 ("lack of remorse" does not violate Fifth Amendment when government intends to offer only affirmative statements in support); *Cooper*, 91 F. Supp. 2d at 112 (distinguishing *Davis*, 912 F. Supp. at 946, and allowing "lack of remorse" as it pertains to defendant's future dangerousness in prison provided government does not rely on silence).

As discussed above, the Court rejects McCluskey's assertion that there is impermissible duplication with other factors.  [Doc. No. 892, p. 43]  *See McCullah*, 76 F.3d at 1111-12; *Nguyen*, 928 F. Supp. at 1542 (holding that there is no impermissible duplication under *McCullah* even between "lack of remorse" and "continuing threat"); *Umana*, 707 F. Supp. 2d at

635 n.7 (stating that duplicative sub-factors are not unconstitutional, because they are part of only one aggravating factor).

### (2) Challenges to specific information alleged in support of "Lack of remorse"

McCluskey observes that the Court has excluded, from both the guilt and penalty phases, McCluskey's statements to FBI Agent James Rominger on August 20, 2010, and to FBI Agent James McCaskill and New Mexico State Police Agent Patrick Busksath on August 24, 2010. [Doc. No. 646, filed 8/27/12; Doc. No. 812, filed 2/13/13]  With regard to other statements to law enforcement personnel or the co-defendants, McCluskey exhorts the Court to "be cautious not to permit the government to rely solely on expressions of warped bravado."  [Doc. No. 892, p. 45]  McCluskey relies on *Davis*, 912 F. Supp. at 945, for this argument.  First, the Court has rejected the additional restriction of "sufficient gravity" imposed by the *Davis* court, which supports the portion of *Davis* on which McCluskey relies.  Second, the Court believes that the *Davis* court may have infringed on the province of the jury when that court excluded evidence because it might be inferred to constitute mere "threatening words and warped bravado"; in general, such factual inferences from the words used and the circumstances presented are for the jury to make, not this Court.  The Court will decide whether a rational jury could find statements support the "Lack of remorse" sub-factor if, and when, such evidence is presented; the Court will not decide admissibility of such statements without knowing the circumstances and context.  *See United States v. Concepcion Sablan*, 555 F. Supp. 2d 1177, 1188 (D. Colo. 2006) (admissibility of threats of violence without criminal conduct cannot be decided on per se basis, but will be determined when specific statements and context are offered).  In addition, the *Davis* court ruled that the probative value of Davis's threats was "far outweighed by the danger of unfair prejudice and confusion of the issues."  *Davis*, 912 F. Supp. at 945.  This balancing test is better performed

at the time such statements are offered at the penalty phase, when the specific statements, circumstances, and context are before the Court.  Finally, the Court does not agree with the *Davis* court's determination that "words alone" cannot properly support an aggravating factor.  In addition, "words alone" can more easily support the "Lack of remorse" sub-factor; the *Davis* court made this determination with respect to a "continuing threat" factor.  *Id.*

McCluskey argues that the following allegations are not relevant and that their probative value is outweighed by the danger of unfair prejudice and confusion of the issues:  (1) McCluskey had "repeated sexual intercourse with Co-Defendant Welch in the days after Defendant killed the Haases," particularly since Welch is McCluskey's cousin and the jury is invited to improperly find that McCluskey is "a bad person for engaging in an incestuous relationship"; (2) McCluskey was "camping, fishing, and enjoying freedom in national parks in the days following the killings"; and (3) McCluskey was "wearing Gary Haas's John Deere hat in the days following the killings."  [Doc. No. 840, pp. 9-10]  The Government responds that these allegations demonstrate "Lack of remorse" by providing the jury "with a glimpse into Defendant's character and support[ing] the conclusion that Defendant was not remorseful or otherwise emotionally distraught after killing the Haases."  [Doc. No. 907, p. 21]  The Court concludes that these allegations are relevant to "Lack of remorse," and that a rational jury could find that they indicate "Lack of remorse."  With regard to allegation (1) above (prejudice due to "an incestuous relationship"), the Court notes that there would be little, if any, additional prejudice because the jury already heard, in the guilt phase, Casslyn Welch's testimony that she is McCluskey's first cousin and that they had a relationship that was "romantic in every sense of that term."  [Tr. 9-16-13, pp. 6270, 6277-78]  The Court declines to perform the balancing test under § 3593(c) until such time as this evidence is presented in the penalty phase, if there is a

selection phase, and until the Court has been made aware of all of the facts, circumstances, and context.

