IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

    Plaintiff,

    v.

                                                CR No. 10-2734 JCH

JOHN CHARLES McCLUSKEY,

    Defendant.

UNITED STATES' SEALED SENTENCING MEMORANDUM

The United States of America respectfully submits this sealed Sentencing Memorandum to provide the Court with a complete record of Defendant John Charles McCluskey's violent past, future dangerousness and low rehabilitative potential. Due to the gravity of the offenses for which Defendant has been convicted by jury, the Court is bound by statute to impose upon Defendant a sentence of life without the possibility of release.

1.    The Nature and Circumstances of the Offense

The Court is fully informed about the factual and procedural background of this case. Other than noted herein, the government does not oppose the factual basis as laid out in the presentence investigation report (PSR). *See* PSR ¶¶ 1-40. Despite Defendant's protestations that Province and/or Welch were actually the ones in charge, the evidence presented at trial supported the testimony of both co-defendants that it was Defendant who led the way.

The Government admitted into evidence phone calls between Defendant and Welch recorded by Kingman Prison prior to the escape that clearly reveal that Defendant was managing

1

Welch's every move. Among other things, in the recorded calls Defendant dictates to Welch what type of guns to purchase, to ensure they worked properly, to purchase a certain type of heavy-duty wire cutters, to have the getaway vehicle serviced, and to ensure the vehicle's title was free and clear. Defendant was the one who stood with two guns during the escape, armed and ready to shoot any guards that might come upon the scene. Defendant directed the kidnapping of the truckers, taking the wheel and voting to kill them, while Welch and Province declined.

Defendant was the sole shooter of Gary and Linda Haas, while Province and Welch were unaware of what Defendant was planning until the shots rang out. Defendant's own *voluntary* confession, although suppressed due to a Miranda violation, supported both Province and Welch's testimony that Defendant committed the murders of Gary and Linda Haas intentionally, deliberately, and without input from the others. As he coldly admitted in his confession, "what I did in New Mexico was . . . a tragedy, but it was something I thought that needed to be done at the time to further myself. . . . And I would have . . . done that to anybody. Bates 2045. Congress has demonstrated that it views the crimes Defendant committed, and was found guilty of at trial, as extremely egregious, by imposing a penalty of either mandatory life without release, or death. PSR § 117 (citing 18 U.S.C. § 1512(a)(1)(C)).

2.   History and Characteristics of the Defendant

Defendant's history is a lengthy recitation of violence, both within the corrections system and without. The PSR discusses the numerous medical and mental health issues presented by Defendant at trial, specifically evidence of Defendant's brain damage. PSR § 110. However, it is important to note that the Government also presented substantial evidence suggesting that

2

Defendant did not and does not suffer impairment from brain damage at all. Tr. 9850-53 (summarizing evidence in argument). Rather, Defendant's propensity toward violence and criminality are caused, not by brain damage, but by an antisocial personality disorder. Tr. 9394. As the United States suggested to the jury at trial, the best indicator of whether Defendant has brain impairment is to look at his criminal behavior and ability to mastermind complex criminal enterprises. Tr. 9850-53.

### a. Criminal Activity Outside the Penal System

Based upon trial testimony, this Court is well aware of Defendant's criminal history outside penal institutions. It began in 1983 when, shortly before his 18th birthday, McCluskey approached an elderly woman outside a grocery store in Phoenix, pointed a handgun at her and threatened to shoot her unless she gave up her purse. He was convicted as an adult for that crime.

From 1986 through 1992 he picked up a slew of offenses in Arizona, New Mexico, and Texas, to include disorderly conduct; shoplifting; driving while intoxicated; marijuana possession; assault-domestic violence; and battery, culminating with charges that would put him in prison for 15 years – several counts of robbery and aggravated assault in Pennsylvania. PSR at pages 22, 23, 30, 31. The robberies in Pennsylvania were once again committed with a handgun, as Defendant participated as one of two, in a larger group of associates, who acted as a gunman at each of the robberies. Testimony at trial showed that the victims in this case still relive the fear of these events although it happened twenty-two years ago.