**D.   "Callous disregard for human life" sub-factor**

McCluskey argues that this sub-factor should be stricken because "the only two factual acts alleged in support" are impermissibly duplicative.  [Doc. No. 892, p. 46]  These "two factual acts" alleged in the NOI are:  "(i)  the execution-style killings of Gary Haas and Linda Haas and the post-mortem mutilation of their bodies; (ii) attempts to kill or seriously injure victims of previous criminal acts in Pennsylvania and Arizona."  [Doc. No. 755, p. 7]  McCluskey does not argue that the remaining five allegations of statements made by him present any issue of duplicativeness; therefore, since not all of the allegations are repeated, there is no impermissible duplication.  In addition, as discussed above, there is no impermissible duplication between:  (1) aggravating factors and elements of the capital or other crimes for which McCluskey is on trial; and (2) mental state gateway factors.  *See Lowenfield*, 484 U.S. at 246; *see Tuilaepa*, 512 U.S. at 971-72; *Chanthadara*, 230 F.3d at 1261.

McCluskey also asserts there is impermissible duplication with the two "Prior Conviction" statutory aggravating factors:  "Previous Conviction of Violent Felony Involving Firearm,"  3592(c)(2); and "Previous Conviction of Other Serious Offenses," § 3592(c)(4).  This claim is based on repeating the allegation of the Pennsylvania and Arizona convictions.  There is no impermissible duplication because there is only some overlap of the evidence; the jury could find one factor or sub-factor without "necessarily" finding the others.  *See McCullah*, 76 F.3d at 1111; *Medlock*, 200 F.3d at 1319; *Johnson*, 169 F.3d at 1252 ("Here, although the jury may have relied on some of the same evidence—namely petitioner's past felony convictions—in finding the aggravating circumstance of future dangerousness, it did not necessarily have to find one in

64

order to find the other.").  In addition, rather than considering the sub-factor "Callous disregard for human life," analysis of duplicativeness must focus on aggravating factors—not sub-factors. *See Umana*, 707 F. Supp. 2d at 635 n.7.  The aggravating factor of "Future Dangerousness" focuses the jury's attention on "the likelihood of *future* violent conduct," while the "Previous Conviction" factors focus on "the particular nature and consequences of his *past* conduct." *Cooks*, 165 F.3d at 1289 (holding "continuing threat" aggravator not impermissibly duplicative of "prior conviction" aggravator); *see Medlock*, 76 F.3d at 1319.  There is no impermissible duplicativeness.

McCluskey contends that there is impermissible duplication with the statutory aggravating factor of "Multiple Killings or Attempted Killings" in a single episode.  [Doc. No. 755, p. 4]  The Court concluded that there is no impermissible duplication, in Section V above. The Court concluded in Section VII above that there is no impermissible duplication with the "Contemporaneous Serious Criminal Acts" factor.  There is no impermissible duplication with another sub-factor, "Continuing pattern of violence," because these are sub-factors of the same aggravating factor, "Future Dangerousness," which is weighed only once; there is no "double-counting."  *See Umana*, 707 F. Supp. 2d at 635 n.7.

McCluskey argues that, "for the reasons stated above in the discussion of the 'especially heinous, cruel, or depraved manner' proposed aggravating factor, evidence that Mr. McCluskey burned the Haases' bodies long after their deaths is not relevant to a jury's determination whether Mr. McCluskey showed callous disregard for human life."  [Doc. No. 892, p. 46]  The Government states that the purpose of the "Callous disregard for human life" sub-factor "is to demonstrate the Defendant's 'general moral character' and how he treats others."  [Doc. No. 436, p. 47]  The Government argues that under a commonsense view of this sub-factor, incinerating

the victims' bodies "not long after killing them" shows "Callous disregard for human life."  The
Government observes that "[t]o many people, the body is sacred, even after death."  [Doc. No.
907, p. 22]   In discussing "serious physical abuse" under the "Heinous, cruel, or depraved
factor," the Ninth Circuit observed that post-mortem mutilation "rationally identifies those who
are more blameworthy on account of their depravity or cold-bloodedness, even when the
mutilation is done the next day and for the purpose of concealing evidence. *Mitchell*, 502 F.3d
at 976-77 (emphasis added).  The Court concludes that the allegation that McCluskey burned the
Haases' bodies is relevant to the "Callous disregard for human life" sub-factor.