Once released on parole in 2007, Defendant absconded, traveling to Arkansas to reunite with Welch, and then subsequently returning to Arizona, where once again he used a gun to

3

commit another violent act. PSR § 85. As testimony showed during trial, Defendant discharged a shotgun into the front-room window of a home where residents had been standing moments before. It was only because the residents saw Defendant and ducked out of the way that they were not seriously injured or killed. Following the shooting, Defendant fled from the police and admitted after his arrest he would have shot pursuing officers had his gun not jammed. He also admitted that, had the gun not jammed, he would have shot again at the victim and "split his guts open." *Id.* A recorded post-arrest statement made while talking with Welch on the phone shows the lengths Defendant is willing to go to exact his revenge. "Now, I don't know how to get a message to this guy. I don't even know this fucking prick's name. But you tell that chickenshit motherfucker if you ever find out who he is that if I ever run into him I'll kill him. I don't care if it's 20 years from now." Tr. 8952.

Defendant subsequently pled guilty to this offense and was sentenced to 15 years imprisonment on July 15, 2009. PSR § 85. Slightly over a year later, Defendant along with his fellow inmates, Province and Daniel Renwick, escaped from prison with the outside assistance of Welch. *See* PSR § 86. Following the murders of Gary and Linda Haas, Defendant continued to show a propensity for violence as evidenced by the robbery of the Kut 'n Kurl Hair Salon in Gentry, Arkansas. Once again Defendant used a gun to further his objectives, with trial testimony showing that Defendant threatened the salon's owner, Joyce Cook, if she did not comply. Once again Defendant victimized an innocent stranger who continues to relive the horror of that incident to this day. And once again, Defendant demonstrated his aptitude for developing and executing criminal plans by placing a phone call well before the escape, in which he asked Welch to think of businesses in Gentry that would have money. Bates 16386-406, Exh.

667 (7-29-10 10:21:08) (admitted into evidence Nov. 7, 2014).

### b. Criminal Activity Within the Penal System

Defendant's cunning, penchant for violence, and propensity to break the law to further his own interests make him a danger even in the incarcerated setting. Indeed, throughout his many years of imprisonment, particularly in more recent years while in the custody of the Arizona Department of Corrections (ADOC), Defendant has continuously engaged in serious criminal activity, including acts of violence against his fellow inmates. Although the PSR notes that, according to ADOC, prior to the escape Defendant had not sustained any disciplinary action, evidence at trial showed Defendant was heavily involved in criminal activity. PSR at 26. McCluskey masterminded and managed a sophisticated drug importation and distribution system into the ADOC with a customer base of 50 to 100 customers and weekly deliveries of heroin and marijuana. He exploited vulnerabilities in prison security, used coded language on the phone to defeat electronic surveillance, accounted for all debts from inmate customers and outside third-party payments, and supervised the efforts of his co-defendant, Casslyn Welch. At McCluskey's direction, Welch obtained from multiple sources of supply various kinds and amounts of controlled substances and then smuggled them into the prison visitation area during her weekly visits with McCluskey over the course of six months. McCluskey then smuggled the controlled substances, usually inside his body, into the interior of the prison, whereupon he and other inmates distributed the controlled substances to their inmate clientele. Co-defendant Welch, again operating at McCluskey's specific direction, then received payment via U.S. Postal Service or money wiring service for the controlled substances from family members or associates of McCluskey's inmate clientele. And all payments and debts were carefully tracked using dual

5

accounting logs—one inside and one outside the prison—that were updated daily by way of code talk over recorded lines. The United States' evidence includes scores of recorded telephone conversations between McCluskey and Welch, Welch's interdiction outside Kingman Prison, as well as co-defendant trial testimony and recorded debriefing sessions.