The informative outline generally alleges a number of McCluskey's statements to law
enforcement officers in support of this sub-factor.  McCluskey asks the Court to evaluate each
statement to determine whether it is "particularly relevant" and whether its probative value is
outweighed by unfair prejudice under § 3593(c).  [Doc. No. 892, p. 47]  The Court will do so if
and when such statements are offered, and when the specific statements together with the
circumstances and context are before the Court.

### E.  Gang affiliation

The Government's NOI initially included under the aggravating factor of "Future
Dangerousness" the sub-factor of "Gang membership."  The Court granted the Government's
motion to amend its NOI to modify McCluskey's alleged involvement with the Aryan
Brotherhood gang from "membership in" to "affiliation with" the gang.  [Doc. No. 993, filed
5/28/13]

McCluskey argues that the allegation of gang affiliation is irrelevant and more prejudicial
than probative "because it is classic 'guilt by association' evidence."  [Doc. No. 892, p. 47]  "The
government seeks here to lose Mr. McCluskey's identity in the mass of prejudicial information

about the Aryan Brotherhood prison gang, focusing on its activities in the Arizona Department of Corrections, a place the government must speculate Mr. McCluskey will end up in if he is sentenced to life imprisonment."   [Doc. No. 892, pp. 47-48]   McCluskey argues that this evidence has a "tendency to sidetrack this trial on collateral issues."  [Doc. No. 892, p. 48]

The Government alleges that it can "establish Defendant's close affiliation with and criminal activity for the Aryan Brotherhood," and that his "close ties" with that gang "undoubtedly make Defendant more dangerous, particularly if he is returned to the Arizona prison system."  [Doc. No. 907, p. 22]  The Government alleges that, while at Kingman Prison: McCluskey "spearheaded an extensive and sophisticated drug importation and distribution enterprise with the express permission of the Aryan Brotherhood," and that "[c]onsistent with Aryan Brotherhood rules, Defendant paid a 25% 'tax' for doing so"; and that McCluskey "worked extremely closely and on virtually a daily basis with the senior-ranking Aryan Brotherhood associates at the Kingman Prison to import and distribute the drugs and also to collect payment for the drugs."  [Doc. No. 840, p. 11]

Gang participation generally has a plausible connection to the facts because it is relevant to the non-statutory aggravating factor of "Future Dangerousness."   [Doc. 993, p. 10, filed 5/28/13]   *See Dawson v. Delaware*, 503 U.S. 159, 165 (1992) ("In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society."); *Fuller v. Johnson*, 114 F.3d 491, 497-98 (5th Cir. 1997); *Umana*, 707 F. Supp. 2d at 638.  In a prior Memorandum Opinion and Order, the Court emphasized that it was not determining that the proposed gang-related evidence is admissible in all respects, but simply that it indeed has a plausible connection to the facts at issue if a sentencing phase is necessary in this case.  [Doc. No. 993, p. 10]  The purpose of the "Gang affiliation" sub-factor is

to support "Future Dangerousness" in its tendency to show that life imprisonment would be insufficient to prevent future violence.

The Government argues that McCluskey's "affiliation with a dangerous prison gang could be relevant to determining whether he will be a future danger in prison." [Doc. No. 436, p. 48] McCluskey argues that when his alleged connection with the gang "is as attenuated as it is here," admission of the evidence is more problematic. [Doc. No. 937, pp. 9-10] The Court acknowledges that the allegation that McCluskey is "affiliated with," rather than a member of, a gang is quite likely to carry less weight with the jury. On the other hand, the allegation of affiliation also carries less danger of prejudice. The FDPA requires balancing of probative value against "undue" prejudice, not all prejudice. *Lujan*, 603 F.3d at 858.

The Court notes that the informative outline relies on information from Keland Boggs, cited as "an ADOC prison gang expert." [Doc. No. 840, pp. 10-11] The Court's prior Memorandum Opinion and Order [Doc. No. 994] granted McCluskey's motion to exclude testimony by D. Scott Dodrill, Leslie Smith, and Keland Boggs, on the ground that the Government failed to carry its burden to show that the expert evidence was admissible under Rule 702 and *Daubert*. The Government had "refused to give the Court any inkling of what the experts' testimony will consist of, what their opinions are, what they are based upon, and how they relate to the charges against McCluskey." [Doc. No. 994, p. 7] The Government stated that it intended to offer testimony from these witnesses in the penalty phase as rebuttal and "'to address the significance of Defendant's allegiance to a gang as it applies to the future dangerousness factor.'" [Doc. No. 994, p. 9] The Court observed: "Again, the Government does not explain how the three expert witness' testimony will be relevant to the future dangerousness factor, what their opinions will be, or why their conclusions are reliable." [Doc. No. 994, p. 9]

68

The Court excluded testimony of Dodrill, Smith, and Boggs at trial.  [Doc. No. 994, pp. 11, 14]  The Court notes that its Memorandum Opinion and Order [Doc. No. 994] was filed on May 28, 2013—after McCluskey's Reply on the motion to strike aggravating factors.  Neither the Government nor McCluskey has attempted to supplement its information or arguments in response.