Also while in the Arizona prison system, substantial evidence shows that Defendant attacked another prisoner for alleged transgressions against Defendant's family. This attack occurred at Kingman Prison in April of 2010 and resulted in the inmate, Stevenson Williams, being transported to the Kingman Regional Medical Center to receive emergency medical care for having his throat slashed. Bates 14239-14300 (disclosed Apr. 19, 2013). Williams was subsequently moved into protective custody following his release from the hospital. *Id.* Evidence of this attack includes McCluskey's own August 20, 2011, confession to FBI Special Agent Jay Rominger, during which he gloats about having "carved this motherfucker up," correspondence from the victim stating that "I was attacked while residing at Kingman Facility by having my throat slit and having to be taken to the hospital . . . because my other nephew . . . stole money from the Aryan Brotherhood . . . and now the Aryan Brotherhood is retaliating against myself and other members of my family," photographs of the bloody aftermath, and a series of recorded prison calls that demonstrate how McCluskey cleverly used resources inside and outside prison walls to pinpoint his victim's whereabouts and carefully time his vicious attack. Bates 2062-63 (disclosed Dec. 23, 2010); Bates 7368-7373 (disclosed Jun. 15, 2012); Bates 14239-14300. The calls—both before and after the slashing—demonstrate McCluskey's intent ("Remember[] the guy that was bothering [you] on the phone. . . . He just showed up . . . he'll never bother you again.") and depravity (referring to the victim as "Frankenstein" due to the

number of stitches he received at McCluskey's hands). Bates 17161-78, Exh. 718 (04-20-2010_18:25:42) (disc F8 disclosed Feb. 11, 2013); Bates 17612-28, Exh. 1213 (03-16-12 13:12) (disc D2 disclosed Nov. 9, 2012); Bates 16110-25, Exh. 651 (07-11-10 12:20:34) (disc C9 disclosed Nov. 9, 2012).

Before Defendant was transferred into the Arizona prison system, Defendant was involved in a race riot at the Maricopa County Jail. In May of 2009, he jammed his cell door open and fought in a race riot at the direction of the white-inmate leadership in his pod. Bates 14515. He was formally cited for "fighting" and "interfering or tampering with" his cell door for the incident, but refused to acknowledge receipt of the charges. *Id.* He was found guilty of the offenses. *Id.* In a later recorded phone call with his step-daughter Kodie Keys, Defendant admitted to participating in this race riot. Exh. 1308 (03-31-12 11:38) (disc D3 disclosed Nov. 9, 2012).

Following his arrest on the escape from Kingman and the subsequent murders of Gary and Linda Haas, Defendant attacked an officer with the Mohave County Sheriff's Office. On June 13, 2011, following a pretrial hearing, McCluskey assaulted Detective Jason Elsbury as he was being escorted from the courtroom. McCluskey broke free from his escorts, lunged at Detective Elsbury and elbowed him. This occurred at the rear door to the courtroom, which was a short distance from the building's exit. Elsbury was armed at the time. Courtroom security had to wrestle McCluskey to the ground to subdue him. The government presented this evidence at trial in support of the future dangerousness aggravating factor, demonstrating McCluskey has low rehabilitative potential.

As demonstrated by a series of recorded prison calls, Welch feared McCluskey's penchant for violence and ability to reach her, even while he was incarcerated. McCluskey planned to have Welch's trailer burned down and Welch took the threat so seriously, she moved out of her trailer to another town, until she could be assured that he had called off "the contract." Discovery Disc G5 & G6 (Calls from Dec. 2009 to Jan. 2010) (disclosed Jun. 27, 2013). And Welch wasn't the only person he planned to exact violence upon while in prison. The United States has knowledge—mainly from McCluskey's own recorded prison calls—of McCluskey's plans to order that violence be done to two of his mother's employees—her roofer and one of her former store clerks. Bates 16952-75, Exh. 700 (03-25-2010 13:42:26) (disc F8 disclosed Feb. 11, 2013); Bates 16976-91, Exh. 701 (03-25-2010 13:59:29) (disc F8); Bates 15466-83, Exh. 610 (5-16-10 14:12:31) (disc C8 disclosed Nov. 9, 2012); Bates 16515-32, Exh. 674 (02-26-2010 06:17:14) (disc F8); Bates 16533-53, Exh. 675 (02-26-2010 07:43:27) (disc F8); Bates 16554-77, Exh. 676 (02-27-2010 18:13:44) (disc F8); Bates 16578-99, Exh. 677 (02-28-2010 06:46:23) (disc F8); Bates 16638-58, Exh. 680 (03-03-2010 10:28:19) (disc F8); Bates 16703-20, Exh. 683 (03-07-2010 16:23:23) (disc F8); Bates 16721-41, Exh. 684 (03-07-2010 16:49:36) (disc F8); Exh. 685 (03-08-2010 11:16:48) (disc F8); Bates 16762-79 Exh. 688 (03-11-2010 11:51:04) (disc F8); Bates 17053-71, Exh. 707 (04-07-2010 10:17:59) (disc F8). Additionally, while his federal trial was pending, McCluskey wrote to his son that had he known his ex-wife Glattfelder and her current husband would talk to the police, he "would have peeled them both." Bates 4572-73. If that weren't enough, McCluskey actually contacted Glattfelder before her testimony in this very case to intimidate her and reprimand her for talking to law enforcement about his mother's involvement in the escape. Bates 17427-53, Exh. 1172 (1-9-12 13:44) (disc B2