The Government, however, did file a *Motion To Reconsider Exclusion of Witness Dodrill for the Purpose of Penalty-Phase Rebuttal* on June 20, 2013.  [Doc. No. 1047]  McCluskey filed a Response and the Government filed a Reply.  [Doc. No. 1074; Doc. No. 1084]

Although Rule 702 does not apply at the penalty phase, the Government's evidence must still be reliable.  If reliable information can be produced, "gang affiliation" may be relevant.

In *Wilson*, the district court concluded the proof of the defendant's membership in the Bloods was relevant to future dangerousness.  *United States v. Wilson*, 493 F. Supp. 2d 491, 501 (E.D.N.Y. 2007).  The court further concluded that such evidence was admissible "only if it is tailored to Wilson's future dangerousness, as opposed to the dangerousness of the Bloods in general," under § 3593(c).  *Id.*  The court ruled that it would allow the government to "briefly" present information to the jury regarding Wilson's membership in the Bloods in support of the future dangerousness aggravating factor.  *Wilson*, 493 F. Supp. 2d at 502; *see United States v. Wilson*, 2013 WL 1386137, *4-5 (E.D.N.Y. 2013) (unpublished) (same court reaffirming prior ruling on gang membership and limitation of evidence, for penalty phase re-trial).  In *Gooch*, the district court allowed information about the defendant's membership in and allegiance to a gang in support of a sub-factor under "future dangerousness."  *United States v. Gooch*, 2006 WL 3780781, *30 (D.D.C. 2006) (unpublished).  The *Gooch* court ruled that evidence in support of "future dangerousness" must be limited to dangerousness while incarcerated under a life

sentence; the court stated that "Congress has recognized that gang activity magnifies the already significant threat to communities posed by drugs and violence," and reasoned that Gooch's allegiance to a gang "that pooled its energies and resources toward violent ends, ineluctably bears on whether he would follow the same behavior patterns in prison." *Id.*

Provided that the Government can reliably demonstrate McCluskey's affiliation, and provided that the Government can present reliable information that is "tailored to" McCluskey's future dangerousness—as opposed to the dangerousness of the Aryan Brotherhood in general—the Court concludes that evidence in support of this sub-factor is relevant. The Court will not at this time strike this sub-factor under § 3593(c); the Court will make a final determination under the balancing test of § 3593(c) if there is a penalty phase at which this evidence is offered.

### F.  "Escape risk" sub-factor

McCluskey argues that this sub-factor is duplicative of Count 20. The Court has already concluded that there is no impermissible duplication of an aggravating factor with the charges for which McCluskey is on trial; similarly, there can be no impermissible duplication with a sub-factor. *See Lowenfield*, 484 U.S. at 246; *see Tuilaepa*, 512 U.S. at 971-72; *Chanthadara*, 230 F.3d at 1261; *Umana*, 707 F. Supp. 2d at 635 n.7. The Court has already concluded that there is no impermissible duplication with the "Contemporaneous Serious Criminal Acts" factor under Section VII, above. There would be no impermissible duplication with the "Armed Fugitive from Justice" factor, even if the Court had not stricken this factor; the "Armed Fugitive from Justice" factor focuses on the particular nature of the past episode of criminal acts committed around the time of the capital offenses, while the "Future Dangerousness" factor focuses on the likelihood of future violent conduct. *See Medlock*, 76 F.3d at 1319; *Cooks*, 165 F.3d at 1289.

There is no impermissible duplication with other sub-factors of "Future Dangerousness," because there is no double counting.  *See Umana*, 707 F. Supp. 2d at 635 n.7.  The sub-factors are not "counted" individually, and the "Future Dangerousness" factor is counted only once.

The informative outline states:

> To prove this factor, the Government will introduce evidence of Defendant's July 30, 2010, escape from Arizona State Prison—Kingman, and Defendant's possession of contraband weapons while incarcerated since August 20, 2010.  The evidence that will support these factors is outlined above in the section regarding the sub-factor of Low Rehabilitative Potential.