8

disclosed Nov. 23, 2012). Glattfelder explained in a recorded interview with the government that McCluskey's call terrified her, that she thought it was connected to death threats she had received from a Texas prison line, and that she believed her "car was going to blow up for the longest time when [she would] get in it." Bates 13929.

In short, McCluskey's propensity for violence, risk-taking behavior, and lack of respect for law and order, should leave the Court—as it did the jury—with a firm conviction that McCluskey will remain a threat in *any* confinement context.

### c. Aryan Brotherhood Affiliation

Defendant objected to the PSR finding that he was affiliated with the Aryan Brotherhood while he was incarcerated within the Pennsylvania prison system, based upon a letter from the Pennsylvania Department of Corrections (PDOC) that McCluskey was not noted as having an STG (security threat group) affiliation while in custody there. Technically, he is correct. But PDOC did not carefully track STGs during the time McCluskey was incarcerated there. The Government, however, has substantial evidence linking him to the gang, all of which has previously been provided to the defense. The Government did not proceed on this evidence during the capital sentencing hearing because it had the potential to spawn numerous minitrials and divert the jury's focus at the end of a lengthy trial. Nonetheless, the evidence of Defendant's gang affiliation is significant and must be taken seriously when determining Defendant's final sentence and placement.

Significantly, it was Defendant himself that admitted his own affiliation when he entered into the Arizona prison system. His intake sheet notes that he admitted to being a validated member in Pennsylvania of the Peckerwoods. Bates 8653. Indeed, he has a tattoo on his

9

forearm consisting of a shamrock with two lightning bolts in the shape of the letters "SS," with the shamrock bordered on the top and bottom with the words "PURE" and "WOOD." Bates 7769-7770, 8653. Credible sources on gangs and gang tattoos, including investigators within ADOC, associate the Peckerwoods with the Aryan Brotherhood (AB) and other white supremacist groups. According to the Simon Wiesenthal Center, "Peckerwoods today are involved with organized racist activity in and out of the nation's prisons." *See* Simon Wiesenthal Center Report, *The New Lexicon of Hate: The Changing Tactics, Language and Symbols of America's Extremists* 9 (1998). The shamrock within Defendant's tattoo and the "SS" lightning bolts, are both listed as "tattoos used by racist skinheads," and earned for committing acts of violence. *See The New Lexicon of Hate* 14-17. The "SS" bolts are specifically "'earned' for . . . a stabbing or shooting which does not end in death." *Id.* at 15.

Defendant claimed to have earned the patch by committing acts of violence and debt collection on behalf of the AB while incarcerated in Pennsylvania. Bates 8653. In addition to McCluskey's own statements and what he described as the Pennsylvania patch, his AB association was ratified by a senior leader in AB's Arizona chapter as well as senior AB associates at the Arizona State Prison Complex-Lewis, where he was incarcerated in 2009. Bates 14073-74. Consequently, McCluskey was considered by the senior-ranking AB associates at the Kingman Prison as himself an AB associate or "breadwinner for the family." Bates 1405-76. While at the Kingman Prison, Defendant spearheaded an extensive and sophisticated drug importation and distribution enterprise with the express permission of the AB. Bates 14080-81. Consistent with AB rules, Defendant paid a 25% "tax" for doing so. Bates 14081. He worked extremely closely and on virtually a daily basis with the senior-ranking AB associates at the

10

Kingman Prison to import and distribute the drugs and also to collect payment for the drugs.