[Doc. No. 840, p. 12]  The Government argues:  "Because he has escaped before, he is a risk of escaping again.  Further, because he is an escape risk, he is more likely to be a future danger to others."  [Doc. No. 436, p. 48]  McCluskey argues that the probative value of this evidence is minimal and the risk of unfair prejudice substantial.  [Doc. No. 892, p. 48]  McCluskey states that he incorporates the arguments he made regarding allegations he possessed contraband weapons while incarcerated; the Court has already addressed these arguments in Section X(B)(2)(c), above.

McCluskey argues that the probative value of evidence of his alleged escape from the Arizona State Prison - Kingman "is greatly diminished" by the following factual assertions:  (1) the security level at that prison was "substantially lower than the level of any facility where Mr. McCluskey is likely to serve a future sentence"; (2) there were "numerous security problems that are extremely unlikely to be repeated at a higher security facility"; and (3) "any maximum security prison in which Mr. McCluskey will serve a sentence in the future will be fully aware of the prior escape allegations and will undoubtedly take measures to eliminate any risk of escape."  [Doc. No. 892, pp. 48-49]  To the extent that McCluskey's argument relies on an assumption about where he would be incarcerated, if he were convicted and received a life sentence, the

argument is based on an unestablished factual matter.  Since none of these factual assertions has been established, the Court rejects McCluskey's argument.  Even if it were established that McCluskey would be incarcerated at a different prison, with superior security, the Court concludes that the NOI's allegations have sufficient probative value, and the sub-factor alleging that McCluskey is an escape risk would still be relevant to "Future Dangerousness."  As the Government argues, "No evidence is more probative of an individual's escape risk than evidence that the individual has previously escaped from prison, regardless of whether that prison was not of the highest security level."  [Doc. No. 907, p. 23]

McCluskey also argues that the probative value is outweighed by the danger of confusing or misleading the jury, citing cases holding that due process requires a jury considering "Future Dangerousness" to be informed that a life sentence carries no possibility of parole.  [Doc. No. 892, pp. 49-50]  This issue will be addressed in settling the jury instructions if a penalty phase is required in this case.  The Court notes that the Government's Proposed Penalty Phase Instruction No. 1 is:  "Each of these offenses is punishable by death or by imprisonment for life without possibility of release."  [Doc. No. 1063, p. 7 (referring to Counts 2-5 and 9-18)]  McCluskey's Proposed Penalty Phase Instruction No. 1 includes the same sentence.  [Doc. No. 1066, p. 6]

McCluskey also argues that, if he is convicted and receives a life sentence, whether he is incarcerated in an Arizona prison or in a federal prison is within the discretion of government officials, so "evidence that he presents an escape risk based on the alleged Arizona escape invites the jury to sentence him to death based on arbitrary and capricious factors."  [Doc. No. 892, p. 50]  As discussed above, the Court concludes that the evidence alleged in support of the "Escape risk" sub-factor is relevant regardless of the location of incarceration.  In addition, the Court concludes that the probative value of this evidence is not outweighed by the danger of "unfair"

prejudice, confusion of the issues, or misleading of the jury under § 3593(c).  Allegations that McCluskey armed himself with weapons and made an escape attempt, together with a possible inference that his future behavior would repeat his past behavior, would still be probative under the "Future Dangerousness" factor, even if an escape attempt were unsuccessful.

### XI.  The Catchall Aggravator

McCluskey argues that the "Catchall Aggravator" should be stricken.  [Doc. No. 892, pp. 51-52]  The Government states that it is not alleging such a factor.  [Doc. No. 907, p. 7 n.6]

### XII.  Evidentiary Hearing

McCluskey requests an evidentiary hearing on his motion.  The Court concludes that an evidentiary hearing is unnecessary to resolve the issues which currently need to be decided by the Court.  Issues requiring the balancing test of § 3593(c) are best left until the penalty phase, if one is required in this case, when the specific information, circumstances, and context are before the Court.

**IT IS THEREFORE ORDERED** that McCluskey's *[Corrected] Renewed Motion To Strike Particular Aggravating Circumstances* [Doc. No. 892] is **GRANTED** with regard to McCluskey's motion to strike the aggravating factor of "Armed Fugitive from Justice," but otherwise **DENIED** in all other respects.

**UNITED STATES DISTRICT JUDGE**