. . .

Evidence of Defendant's AB affiliation includes recorded statements by cooperating co-defendants, information from an ADOC prison gang expert named Keland Boggs and other ADOC personnel, photographs depicting Defendant's gang-related tattoo, an ADOC intake report, a letter McCluskey wrote to a female acquaintance, Trisha Sanchez, while awaiting his federal trial discussing gang affiliation, as well as prison telephone calls and written correspondence demonstrating Defendant's gang association. Bates 15658-76, Exh. 620 (5-24-10 18:58:27) (disc C8 disclosed Nov. 9, 2012). Further ties within Defendant's family are also present, in that his step-daughter Kodie Keys is the wife of Jimmy Springer, who is the step-son of known AB leader Bruce Foy Lowry. Letters and phone calls between Defendant and his step-daughter and her husband support this affiliation. *See, e.g.*, Bates 17629-47, Exh. 1214 (3-16-12 13:36) (disc D2 disclosed Nov. 9, 2012).

3.  <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Provide Adequate Deterrence, and Protect the Public from Further Crimes of the Defendant</u>

At the selection phase of McCluskey's capital sentencing hearing, the jury was deadlocked 9-3 on a sentence of death. In other words, three-fourths of the jury determined that McCluskey's crimes, character and future danger warranted imposition of the death penalty to neutralize him. But by operation of law, McCluskey will be sentenced to life imprisonment because a sentence of death must be unanimous. The jury did, nonetheless, unanimously find beyond a reasonable doubt that the government proved the aggravating factor of future dangerousness. Specifically, the jury found that McCluskey "poses a future danger to the lives and safety of other persons – that is, that the defendant is likely to commit criminal acts of

12

violence in the future that would constitute a continuing and serious threat to the lives and safety of others."[1]

Of particular note, in reaching its future dangerousness conclusion, the jury found that McCluskey has demonstrated a low potential for rehabilitation and represents an escape risk. Substantial evidence was presented by the defense at trial, primarily through former Warden Mark Bezy, that BOP could safely house McCluskey. Nonetheless, the jury still unanimously agreed that McCluskey is, in fact, likely to commit future violent acts in a high-security setting. It is also worth noting that not only does the PSR take notice of the fact that Defendant has at least three prior violent felony convictions that occurred on separate occasions, but that he also qualifies as an Armed Career Criminal, pursuant to U.S.S.G. § 4B1.4. PSR § 77.

Defendant's prior imprisonments were clearly insufficient to deter him from committing continued criminal acts. Indeed, although Defendant was 45 years old at the time of his escape from prison, he chose to commit grave criminal acts to further his objectives, which included the brutal, senseless murders of two innocent people.

CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court conclude that a sentence of Life plus 235 years would constitute an appropriate sentence and that no departures or variances are warranted.

---

[1] In making this finding, the jury unanimously answered "yes" to questions asking if the jury found that McCluskey: 1) has engaged in a continuing pattern of violence; 2) has demonstrated a low potential for rehabilitation; 3) has not expressed genuine remorse for killing Gary Haas and Linda Haas; 4) has demonstrated callous disregard for human life; and 5) represents an escape risk.

Respectfully submitted,
DAMON P. MARTINEZ
Acting United States Attorney

*Electronically Filed*

LINDA MOTT
Assistant United States Attorney
District of New Mexico
505-224-1444

MICHAEL S. WARBEL
Trial Attorney
Capital Case Section
DOJ Criminal Division
202-514-5605

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system which will send
notification to Defendant's attorneys,
and Probation Officer Sami Geurts (ABQ).

*Filed Electronically 5/13/2014*
LINDA MOTT
Assistant United States Attorney

14